# EXHIBIT "O"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **B.P., a Minor, by Dawn Fragnoli Individually as Parent and Next Friend,** ) | **Case No. 13-cv-324-DRH-SCW** |
| ) | |
| **J.B., a Minor, by Linda LeJeune Individually as Legal Custodian and Next Friend,** ) | **Case No. 13-cv-326-DRH-SCW** |
| ) | |
| ) | |
| **IN RE DEPAKOTE: RHEALYN ALEXANDER, et. al.,** ) | **Case No.  12-52-DRH-SCW** |
| ) | **LEAD CONSOLIDATED CASE** |
| ) | |
| **KENNETH HARRISON and CAROLYN HARRISON, Individually and as Parents and Natural Guardians of S.H., a Minor,** ) | **Case No. 13-cv-910-DRH-SCW** |
| ) | |
| ) | |
| ) | |
| **SHARI DUNDAS and TIMOTHY DUNDAS, Individually and as Parents and Natural Guardians of A.D., a Minor,** ) | **Case No. 13-cv-01005-DRH-SCW** |
| ) | |
| ) | |
| ) | |
| **JAMIE STABLES, Individually and as Parent and Natural Guardian of J.S., a Minor,** ) | **Case No. 13-cv-01031-DRH-SCW** |
| ) | |
| ) | |
| **GLORIA QUIROZ, Individually, and FRANCISCO QUIROZ, Individually, and as Parents and Natural Guardians of D.Q., a Minor,** ) | **Case No. 13-cv-01032-DRH-SCW** |
| ) | |
| ) | |
| ) | |
| ) | |
| **TIFFANY MAZE, Individually and as Parent and Natural Guardian of L.R., a Minor,** ) | **Case No. 13-cv-01034-DRH-SCW** |
| ) | |
| ) | |
| **PATRICIA DUNCAN, aka PATRICIA JIMENEZ and DAVID JIMENEZ, Individually and as Parents and Natural Guardians of W.J., a Minor,** ) | **Case No. 13-cv-01038-DRH-SCW** |
| ) | |
| ) | |
| ) | |
| ) | |
| **DAWN ROBINSON, Individually and as Mother and Natural Guardian of A.R., a Minor,** ) | **Case No. 13-cv-01040-DRH-SCW** |
| ) | |
| ) | |
| **AURORA CLAY, Individually and as Parent and Natural Guardian of J.C., a Minor,** ) | **Case No. 13-cv-010141-DRH-SCW** |
| ) | |
| ) | |
| **TAMMY TAFT AND ROGER TAFT, Individually and as Parents and Natural Guardians of M.T., a Minor,** ) | **Case No. 3:13-cv-01043-DRH-SCW** |
| ) | |
| ) | |
| ) | |

| | |
|---|---|
| **APRIL BRUMLEY, Individually and As Parent and Natural Guardian of T.B., a Minor,** ) | **Case No. 3-13-cv-01050-DRH-SCW** |
| ) | |
| **PATRICIA ENGLAND,** ) | **Case No. 3:13-cv-01306-DRH-SCW** |
| ) | |
| **LAURIE CAMPBELL, Individually and as Parent and Natural Guardian of M.H., a Minor,** ) | **Case No.: 3:13-cv-01345-DRH-SCW** |
| ) | |
| **PLAINTIFFS,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ABBOTT LABORATORIES, INC.,** ) | **JURY TRIAL DEMANDED** |
| ) | **ON ALL COUNTS** |
| **DEFENDANT.** ) | |
| ) | |

## DISCOVERY ISSUES FOR CONSIDERATION
## AT THE MARCH 27, 2014 DISCOVERY CONFERENCE

Plaintiffs respectfully submit the following issues for consideration at the March 27, 2014 Discovery Conference. These issues were discussed by the Parties during a telephone conference on March 24, 2014.

**A.      New Topics**

**126.      Abbott's Failure to Produce Relevant Policies and Procedures**

On March 7, 2014, Abbott produced five versions of the Standard Operating Procedure ("SOP") that governs "Promotional Labeling," which includes the product labeling in the Physicians' Desk Reference ("PDR").[1] Among the versions produced by Abbott are the versions enacted in 1993 and 1994, both of which cover the time period immediately before and during Chantele Bonner's pregnancy.

Abbott purported to produce these as relevant documents in advance of the 30(b)(6) deposition of Abbott representative Scott Anderson.[2] However, Mr. Anderson was the third corporate representative designated to talk about topics related to the marketing and promotion of Depakote.[3] It is somewhat perplexing that Abbott chose to produce these documents in relation to the last deposition of an Abbott representative, after the close of discovery.[4] Further,

---

[1] *See* Exhibit A, March 7, 2014 Correspondence; *see also* Exhibit B, SOPs produced at ABTILSD-A00034722 – A000034783.

[2] *Id.*

[3] *See* Exhibit C, Deposition Notice of Scott Anderson. *See also* Exhibit D, Deposition Notice of Michael Murray; Exhibit E, Deposition Notice of Mary Kay Rybicki.

[4] Discovery closed January 31, 2014 in *J.B. v. Abbott Laboratories, Inc.,* 13-cv-326. The deposition of Scott Anderson took place on March 13, 2014. Abbott initially declined to designate a representative for the 30(b)(6) topic *Footnote continued on next page.*

this SOP is a regulatory policy. As such, this SOP should have been produced in response to requests for production made earlier in the litigation or as part of requested custodial files of Abbott employees.

On December 6, 2013, per the Court's November 25, 2013 Order, Plaintiffs' sent a letter to Abbott's counsel with a list of issues/topics for which Abbott was to certify completion of production.[5] Issue No. 55 asked Abbott to certify completion of production of all SOPs "regarding pharmacovigilance, risk management, product safety and regulatory affairs from 1978 to present."[6] The SOP governing Promotional Labeling clearly falls within the scope of Issue No. 55 because the policy has an express regulatory purpose, scope, and application:

- Purpose: "To establish the necessary activities and responsibilities for developing, approving, and maintaining PPD Promotional Labeling in compliance with applicable sections of 21 Code of Federal Regulations and the Food, Drug, and Cosmetic Act."[7]

- Scope: "This covers all PPD advertising and promotional matter descriptive of a marekted product which falls within the regulatory definition of labeling and advertising."[8]

  - "An advertisement or promotional labeling piece is not satisfactory if it is false or misleading as defined in the Code of Federal Regulations with respect to … a) side effects, contraindications, or effectiveness … (h) containing a reference to literature or studies that misrepresent the safety or effectiveness of a product."[9]

- Policy: "Regulatory and medical will determine which product labeling changes will affect current promotional labeling."[10]

Documents responsive to Issue No. 55 were addressed at the June 6, 2013 Discovery Dispute Hearing and in the Court's June 14, 2013 Order.[11] Abbott stated it did not have any objection to producing such documents and stated that "its productions to date contained responsive documents and that it will undertake additional reasonable searches of relevant sources for additional responsive documents."[12] On December 13, 2013 Abbott certified that it had conducted a reasonable search and had produced any responsive documents.[13]

---

for which Mr. Anderson was designated. Per the Court's order, Mr. Anderson was designated for a date after the close of discovery.

[5] *See* Exhibit F, December 6, 2013 Letter from J Boundas to Abbott's Counsel Re Topics to Certify.

[6] *Id.* at p. 4.

[7] *See* Exhibit B, Promotional Labeling SOP enacted 12/06/1993, ABTILSD-A000034722 at I.

[8] *Id* at II.A.

[9] *Id.* at II.C.1.a and II.C.1.h

[10] *Id.* at III.E.1.

[11] *See* Exhibit G, Court's June 14, 2013 Order at 4.

[12] *See* Exhibit H, June 6, 2013 Joint Submission at 15; *see also* Exhibit G, Court's June 14, 2013 Order at 4.

[13] *See* Exhibit I, December 13, 2013 Letter from Abbott's Counsel Certifying Issues at 1.

Abbott should have also produced these SOPs as part of the custodial files of David Pizzutti and David Gofreddo.  Abbott agreed to produce the custodial file of David Pizzutti on July 11, 2013[14] and David Gofreddo on September 20, 2013.[15]  These individuals are listed on the SOP as the Director of Medical Affairs and Vice President of Pharmaceutical Marketing, respectively.  Despite this fact, Abbott informed Plaintiffs' that no responsive documents could be produced from either custodial file and as a result Abbott produced no documents at all for either of these Abbott employees.[16]

Plaintiffs are concerned that Abbott has a repository of SOPs or other responsive documents from the key time period relevant to this first bellwether case that it neglected to produce.  In particular, there has been much discussion in the discovery process relating to documents in existence at Abbott from the 1990s, as it is clear that Abbott has discarded many such documents.  For Abbott to now produce documents from the early 1990s raises the question of whether other responsive documents form this time frame exist.  Plaintiffs request that Abbott conduct a search and produce any responsive documents and certify that all responsive documents have been produced.

**Abbott's Response:**

Abbott's production of an SOP entitled "Promotional Labeling" was timely.  Abbott located this "Promotional Labeling" SOP in connection its efforts to identify a 30(b)(6) witness to address the following topic:  "Whether and how Abbott verified the accuracy of scientific and/or medical information contained in marketing, sales, informational, and/or promotional materials concerning Depakote" for the 1974 to 1996 time period.  It then produced four versions of this SOP in connection with the deposition of Scott Anderson, the 30(b)(6) witness who addressed this very specific topic.

Plaintiffs claim that this SOP should have been produced earlier in connection with the depositions of two other corporate representatives (Mike Murray and Mary Kay Rybicki) who were "designated to talk about topics related to the marketing and promotion of Depakote."  The topics about which these two witnesses testified, although related to the marketing and promotion of Depakote, did not relate to the subject matter of this SOP.  Specifically, the topic about which Ms. Rybicki testified was "communications with FDA regarding marketing, promotional or advertising materials for the VPA drugs" for the 1978 to 1996 time period.  The topics related to the marketing and promotion of Depakote about which Mr. Murray testified were "[m]aterials that were used to train Abbott sales representatives about VPA drugs," "[p]roduct information materials and marketing materials, whether intended for physicians or patients, concerning VPA drugs," and "[s]ales, expense, and budget information on the following: . . . expenses incurred for marketing and sales activities with regard to each of the VPA drugs" for the 1974 to 1996 time period.  Accordingly, any suggestion by plaintiffs that this SOP should have been produced in connection with those depositions is misplaced.

---

[14] *See* Exhibit J, July 11, 2013 Joint Submission at 5, 14.
[15] *See* Exhibit K, September 2013 Correspondence between D Sangiamo and H Novosad.
[16] *See* Exhibit L, October 3, 2013 Correspondence from D Sangiamo to J Boundas.

Moreover, plaintiffs' claim that this SOP is a "regulatory" SOP and that Abbott should have, therefore, produced it earlier in the litigation in connection with their request for SOPs "regarding pharmacovigilance, risk management, product safety and regulatory affairs from 1978 to the present" is incorrect.  First, the fact that this SOP contains references to the word "regulatory" does not mean that it relates to "regulatory affairs" or that it is a "regulatory" SOP. Accordingly, it does not fall within the scope of the documents previously requested by plaintiffs.  Second, consistent with the representations of Abbott cited above by plaintiffs, Abbott did conduct reasonable searches in order to identify documents responsive to plaintiffs' request for "regulatory affairs" SOPs.  It produced those documents on October 1, 2013.

Plaintiffs also claim, apparently because the names of David Pizzuti and David Goffredo appear on these documents, that Abbott should have produced this SOP as part of their custodial files.  This claim is simply without merit.  It is not the case that every time an individual's name appears on a document that document is located in that individual's files.  This is especially true when the document is 20 years old.   Accordingly, the fact that this SOP was not produced as part of the custodial files of Pizzuti and Goffredo is not surprising and does not mean that Abbott did not conduct a reasonable search of their files for responsive documents.

Further, it is simply not the case, as plaintiffs suggest, that "Abbott has a repository of SOPs or other responsive documents from the key time period relevant to this first bellwether case that it neglected to produce."  Abbott has conducted reasonable searches in an effort to identify the SOPs requested by plaintiffs in this litigation and has produced the responsive documents it has identified.

### 127.   Abbott's Failure to Respond to Plaintiff Kenneth Harrison, et al.'s Request for Production No. 30

On January 9, 2014, Plaintiffs represented by Burg Simpson in Case Nos. 13-cv-00910-DRH-SCW, 13-cv-01005-DRH-SCW, 13-cv-01031-DRH-SCW, 13-cv-01032-DRH-SCW, 13-cv-01034-DRH-SCW, 13-cv-01038-DRH-SCW, 13-cv-01040-DRH-SCW, 13-cv-01041-DRH-SCW, 13-cv-01043-DRH-SCW, 13-cv-01050-DRH-SCW, 13-cv-01306-DRH-SCW, and 13-cv-01345-DRH-SCW (collectively, the "Burg Simpson Cases") served Abbott with Requests for Production of Documents ("Harrison RFP").[17]  Harrison RFP No. 30 requested that Defendants "[p]roduce all documents analyzing, reviewing, studying or discussing the risk of autism, autism spectrum disorders, neuro-behavioral effects, or cognitive impairment among children exposed to valproate in utero."[18]  Abbott's response to Harrison RFP No. 30 was simply to reference the prior production "in the consolidated action pending in this Court."[19]  However, Abbott admits that it has not searched for documents responsive to this request as a part of the prior document production in the consolidated cases in Illinois.[20]  Specifically, counsel for Abbott has previously admitted that "the term 'autism' was not a specific search term requested by plaintiffs in the

---

[17] *See* Exhibit M, Pls'. First Req. for Doc. Produc., Case No. 13-cv-00910-DRH-SCW, et al., Jan. 9, 2014.
[18] *Id*.
[19] *See* Exhibit N, Def's. Resp. to Pl's. First Req. for Doc. Produc., Case No. 13-cv-00910-DRH-SCW, et al., Feb. 11, 2014.
[20] *See* Exhibit O, Nov. 6, 2013 Letter from J Rose to J Abaray, pp. 9-10.

Illinois consolidated litigation […]."[21]  Further, Defendants did not search the words cognitive, verbal or IQ, despite the fact that all of these terms have been used in reference to the developmental harm caused by this product.[22]  As such, no search specific to autism was conducted, and many other terms relevant to developmental delay were not searched as well. Therefore, documents responsive to Request 30 have only been produced if they also chanced to be relevant to other requests made by Plaintiffs in the Consolidated Cases.

Plaintiffs are entitled to documents responsive to Harrison RFP No. 30 on autism and behavioral disorders.  All the minor Plaintiffs in the Burg Simpson Cases filed to date and many of the Plaintiffs represented by other firms have diagnosed cognitive delays, neuro-behavioral impairments, and autism spectrum disorders.  Thus, despite the fact that Abbott acknowledges that no searches for the terms autism, cognitive, DD, NDD, IQ or verbal, by way of example, were conducted in the consolidated case (Case No. 12-cv-52-DRH-SCW), Abbott refuses to search for responsive documents.

On February 21, 2014, Plaintiffs contacted Abbott regarding its failure to provide documents responsive to Harrison RFP No. 30.[23]  The Parties have conferred on this issue, and on March 3, 2014, Abbott confirmed that it is unwilling to search for documents responsive to this request.[24]  During the Parties' March 24, 2014 meet and confer in preparation for the March 27, 2014 Discovery Hearing, counsel for Abbott indicated that Abbott believed that the discovery cutoff for all cases in the Southern District of Illinois ended on January 31, 2014.  In response to the particular request for Abbott to search for specific terms related to autism, counsel for Abbott stated that Abbott could only respond to Plaintiffs' request to run additional searches for documents in the context of the complete list of outstanding discovery requested by Plaintiffs.  Abbott would not commit to run a search for the documents requested by Plaintiffs, as it believes discovery ended on January 31, 2014.

Plaintiffs respectfully request that the Court order Abbott to (1) provide a meaningful response to Harrison RFP No. 30; (2) run searches for the specific terms addressing this issue, to be determined during a meet and confer with Defendants; and (3) produce all responsive, non-privileged documents resulting from the search in (2) no later than April 11, 2014.

**Abbott's Response:**

Plaintiffs in these cases identified search terms for Abbott's productions and Abbott has used the terms requested by plaintiffs.  Burg Simpson began filing cases in this Court on or about September 3, 2013, five months before the January 31, 2014 discovery cut-off.  That firm has had the benefit of the Abbott document production and has been very active in the deposition discovery, taking the lead in three Abbott depositions and actively participating in others.

---

[21] *Id.*
[22] Defendants stated they searched only the terms "development*" "delay*" "impair*" "defect" and "retard*." While these searches would provide some responsive documents, many others would be overlooked.  *Id.*
[23] *See* Exhibit P, Feb. 21, 2014 Email from J Abaray to D Sangiamo.
[24] *See* Exhibit Q, March 3, 2014 Email from D Sangiamo to J Abaray.

On September 19, 2013, plaintiffs raised their concern about the absence of "autism" as a search term in the case they filed in Cincinnati.  In its response, Abbott noted the absence of an autism diagnosis in that case, but also pointed out that the terms "development," "delay," "impair," "defect," and "retard" were search terms requested by plaintiffs in the Illinois consolidated litigation and used in Abbott's searches for responsive documents.  Abbott also informed plaintiffs' counsel that a simple word search for the term "autism" run against the population of produced documents revealed that over 20,000 documents discussing autism had been produced.  In the ensuing months, plaintiffs made no attempt to raise that concern in this Court.  In fact, plaintiffs did not even file a document request here seeking such documents until January 9, 2014, with less than 30 days remaining in the fact discovery period.  Moreover, plaintiffs did not raise the issue in discovery dispute conferences in the Cincinnati case until March 17, 2014, when the Court there denied plaintiffs' request to have additional searches run.

As noted above, Abbott's production has included a substantial quantity of documents involving autism simply by virtue of the search terms plaintiffs had requested.  Under all of the circumstances, including the timing of plaintiffs' request, Abbott does not believe that it should be required to re-do prior searches.  Abbott also believes it would be entirely inappropriate simply to disregard the January 31, 2014 cut-off, which is why it has asked for additional specifics about the scope of what plaintiffs have in mind with their interpretation of that deadline.

### 128.  <u>Abbott's Failure to Respond on Various Discovery Issues in the Burg Simpson Cases</u>

Counsel in the Burg Simpson Cases has requested deposition dates of several Abbott witnesses with no response from Abbott.  Similarly, counsel in the Burg Simpson Cases has requested certain documents necessary to prepare for depositions with no response from Abbott.

### A.    **Request for the Depositions of Jeff Baker**

On January 31, 2014, counsel in the Burg Simpson Cases requested the deposition of Jeff Baker.[25]  Counsel in the Burg Simpson Cases sent Abbott a follow-up email on February 19, 2014, again requesting dates for Mr. Baker.  Counsel for Abbott responded that Abbott would provide an update on Abbott's attempts to contact Mr. Baker on February 21, 2014.[26]  To date, Abbott has failed to confirm whether it will or will not produce Mr. Baker for deposition.

During the Parties' March 24, 2014 meet and confer, counsel for Abbott stated that Abbott has been unable to contact Mr. Baker, a former employee, and requested additional time to contact him.  In response to Plaintiffs' request for Mr. Baker's last known contact information to find Mr. Baker themselves, counsel for Abbott requested additional time to continue their efforts to find Mr. Baker.

---

[25] *See* Exhibit R, Pls'. Notice of Deposition of Jeff Baker and Cross Notice of Deposition for Jeff Baker, January 31, 2014.

[26] *Id.*

During the Parties' March 24, 2014 meet and confer, counsel for Abbott questioned why this issue was being addressed in the context of the Illinois litigation, as counsel in the Burg Simpson Cases requested the deposition of Mr. Baker in the context of the *Rheinfrank* matter pending in the Southern District of Ohio.  However, just as Plaintiffs' counsel did with the deposition notice of Mark Mularski, Plaintiffs' counsel cross-noticed the deposition of Mr. Baker in their cases pending in Illinois.  Therefore, the issue is ripe for decision in this forum.

Plaintiffs respectfully request that the Court require Abbott, if it is able to contact Mr. Baker, to confirm Jeff Baker's availability by April 2, 2014.  If Abbott fails to confirm Jeff Baker's availability, then this Court should prohibit Abbott from representing Jeff Baker at his deposition.  Further, if Abbott is unable to find Mr. Baker by Monday, March 31, 2014, Abbott should provide Plaintiffs with Mr. Baker's last known address, email address, phone number, and other pertinent contact information.

**Abbott's Response:**

The deposition of Jeff Baker was requested and noticed in a case filed by the Burg Simpson firm in Cincinnati.  For whatever reason, plaintiffs have apparently decided that they do not want to seek the relief they are requesting in the Court in which they have noticed the deposition.  Plaintiffs may have cross-noticed the Baker deposition into this Court, but to place issues concerning the deposition before this Court for adjudication on the basis of that cross-notice would be like the tail wagging the dog.  As noted elsewhere in this submission, Abbott believes that, if there is to be additional discovery of Abbott in this Court notwithstanding the January 31, 2014 fact discovery cut-off, parameters for that discovery should be established.

Based on its belief that Dr. Baker's deposition was being sought in the Cincinnati case, Abbott has been attempting to contact Dr. Baker, who is a former employee, but has so far been unsuccessful.  Abbott has been keeping Burg Simpson apprised of these efforts throughout.  During the March 24, 2014 meet-and-confer, counsel for Abbott said that Abbott would continue to try to reach Dr. Baker and update plaintiffs on the status of its efforts.  Although Abbott agrees to use its best efforts to provide plaintiffs' counsel with a date for the deposition of Dr. Baker by April 2, 2014, if for some reason it is unable to do so, it does not believe that the Court should prohibit Abbott from representing Dr. Baker at any deposition of him that may occur.  Such an extraordinary step of interfering with a witness' ability to obtain counsel would seem, at a minimum, to be worthy of briefing.  In addition, that issue is more properly brought before the Cincinnati court rather than here.

Finally, Abbott notes that if in fact the deposition of Dr. Baker should now be deemed to be proceeding in this jurisdiction, then the availability and timing of that deposition should be determined in the context of an overall schedule for whatever additional discovery of Abbott, if any, is to take place.

**B.     Request for the Deposition of Jeanne Fox**

On February 21, 2014, counsel in the Burg Simpson Cases requested the deposition of Jeanne Fox.[27]  Counsel for Abbott did not respond to Plaintiffs' request.  During the Parties' March 24, 2014 meet and confer, counsel for Abbott stated that he believes Ms. Fox is a current employee, but he did not have any information to provide with respect to Ms. Fox's availability for deposition.

During the Parties' March 24, 2014 meet and confer, counsel for Abbott questioned why this issue was being addressed in the context of the Illinois litigation, as counsel in the Burg Simpson cases first requested the deposition of Ms. Fox in the context of the *Rheinfrank* matter pending in the Southern District of Ohio.  However, just as Plaintiffs' counsel did with the deposition notice of Mark Mularski and Jeff Baker, Plaintiffs' counsel intend to cross-notice the deposition of Ms. Fox in their cases pending in Illinois.  Therefore, this issue is ripe for decision in this forum.

Plaintiffs respectfully request that the Court require Abbott to confirm Jeanne Fox's availability by April 2, 2014.  If Abbott fails to confirm Jeanne Fox's availability, then this Court should prohibit Abbott from representing Jeanne Fox at her deposition.  Further, Abbott should provide Plaintiffs with Jeanne Fox's last known address, email address, phone number, and other pertinent contact information.

**Abbott's Response:**

Abbott understood the deposition of Jeanne Fox to have been requested in a case filed by the Burg Simpson firm in Cincinnati.  In fact, based on subsequent discussions among counsel, it was not clear to Abbott the plaintiffs intended to pursue that deposition, although plaintiffs have now made clear that they do.

Based on its belief that Ms. Fox's deposition was being sought in the Cincinnati case, Abbott is attempting to obtain a date for her deposition.  During the March 24, 2014 meet-and-confer, counsel for Abbott informed plaintiffs' counsel that he hoped to be able to provide a date for the deposition of Ms. Fox by the end of this week.  Although Abbott agrees to use its best efforts to provide plaintiffs' counsel with a date for the deposition of Ms. Fox by April 2, 2014, if for some reason it is unable to do so, it does not believe that the Court should prohibit Abbott from representing this current employee at any deposition of her that may occur.  Such an extraordinary step of interfering with a current employee being represented by company counsel would seem, at a minimum, to be worthy of briefing.  In addition, that issue is more properly brought before the Cincinnati court rather than here.

Finally, Abbott notes that if in fact the deposition of Ms. Fox should now be deemed to be proceeding in this jurisdiction, then the availability and timing of that deposition should be determined in the context of an overall schedule for whatever additional discovery of Abbott, if any, is to take place.

---

[27] *See* Exhibit S, Email Chain between J Abaray and D Sangiamo dated February 20-21, 2014.

### C.        Request for the Deposition of Mark Mularski

On March 17, 2014, counsel in the Burg Simpson Cases requested the deposition of Mark Mularski.[28]  Counsel for Abbott did not respond to Plaintiffs' request, forcing counsel in the Burg Simpson Cases to unilaterally notice Mr. Mularski's deposition.[29]  Plaintiffs' counsel noticed Mr. Mularksi's deposition in the *Rheinfrank* matter pending in the Southern District of Ohio, and cross noticed Mr. Mularski's deposition in their cases pending in Illinois.

During the Parties' March 24, 2014 meet and confer, counsel for Abbott stated that Mr. Mularski, a current Abbott employee, was out of the office until Monday, March 31, 2014 and that they were unable to provide a date for his deposition at this time.  Counsel for Abbott stated that he hoped to be able to provide a date for Mr. Mularski's deposition by Monday or Tuesday of next week.

Plaintiffs respectfully request that the Court require Abbott to confirm Mark Mularski's availability by April 2, 2014.  If Abbott fails to confirm Mark Mularski's availability, then this Court should prohibit Abbott from representing Mark Mularski at his deposition.  Further, Abbott should provide Plaintiffs with Mark Mularski's last address, email address, phone number, and other pertinent contact information.

### Abbott's Response:

The same general comments above regarding the Baker and Fox depositions apply here. Similarly, based on its belief that Mr. Mularski's deposition was being sought in the Cincinnati case, Abbott has been attempting to obtain a date for his deposition.  During the March 24, 2014 meet-and-confer, counsel for Abbott informed plaintiffs' counsel that Mr. Mularski is out of the office until Monday, March 31, 2014 and that he hoped to obtain an available date for Mr. Mularski's deposition upon his return to the office—early next week.  Although Abbott agrees to use its best efforts to provide plaintiffs' counsel with a date for the deposition of Mr. Mularski by April 2, 2014, if for some reason it is unable to do so, it does not believe that the Court should prohibit Abbott from representing this current employee at any deposition of him that may occur. Such an extraordinary step of interfering with a current employee being represented by company counsel would seem, at a minimum, to be worthy of briefing.  In addition, that issue is more properly brought before the Cincinnati court rather than here.

Finally, Abbott notes that if in fact the deposition of Mr. Mularski should now be deemed to be proceeding in this jurisdiction, then the timing of that deposition should be determined in the context of an overall schedule for whatever additional discovery of Abbott, if any, is to take place.

---

[28] *See* Exhibit T, Pls'. Notice of Deposition for Mark Mularski, March 17, 2014; Exhibit U, Cross Notice of Deposition for Mark Mularski.
[29] *See* Exhibit V, March 18, 2014 Letter from J Abaray to D Ball and enclosed Notice of Deposition and Cross-Notice of Deposition.

### D.      Request for Certain Abbott Documents to be Produced as Native Files

Abbott's document production includes data analysis on adverse events and other information presented in Excel spreadsheets and/or other databases.  Unfortunately, certain documents related to analysis of developmental delay and other neurological disorders were not produced in native format, but rather as PDFs consisting of thousands of pages and hundreds of columns of data.[30]  Consecutive pages of the spreadsheet do not even appear together in the PDF. On March 10, 2014, counsel in the Burg Simpson Cases requested that Abbott produce seven such documents in native format.[31]  Plaintiffs requested the production of these documents in native format as quickly as possible due to upcoming depositions.[32]  Counsel for Abbott did not respond to Plaintiffs' request.  Plaintiffs followed up and indicated that the deposition of Mr. Tresley would be continued in progress due to the failure to provide these documents in advance of the deposition.[33]  Counsel for Abbott responded that the images had been produced in TIFF format and that Abbott would not agree to keep the deposition open on the basis that Abbott had not produced native files.[34]

During the Parties' March 24, 2014 meet and confer, counsel for Plaintiffs stated that producing the adverse events spreadsheets and databases in TIFF images makes the documents virtually unusable.  For example, the Excel spreadsheet of adverse event data contains 51 columns of data and in order to get the complete data in one row you have to search through hundreds of pages of TIFF images to find the data for one row and then paste together multiple pages of documents just to finish the data in one row of the spreadsheet.  In response, counsel for Abbott stated that the reason the documents were produced in TIFF images, rather than native format, was that the current ESI protocol states that documents requiring redactions are required to be produced as TIFF images rather than in the native format.  Counsel for Abbott stated he was reluctant to deviate from the ESI protocol in place.  Counsel in the Burg Simpson Cases did not participate in drafting ESI protocol.  While Plaintiffs understand that the production of a native Excel spreadsheet is difficult when that spreadsheet should contain redactions, Plaintiffs believe that there are manners in which the Parties can agree that these documents can be produced and protected and exceptions to the ESI protocol should be made when the documents become unusable.  Plaintiffs respectfully request that the Court require Defendants to provide the native format files and re-produce Dr. Tresley for deposition to permit inquiry into these documents.

### Abbott's Response:

As noted during the March 24, 2014 meet-and-confer, Abbott produced the 7 documents (consisting of 13 separate excel spreadsheets) identified by plaintiffs pursuant to the ESI Protocol which was agreed to by the parties after extensive negotiations.  In accordance with the ESI Protocol, documents requiring redactions are to be produced as TIFF images rather than in

---

[30] *See e.g.*, Exhibit W, ABTILSD001255523-27; ABTILSD001255587-92.

[31] *See* Exhibit X, March 10, 2014 Email from J Abaray to D Sangiamo.

[32] *Id.*

[33] *See* Exhibit Y, Email Chain between J Abaray and D Sangiamo dated March 19, 2014.

[34] *Id.*

native format.  The documents identified by plaintiffs were redacted and, therefore, produced as TIFF.  Thus, Abbott produced them in exactly the manner in which it was supposed to.

Now, after the close of fact discovery in this Court – and more than a year after most of the documents were produced – plaintiffs are requesting that Abbott be ordered to produce these documents in a different format.  Having investigated the issue, it appears that Abbott would have to go into the documents in their native format, delete information from them on a manual basis, and insert a "REDACTED" designation.  Although this is one method that could have been used, it is not the method to which the parties agreed.  To perform that function at this point would be time-consuming, especially in light of the risk that plaintiffs will seek to require Abbott to perform this exercise on additional documents in the future.  Abbott does not believe that this is appropriate.

Abbott also believes that the relief being sought in connection with the deposition of Dr. Richard Tresley should be denied.  First, Dr. Tresley's deposition was noticed – and agreed to by Abbott – in the Cincinnati case referred to above.  If plaintiffs want relief in connection with the deposition, they should seek it in that Court.  Indeed, the parties were before that Court on Monday, March 17, 2014, for a hearing on their respective complaints about the other side's discovery responses.  For reasons of their own choosing, plaintiffs opted not to bring the issue up to that Court, even though that is the Court in which the deposition was noticed.  Had they done so, and had they obtained the relief they seek, they could have had the documents in time for the deposition of Dr. Tresley, which took place on March 25, 2014.

Moreover, plaintiffs could have sought to postpone the deposition of Dr. Tresley until this issue was resolved.  Instead, they decided to proceed.  Plaintiffs were within their rights to do so, but they should not now be heard to complain of the consequences of their affirmative decision, especially since Abbott clearly put plaintiffs on notice that it disagreed with plaintiffs' position that they should be entitled to additional questioning if the documents were ordered to be produced in native.

Dr. Tresley is a former employee who missed time from work and appeared willingly for his deposition, without even the need for a subpoena.  He should not be subjected to sitting for an additional deposition under these circumstances.

### 129.   Abbott's Failure to Produce a Corporate Deposition Witnesses

Plaintiffs contacted Abbott in February about designating 30(b)(6) witnesses to speak on several topics that have not yet been addressed in previous 30(b)(6) depositions.[35]  This request was made primarily in connection with *Dotegowski, et al., v. Abbott Laboratories, Inc.*, CGC-10-506794, a related case pending before the Superior Court of the State of California, San Francisco County. However, the deposition(s) also is sought and will be cross-noticed in the consolidated cases pending before this Court (12-cv-52-DRH-SCW) as has been done with all 30(b)(6) depositions to date.

---

[35] *See* Exhibit Z, Email from S Brahmbhatt to Abbott's Counsel.

Plaintiffs subsequently served Abbott with a general notice on February 27, 2014 asking Abbott to designate a witness to speak on the following topics, topics that are applicable to the cases pending in this litigation Sales, marketing, and promotional activities related to Depakote's psychiatric uses during the 1990 through 2003 time period.

- Regulatory affairs and product labeling during the time period January 1, 1995 through January 1, 2000. This includes, the authentication of labels, internal deliberations regarding the label, Abbott's interpretation of the label, and the submission of Dear Doctor Letters.

To date, Abbott has not provided deposition dates, and Plaintiffs respectfully request that the Court order Abbott to do so.

**Abbott Response:**

Just to be unmistakably clear, the deposition notice at issue was for the Dotegowski case in California and, until the meet-and-confer in the instant cases on March 24, 2014, the notion of it being a deposition for the instant cases was never raised by plaintiffs.  In addition to the fact that the caption of the deposition notice (attached hereto by plaintiffs at "Exhibit Z") shows only the Dotegowski case and the fact that communications about it have been by the lawyers handling discovery disputes in that case, the most obvious indicator of it being a Dotegowski deposition is that the second of the three topics in the notice relates exclusively to Dr. Eliot Kaplan, the physician who allegedly provided samples of Depakote to Ms. Dotegowski:

> The identity of and information in Abbott's possession relating to sales representatives or district of regional managers who had responsibility for any territory that covered the location of Dr. Eliot Kaplan, from January 1, 1995 to January 1, 2000, as well as the existence and maintenance of documents relating to the Depakote-related activities of any such persons (including custodial files, records of call notes or physician communications, or records of samples distributed).

Plaintiffs state above that "Abbott has not provided deposition dates," and, during the March 24 meet-and-confer, they stated that Abbott had not discussed this notice with them.  To the contrary, on March 6, 2014, the parties had a Dotegowski meet-and-confer during which the parties discussed this deposition notice, along with Abbott's complaints with plaintiffs' discovery responses, scheduling the depositions of Ms. Dotegowski's treating physicians and family members, and the Dotegowski fact discovery cut-off.   During that meet-and-confer session, Abbott indicated that much of topic A of the notice had already been covered by previous corporate representative depositions that plaintiffs had cross-noticed into Dotegowski and that discussion of what was left of that topic should be deferred until after the deposition of Dr. Kaplan (now set for April 12) in order to see if the topic was even relevant; that it would produce a witness for topic B of the notice; and that, for various reasons specific to the facts of the Dotegowski case, it was not appropriate to produce a witness for topic C.

13

In the three weeks since that meet-and-confer, plaintiffs have elected not to seek relief from the Honorable Curtis Karnow—the San Francisco Superior Court judge to whom the <u>Dotegowski</u> case has been assigned to adjudicate this <u>Dotegowski</u> discovery dispute and instead have brought the notice to the attention of this Court. As noted elsewhere in this submission, if there is to be company discovery of Abbott after the January 31, 2014 discovery cut-off, that discovery should be subject to certain parameters and limitations, including issues concerning timing in light of all of the activity associated with the upcoming bellwether trial. Abbott respectfully submits that any ruling that this Court makes about the <u>Dotegowski</u> deposition notice should be subject to those parameters.

### 130.   <u>Ongoing Discovery in the B.P. and Non-Bellwether Cases</u>

Abbott apparently wants to foreclose further discovery on the merits for hundreds of Plaintiffs relating to a host of issues not covered in the bellwether cases. During the Parties' March 24, 2014 meet and confer in preparation for the March 27, 2014 Discovery Hearing, counsel for Abbott indicated that Abbott "believed" that the discovery cutoff for **all cases** filed in the Southern District of Illinois ended on January 31, 2014.

While Plaintiffs agree that a significant amount of discovery has been completed in the bellwether cases and that the Parties will have the benefit of that discovery for some of the other pending cases, discovery is in no way complete with respect to non-bellwether cases. As of this date, as agreed by the Parties at the inception of the selection of the bellwether cases, discovery has been focused predominantly on issues associated with the Plaintiff B.P. & Plaintiff J.B. actions, whose mothers took Depakote to treat epilepsy in the mid-1990's. Discovery from Abbott has been limited in scope and has not included, for example, label and marketing issues relevant to many of the cases before this Court.

There will be relevant liability and damages issues that will need to be discovered by the Plaintiffs for the non-bellwether cases. As cases pending in this Court include many issues relevant to liability for many of the Plaintiffs, it would be impossible for Plaintiffs to in fact proceed to trial in many of the pending cases absent further liability and damages discovery. Plaintiffs have no interest in redundant or duplicative discovery, but clearly, Plaintiffs will need, at a minimum: (1) Rule 30(b)(6) witness depositions beyond the time period in the bellwether cases; (2) additional Rule 30(b)(6) depositions not requested in the bellwether cases; (3) fact witness depositions not requested in the bellwether cases; (4) additional document production tailored to the non-bellwether cases or otherwise not already requested or produced; (5) documents still to be produced with respect to marketing SOPs referenced in Issue No. 126 discussed above; and (6) documents still to be produced with respect to issues such as the autism search referenced in Issue No. 127 above.

### Abbott Response:

On the evening of March 24, for the first time, plaintiffs raised this issue with no explanation beyond their desire to discuss "ongoing discovery in non-bellwether cases." Abbott reminded plaintiffs that document production, at their request and over Abbott's objection, had been unlimited in scope, both in terms of subject matter and time frame, and that written

discovery, at plaintiffs' insistence, had been completed in a very tight time frame.  Multiple witnesses also have been deposed with no restriction in terms of subject matter or time frame.

In view of this history, on March 24, 2014, Abbott asked plaintiffs to specify the nature of the additional discovery they sought so that Abbott could determine its position.  Plaintiffs did not specify their desired discovery during the March 24 conference and have given only general categories in this submission.

Abbott is prepared to discuss the scope and timing of additional discovery, particularly as regards depositions, if plaintiffs will make specific requests.

Abbott wishes to raise one further point. Plaintiffs have entitled this issue "130.  <u>Ongoing Discovery in the B.P. and Non-Bellwether Cases</u>."  Plaintiffs' agenda for the March 24, 2014 meet-and-confer made no reference to B.P.'s case and that case was not discussed during the parties' conference.  Plaintiffs' submission makes no reference to B.P.'s case.  Like the J.B. case, the B.P. case involves a pre-1996 pregnancy and a Depakote prescription for epilepsy. Abbott believes all discovery in B.P.'s case was to be completed by January 31, 2014, with the exception of expert disclosures and depositions which the parties agreed, with court approval, would be scheduled in connection with the selection of the trial date.  Accordingly, Abbott does not believe any additional discovery is warranted in B.P.'s case.

### B.    Case Coordination and/or Consolidation

Plaintiffs would like to discuss the specifics of the case consolidation order and proposals for case management as additional cases are filed.

**Abbott Response:**

Because plaintiffs have not previously raised this topic with Abbott, Abbott does not know what, specifically, plaintiffs would like to discuss.  As such, Abbott cannot provide its position at this time.

## 131:  Jury Selection

The parties wish to resume their discussions with the Court regarding the procedure for jury questionnaires and jury selection.

Respectfully submitted,

_____/s/ Christopher Cueto_____

Christopher Cueto, #06192248
Michael Gras, #06303414
LAW OFFICE OF CHRISTOPHER CUETO, LTD.
7110 West Main Street

Belleville, IL 62223
Phone: (618) 277-1554
Fax: (618) 277-0962

Ralph D. McBride
Tony L. Visage
Phillip L. Sampson, Jr.
Heath A. Novosad
Blair R. Loocke
Nancy R. McEvily
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 223-2300
Fax: (713) 221-1212

Jennifer M. Salim
BRACEWELL & GIULIANI LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Phone: (214) 468-3800
Fax: (214) 468-3888

John E. Williams, Jr.
John T. Boundas
Steven J. Kherkher
Sejal K. Brahmbhatt
WILLIAMS KHERKHER HART BOUNDAS, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200
Fax: (713) 643-6226

William M. Audet
Joshua C. Ezrin
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Phone: (415) 568-2555
Fax: (415) 568-2556

Jeff Meyer
THE MEYER LAW FIRM, P.C.
6363 Woodway Drive, Suite 720
Houston, Texas 77057
Phone: (713) 974-4100

Fax: (713) 974-0225
Kenneth T. Fibich
Erin Copeland
FIBICH HAMPTON LEEBRON BRIGGS &
JOSEPHSON, LLP
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 751-0025
Fax: (713) 751-0030

Robert L. Salim
SALIM-BEASLEY, LLC
1901 Texas Street
Natchitoches, Louisiana 71457
Phone: (318) 352-5999
Fax: (318) 352-5998

Kathryn Harrington
Mark Ekonen
Amanda S. Williamson
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
P. O. Box 11310
Birmingham, Alabama 35202
Phone: (205) 326-3336
Fax: (205) 326-3332

George Erick Rosemond
ROSEMOND LAW GROUP, PC
8441 Gulf Freeway
Suite 600
Houston, TX 77017
Phone: (713) 230-2342
Fax: (713) 649-3470

**ATTORNEYS FOR PLAINTIFFS IN
CASE NOS. 12-CV-52-DRH-SCW, 13-CV-
324-SCW, AND 13-CV-326-SCW**


AND

/s/ *Janet G. Abaray (with consent)*
_____
Janet G. Abaray
**BURG SIMPSON
ELDREDGE HERSH & JARDINE, P.C.**

17

312 Walnut Street, Suite 2090
Cincinnati, OH 45202
Phone: (513) 852-5600
Fax: (513) 852-5611
E-mail: jabaray@burgsimpson.com

**ATTORNEY FOR PLAINTIFFS IN
CASE NOS. 13-CV-00910-DRH-SCW, 13-
CV-01005-DRH-SCW, 13-CV-01031-
DRH-SCW, 13-CV-01032-DRH-SCW, 13-
CV-01034-DRH-SCW, 13-CV-01038-
DRH-SCW, 13-CV-01040-DRH-SCW, 13-
CV-01041-DRH-SCW, 13-CV-01043-
DRH-SCW, 13-CV-01050-DRH-SCW, 13-
CV-01306-DRH-SCW, AND 13-CV-01345-
DRH-SCW**


AND


BRYAN CAVE LLP

By: /s/ Dan H. Ball (with permission)
    Dan H. Ball
    dhball@bryancave.com
    Peter W. Herzog III
    pwherzog@bryancave.com
    Stefan A. Mallen
    samallen@bryancave.com
    211 North Broadway, Suite 3600
    St. Louis, MO  63102
    (314) 259-2000 (telephone)
    (314) 259-2020 (facsimile)

    Paul F. Strain
    Stephen E. Marshall
    Dino Sangiamo
    VENABLE LLP
    750 East Pratt Street, Suite 900
    Baltimore, MD  21202
    (410) 244-7400

    **ATTORNEYS FOR ABBOTT
    LABORATORIES, INC.**

# EXHIBIT "A"



750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

Dino S. Sangiamo
**T** 410-244-7679
**F** 410-244-7742
dssangiamo@venable.com

March 6, 2014

**VIA EMAIL**

John T. Boundas, Esquire
Williams Kherkher
8441 Gulf Freeway, Suite 600
Houston, Texas  77017-5051

Jay H. Henderson, Esquire
Jay Henderson, PLLC
5020 Montrose Boulevard, Suite 300
Houston, Texas  77006

Heath A. Novosad, Esquire
Bracewell & Giuliani
Pennzoil Place, South Tower
711 Louisiana Street, Suite 2300
Houston, Texas  77002-2770

Re:   **In Re Depakote Cases (Bonner, LeJeune)**
     **United States District Court for the Southern District of Illinois**
     **Case Nos. 13-cv-324-SCW and 13-cv-326-SCW**

Dear Counsel:

      Enclosed please find Defendant Abbott Laboratories Inc.'s eighty-seventh production of documents in the above referenced Illinois cases.  This production, which we are making in connection with the upcoming deposition of Scott Anderson, consists of promotional labeling SOPs for the time period prior to 1996.  The bates range for this production is ABTILSD-A000034722 through ABTILSD-A000034783.

      Abbott's enclosed production is subject to the terms of the Protective Order entered on April 22, 2013 in the above-referenced cases.

      If you have any problem accessing the documents, please let me know.

      Sincerely,

      Dino S. Sangiamo

Enclosure
#7739056v1

# EXHIBIT "B"



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                              **PAGE 1**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

**TITLE**  PROMOTIONAL LABELING

**REFERENCE DOCUMENTS**

N/A

**DISTRIBUTION**

AP16, NC, API, PD, D-443, D-553, D-491

|  | **WRITTEN BY** | **DIR., REG. AFFAIRS** | **DIR., PROF. COMM.** |
|---|---|---|---|
| **NAME:** | M. SILVERBERG | R. CATHERALL/AKH | D. DAVID/JJ |
| **DATE:** | 12/03/1993 | 12/03/1993 | 12/03/1993 |
|  | **DIR., MED. AFFAIRS** | **VP PHARM. MKTG.** | **EDITOR, STDS.&SPECS.** |
| **NAME:** | D. PIZZUTI/JH | D. GOFFREDO/JJ | N. MERTINS |
| **DATE:** | 12/03/1993 | 12/03/1993 | 12/06/1993 |
|  | **VP, QA & RA** |  |  |
| **NAME:** | L. WYATT |  |  |
| **DATE:** | 12/06/1993 |  |  |

**ATTACHMENTS**

A-0, B-0

**APPLICABLE DOCUMENTS**

N/A

I.  <u>PURPOSE</u>

To establish the necessary activities and responsibilities for developing, approving, and maintaining PPD Promotional Labeling in compliance with applicable sections of 21 Code of Federal Regulations and the Food, Drug and Cosmetic Act.

II.  <u>SCOPE</u>

A.  This policy covers all PPD advertising and promotional matter descriptive of a marketed product which falls within the regulatory definition of labeling or advertising.  This policy will provide methods by which promotional labeling or advertising will be developed and approved prior to final printing and the necessary distribution, storage and inventory control requirements assuring that unapproved or obsolete promotional labeling is not distributed.

CONFIDENTIAL                                    ABTILSD-A000034722



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                   PAGE 2

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

II.   A.   (Continued)

This policy does not pertain to sales training materials.

B.   Advertising and promotional items include, but are not limited to, copy and visuals for brochures, sales aids, in-service materials, journal advertising, broadcast advertising, patient education materials, consumer promotional materials, published reprints, group promotional programs (e.g. CET, CEP, etc.), teleconference programs, press materials, premiums, and direct mail items.  This also includes product related copy on reminder items.

Advertisements and promotional labeling as defined in 21CFR Section 202.1(1) (1) and (2) will apply here.

Section 202.1(1) (1):  "Advertisements subject to section 502(n) of the act include advertisements in published journals, magazines, other periodicals, and newspapers, and advertisements broadcast through media such as radio, television, and telephone communication systems."

Section 202.1(1) (2):  "Brochures, booklets, mailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio or visual matter descriptive of a drug and references published (for example the "Physicians Desk Reference") for use by Medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act".

C.   Consideration of Intent:

1.   An advertisement or promotional labeling piece is not satisfactory if it is false or misleading as defined in the Code of Federal Regulations with respect to the following examples (which are not all inclusive):

a.   Side effects, contraindications, or effectiveness.

b.   Fair balance between information relating to side effects and contraindications and information relating to effectiveness.

c.   Failing to reveal facts in the light of consequence from use.

CONFIDENTIAL



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                         PAGE 3

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

II.   C.   1.   (Continued)

    d.   Containing a representation or suggestion, not approved or permitted in the labeling.

    e.   Containing a product comparison that represents or suggests that a product is safer or more effective than another product.

    f.   Containing favorable information or opinions that have been rendered invalid.

    g.   Presenting information from a study in a way that implies greater experience than actually does.

    h.   Containing reference to literature or studies that misrepresent the degree of safety and/or effectiveness of a product.

    i.   Using a statement by a recognized authority that is favorable but is inconsistent with other data.

    j.   Using quote or paraphrase out of context to convey false or misleading idea.

    k.   Using literature or reference that intend to support a claim but do not.

    l.   Using literature or references recommending conditions of use that are not approved in the labeling.

III.   POLICY

    A.   Development and Approval

        1.   At the inception or reprinting of promotional labeling or advertising, Marketing (Creative Services Department) shall assign a commodity number and complete a review and approval form (copy attached, Attachment A, yellow form) for initial review.

        2.   Each piece of promotional labeling or advertising of a program requires a separate routing form and should as a rule be routed together as a packet with companion pieces for review.

CONFIDENTIAL

ABTILSD-A000034724



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                                    PAGE 4

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.    A.    (Continued)

3.    On a scheduled basis, Marketing (Creative Services) distributes promotional labeling or advertising for review by Medical and Regulatory.  This material, to be reviewed for the first time, will include copies of all new references cited in the piece. All materials are formally discussed and approved within a meeting format attended by Medical, Regulatory, Marketing Product Management and Creative Services; though such material can be routed sequentially for review or approval, if desired.  The prescribed sequence for routing is:  Creative Services, Product Management, Medical and Regulatory.

   NOTE:    Business reply cards that offer product samples are additionally distributed for review and approval to Corporate Legal, Corporate Regulatory, and PPD Sales Services for review.

4.    Creative Services is responsible for developing the meeting agenda and chairing the meeting.  All promotional labeling and advertising items on the agenda are reviewed and changes are made on the master copy which is then signed and dated by Marketing (Product Management), Medical and Regulatory.  Marketing (Creative Services) keeps the original copy in their files.

5.    Following initial approval of copy/layout (yellow form), a second approval is required upon completion of the mechanical artwork production phase, and implementation of changes from initially approved copy.  Mechanical stats are distributed to Medical, Regulatory, and QA (Label Control) for review.  A pink form (Review and Approval for Final Circulation) is attached.  All three-dimensional pieces should have booked-up dimensional stats in final size distributed to Medical, Regulatory and QA. Mechanical stat review follows the same approval procedure as that of copy/layout for initial review (yellow form).  Where the initial copy was prepared as final art via computer design, the pink form may be used.  Reviewers may require a yellow form and a second review and approval.

6.    Following final approval of the mechanical stats, no further changes except correction of spelling/typographical errors, will be made without approval by Medical, Regulatory Affairs and QA. Label Control will assure all approved promotional material will be 100% proofread by qualified proofreading personnel.  This includes proofing of the blue lines (proof) against the final approved mechanical stat prior to printing.

7.    The file of approved documents will be maintained in Creative Services.



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    **PAGE 5**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.   A.   (Continued)

      8.   Subsequent revision to any promotional piece requires a new commodity number.

      9.   Each subsequent reprint of previously approved promotional labeling requires generation and approval of yellow form (Review and Approval of Initial Circulation) where changes have been made, and/or a pink form (for Final Circulation) where minimal or no changes are made.  "Minimal changes" are understood to be those which have no impact on original copy.

  B.   Purchase

      1.   After final approval, Marketing (Creative Services) will proceed with final production.  All materials must be reviewed by Regulatory Affairs if not produced within two trimesters after approval.

      2.   All purchase orders will require that the vendor identify shipping containers with the commodity number, purchase order number and quantity of contents.

  C.   Release of Final Material

      1.   It is the responsibility of Creative Services to assure that representative copies of all final materials are forwarded to QA.  QA (Label Control) will proof final samples of all materials, regardless of intended use or medium, against the approved master documentation (Review and Approval for Final Circulation, Pink form) and complete a release form.  If the samples are consistent with the final approved copy, a copy of the release form will be sent to Creative Services.  QA will send copies of the release form with two samples of the final piece to Medical and 4 samples will be sent to Regulatory Affairs; along with completed copies of the approval form to all approvers.  Regulatory Affairs is responsible for determining if materials require submission to FDA after release by QA.

      2.   If the printed samples are inconsistent with the final approved copy, QA will note the discrepancies on an NCMR (Non-Conforming Materials Report), attached to and referenced on the Release form, and forward all samples and copies of the materials back to Creative Services.  Creative Services may resubmit the final materials for review by all original approvers of the piece.  If all original approvers agree that the discrepancies are acceptable, the reviewers will sign and date the Final Circulation attached to the final piece, which will then be returned to QA for review and release as described in III. C. 1.

ABTILSD-A000034726



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                   PAGE 6

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.   C.   2.   (Continued)

If the discrepant piece requires modification, the original reviewers will indicate the necessary changes (e.g., replace pages, cover erroneous text with stickers, etc.) and sign a new Final Circulation Form.  Marketing (Creative Services and Product Management) will implement the necessary corrections.  Creative Services will forward samples of the corrected pieces to QA for disposition in the same manner described in III. C. 1.

3.   In the event that DROP SHIPMENT, direct mailing of promotional labeling or advertising is required of the vendor, it will be the responsibility of Marketing (Creative Services) to obtain representative samples of the promotional labeling or advertising and forward them to QA (Label Control).  Marketing (Creative Services) will assure that vendor material release does not take place until receipt of the respective approved release documents.  QA will then proceed as defined in III. C. 1., above.

D.   Storage and Inventory Control

1.   Upon receipt of shipments of promotional labeling at the respective warehousing facility, a review of shipment containers shall be made to assure that appropriate case identification markings are present and that the labeling containers are intact.

2.   When shipments received at ADH are approved for distribution, they are logged into their inventory system that includes the following data.

a.   Commodity number

b.   Quantity

c.   Maximum order quantity and bundle size

d.   Product

e.   Title of the piece

f.   Status (OK to distribute, or, quarantine/on hold)

3.   For shipments to ADH, Dallas, all promotional labeling will be held in quarantine (on hold) upon receipt until a fax or other written communication referencing the shipment indicates it is approved for distribution.  This written communication comes from Marketing (Creative Services) and is based on the release form from QA (Label Control).



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 7

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.   D.   (Continued)

    4.   Placing an item on "Regulatory/Quality Hold" needs to be done through Creative Services at the direction of Regulatory, Medical or QA management.  Items that are put "Regulatory/Quality Hold", after an initial release, are not allowed to be distributed until Creative Services notifies ADH to release the "hold".

        a.   "Product Management Hold" whereby Creative Services personnel can release items.  The reasons for hold status are neither regulatory, medical nor quality related in nature.

        b.   "Regulatory/Medical/Quality Hold" whereby Creative Services may effect the release only based on written approval from Regulatory, Medical or QA.

    5.   All obsolete and rejected promotional labeling will be physically identified and the respective warehouse records will be identified with a prominent "OBSOLETE" or "REJECT" status.  Where ADH is involved, they will be notified in writing by Creative Services.  All such notifications to ADH must be acknowledged by ADH in writing, along with a signed and dated statement of compliance.

    6.   a.   All "REJECT" promotional labeling and advertising shall be immediately removed from stock and subsequently destroyed within 60 days.

        b.   All "OBSOLETE" promotional labeling shall be immediately removed from stock and destroyed within 6 months.

    7.   Promotional labeling in ADH inventory shall be reviewed minimally every two trimesters, as outlined in Section III. B. 1., initiated by Creative Services.

  E.   Changes in Promotional Labeling

    1.   Regulatory and Medical will determine which product labeling changes will effect current promotional labeling.  This determination will be documented on the completed change request document on the product labeling; and will be communicated by approvers by D-44M (QA).

    2.   PPD Marketing (Product Management and Creative Services) shall cross-reference product label changes with existing promotional label package files to identify and resolve any promotional labeling inconsistencies.  Marketing will identify all active pieces.  Regulatory Affairs and Medical will then determine which pieces require change.



ABBOTT LABORATORIES
PHARMACEUTICAL PRODUCTS DIVISION
QUALITY POLICY                                    PAGE 8
DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW        |

III.   E.   (Continued)

3.   PPD Marketing (Creative Services) shall issue expiration dates of approved distributed promotional labeling, and destruction notices for obsoleted or rejected materials to ADH and any other vendors maintaining inventory.

For material that needs immediate withdrawal from field sales, PPD Marketing shall notify PPD Sales (Senior Management, North Chicago) who, in turn, shall notify PPD Sales Representatives/District and Regional Managers that their stock on hand should be destroyed.

NOTE:   PPD Creative Services will assure the documented destruction of all affected promotional labeling.

F.   Recorded Audio/Visual Promotional Material and Non-interactive Software

1.   Recorded audio/visual promotional material and non-interactive software will be developed and approved in the same manner as that described in Section III. A., including approval of the script at preliminary review.  Final approval will be given for finished materials only.

2.   Once approved Marketing (Creative Services) will supply QA (Label Control) with copies of the approved, signed-off promotional material script and the recorded promotional material for review prior to use, in accordance with III. C., above.

G.   Interactive Software, Demonstration Programs, and Software Utilization/Demonstration/Access Programs

1.   Software to be used as promotional material must follow the same review cycle as promotional printed material with the following additions:

a.   Software must be validated and documented to assure it functions as intended, per PPD software validation requirement.

b.   All software must be identified with a file name and a commodity number.

c.   Master copy of software must be filed in Marketing (Creative Services).

d.   Software program must be instructional or demonstrative only and not be presented for clinical or diagnostic applications.

CONFIDENTIAL



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                           **PAGE 9**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.   G.   1.   (Continued)

    e.   Software must be designed, formatted and coded such that the program listing cannot be obtained by the user and the program cannot be modified by the user for Clinical or Diagnostic or other promotional application.

    f.   Software used as Promotional Labeling must be reviewed for continued applicability with each product change.

    g.   The Approval Request for Promotional items in this category should contain the following:

        (1)   Description of software program and purpose or intended use.

        (2)   Text of software screens and any accompanying literature, describing application.

        (3)   Plan for inventory control and distribution.

        (4)   Definition as to whether copyright is required.

        (5)   Certification as specified in G. 1. a. and e., above.

H.   PDR (Physician Desk Reference)

    1.   Product prescribing information should be sent to Medical (Label Coordinator), Regulatory and QA for review and approval.

    If there are product summaries, they should be routed sequentially per Section III. A..  If no product summaries exist, such material can be routed to Creative Services, Medical, Regulatory and QA for review and approval.

    2.   Photos for the Product Identification Section should be reviewed and signed-off by QA and Product Development (using an approval copy of an issued PDR) prior to submission.  New photos of new products should also be signed-off by Product Development to assure conformance to actual product.

I.   Package Insert/Brief Summary Copy

    1.   PPD Marketing (Creative Services) may access current product package insert/brief summary copy through HPD Graphics.  Label Control should review the printout from HPD Graphics for accuracy and return to Marketing (Creative Services) signed and dated.

CONFIDENTIAL



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    PAGE 10

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.   I.   (Continued)

2.   QA should notify Medical, Regulatory and Marketing (Creative Services) of any changes in prescribing information which it believes may affect final material.  This includes notifying Marketing of changes to product prescribing information that would be in turn affect the product Brief Summary used in journal advertisements.

J.   Record Retention

1.   All master copy and approval documents, and related information should be retained in accordance with the PPD QA Policy for Record Retention.

IV.   <u>RESPONSIBILITY</u>

Six functional areas are involved in the development and review of Promotional Labeling:

A.   MARKETING is responsible for developing promotional labeling, securing the required approvals and Creative Services incorporating the changes made by Medical, Regulatory and QA (Label Control) in the final piece.  In addition, Creative Services is responsible for the distribution of promotional labeling and when necessary the destruction of obsolete, rejected, or recalled literature.  The Creative Services Department (D-321) within Marketing will be responsible for management of the promotional labeling review process.

B.   REGULATORY is responsible for reviewing and approving the promotional labeling to assure compliance with applicable regulations and consistency with current product labeling.  Regulatory is responsible for submission of promotional and advertising materials to FDA, as well as interfacing with FDA regarding promotional labeling or advertising.  Regulatory may determine if materials should be placed on Regulatory Hold or Rejected.

C.   MEDICAL is responsible for reviewing and approving of all promotional labeling for medical accuracy, and consistency with current product labeling.  Medical may determine if materials should be placed on Medical Hold or Rejected.

D.   QA (LABEL CONTROL), is responsible for review and proofreading of all promotional labeling for accurate use of trademarks, logos, generic names, and prescribing information.  In addition Label Control reviews all final printed material to determine compliance to the final copy approval by Medical and Regulatory.  The Quality Assurance function is responsible for assuring all related PPD disciplines are operating in compliance with the requirements of this policy.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                           PAGE 11

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.   (Continued)

E.   SALES is responsible for notifying the Sales Force of any recalled literature and for providing direction regarding its destruction.

F.   PUBLIC AFFAIRS is responsible for developing promotional labeling associated with press releases, in accordance with Section III. A..

**END OF TEXT**

CONFIDENTIAL

QP.009
Attachment A-0

☐ **Sign-off Meeting/Date:** _____     **For initial circulation**
☐ **Routing**                                      **copy/layout**

## REVIEW   AND   APPROVE

Product _____  Date _____
Description _____  No. _____

Total Number of Pages          _____

RETURN TO APPROVAL COORDINATOR BY: _____  *to Dept. 321, Bldg. AP30*

### To be filled out by Product Manager or Project Initiator.

Audience:   ☐  Physician Leave-behind - promotional
            ☐  To be used with physician, but intended NOT to be left with doctor - promotional
            ☐  Physician Leave-behind - educational
            ☐  Reps Use Only (Sales Training) - non-promo.
            ☐  RM/DM Use Only - non-promotional
            ☐  Other (please explain)

Quantity:_____     Bundled in: _____
Quantity to be distributed per rep:

Sales Force: ☐ PMR  ☐ PPR  ☐ HR  ☐ SR  ☐ Other_____

Approximate date of distribution to Sales Force: _____
If Journal Ad, approximate date of issue:        _____
If Direct Mail, approximate date of mailings:    _____

|                       | Signature | Date | OK as is | Note Changes |
|-----------------------|-----------|------|----------|--------------|
| Approval Coordinator  | _____ | _____ | ☐ | ☐ |
| Project Manager       | _____ | _____ | ☐ | ☐ |
| Product Manager       | _____ | _____ | ☐ | ☐ |
| Assoc. Product Manager| _____ | _____ | ☐ | ☐ |
| Label Control Reviewer| _____ | _____ | ☐ | ☐ |
| Medical Physician     | _____ | _____ | ☐ | ☐ |
| Medical Reviewer      | _____ | _____ | ☐ | ☐ |
|                       | _____ | _____ | ☐ | ☐ |
|                       | _____ | _____ | ☐ | ☐ |
| Regulatory Reviewer   | _____ | _____ | ☐ | ☐ |
| PPI Requirements      | ☐ No PPI | ☐ Full PPI | ☐ Brief PPI | |
| Other                 | _____ | _____ | ☐ | ☐ |
|                       | _____ | _____ | ☐ | ☐ |

Label: (Comments) _____
_____
Medical: (Comments) _____
_____
Regulatory: (Comments) _____
_____

Stamped "For Reps Use Only"  ☐ Yes   ☐ No

### Please be sure all questions are answered - yellow slip is signed and date.

☐ Legal File     ☐ Hold for production

Comments: _____

                                   ABTILSD-A000034733

QP.009
Attachment B-0

## REVIEW   AND   APPROVE

Product _____ Date _____

Description _____ No. _____

Total # Pages   _____

RETURN TO APPROVAL COORDINATOR BY:   _____ *to Dept. 321, Bldg. AP30*

| | Signature | Date | OK as is | Note Changes |
|---|---|---|---|---|
| Approval Coordinator | _____ | _____ | ☐ | ☐ |
| Project Manager | _____ | _____ | ☐ | ☐ |
| Product Manager | _____ | _____ | ☐ | ☐ |
| Assoc. Product Manager | _____ | _____ | ☐ | ☐ |
| Label Control Reviewer | _____ | _____ | ☐ | ☐ |
| Medical Physician | _____ | _____ | ☐ | ☐ |
| Medical Reviewer | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| Regulatory Reviewer | _____ | _____ | ☐ | ☐ |
| PPI Requirements | ☐  No PPI | ☐  Full PPI | ☐  Brief PPI | |
| Other | | | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |

**PLEASE BE SURE YOU HAVE INITIALED AND DATED THIS SLIP**

☐  Legal File

**END OF ATTACHMENT**

ABTILSD-A000034734



ABBOTT LABORATORIES
PHARMACEUTICAL PRODUCTS DIVISION
QUALITY POLICY                          PAGE 14
DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

**DESCRIPTION OF CHANGE:**

New (M. Silverberg, CR No. 04088).

**END OF DOCUMENT**

CONFIDENTIAL

ABTILSD-A000034735

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Info |
|------|

| | |
|---|---|
| **Checked Out By:** | |
| **Document ID:** | QP.009 |
| **Title:** | PROMOTIONAL LABELING |
| **Application Context:** | GPDQ2 |
| **Version Label:** | 1.0, Superseded |
| **Action Required:** | Create New / Revise |
| **Approved Date:** | 06-Dec-1993 |
| **Effective Date:** | |
| **Effective Date Type:** | Effective Date |
| **Division Name:** | Global Pharmaceutical Operations |
| **Control Site:** | GPO - PPD Lake County IL (Div QA) |
| **Abbott Document Type:** | Policy |
| **Disable Overlay:** | T |
| **Overlay Name:** | |
| **Translation Source:** | |
| **Abbott Owner:** | qdmprdoc |
| **Document Category:** | gdp_quality_system |
| **Document Date:** | |
| **Language:** | English(en) |
| **QMD Status:** | Superseded |
| **Status Date:** | 06-Dec-1993 |
| **Authors:** | |
| **Pending Agency Approval:** | F |
| **Departments/Areas Affected:** | |
| **Source Document:** | |
| **XML Document Source:** | |
| **CR Initiator:** | |
| **CR Number:** | N/A |
| **Description of Change:** | N/A, This document was migrated to QMD per GPO VCR # 09544 |
| **Legacy CR Numbers:** | N/A |
| **Legacy Control Site:** | Division |
| **Legacy SME:** | N\A |
| **Legacy SME Functional Areas:** | N\A |
| **Legacy User Site Effective Dates:** | |
| **Legacy User Sites:** | |

| Post Approval |
|---------------|

| | |
|---|---|
| **Business Type:** | N/A |
| **Governing Document:** | |
| **Reference Document:** | |

---

CONFIDENTIAL                                                                 ABTILSD-A000034736

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Periodic Review | |
|---|---|
| **Periodic Review State:** | Enabled |
| **Last Review Date:** | |
| **Review Interval:** | 0 months |
| **Next Review Date:** | |
| **Subject Matter Expert:** | Helstad_Elizabeth_A |
| **SME Functional Area:** | Documentation Control |

| Site Effectivity |
|---|
| < No Site Effectivity Data to Display > |

**END OF DOCUMENT**

CONFIDENTIAL                                        ABTILSD-A000034737



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 1

DOCUMENT QP.009

---

**ISSUE DATE    SUPERCEDES**

07/05/1995   03/31/1994

---

**TITLE**  PROMOTIONAL LABELING

---

**REFERENCE DOCUMENTS**

N/A

---

**DISTRIBUTION**

NC, AP16, API, D-30D, D-35T, D-417, D-418, D-443, D-44F, D-44K,
D-41J, D-491, D-49P, D-498, D-50Z, D-6RA, D-487, D-553, D-316,
D-866(5), D-86P(2), D-388, D-44N, D-551, D-554, D-6RK

---

|          | **MED SERVICES** | **REG AFFAIRS** | **DIVISION QA** |
|----------|------------------|-----------------|-----------------|
| **NAME:** | T. HEIMBERGER | A.K. HENRY | W. DONOVAN |
| **DATE:** | 05/08/1995 | 04/14/1995 | 04/12/1995 |
|          | **LABEL CONTROL** | **DIR PROF COMM** | **VP PHAR MKTG** |
| **NAME:** | L. GLASSMAN | D. DAVID | E. FIORENTINO |
| **DATE:** | 05/12/1995 | 05/09/1995 | 05/10/1995 |
|          | **DIR PUBLIC AFFAIRS** | **VP QA & RA** | |
| **NAME:** | D. PETKUS | L. WYATT | |
| **DATE:** | 05/11/1995 | 05/13/1995 | |

---

**ATTACHMENTS**

NON-COMPUTERIZED A-1, B-1, C-0, D-0

---

**APPLICABLE DOCUMENTS**

QP.006, QP.021

---

I.   **PURPOSE**

To establish the necessary activities and responsibilities for developing,
approving, and maintaining PPD Promotional Labeling in compliance with
applicable sections of 21 Code of Federal Regulations and the Food, Drug and
Cosmetic Act.

II.  **SCOPE**

A.  This policy covers all PPD advertising and promotional matter
descriptive of a marketed product which falls within the regulatory
definition of labeling or advertising.  This policy will provide methods
by which promotional labeling or advertising will be developed and
approved prior to final printing and the necessary distribution, storage
and inventory control requirements assuring that unapproved or obsolete
promotional labeling is not distributed.



**ABBOT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    **PAGE 2**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

II.    **SCOPE** (Cont.)

This policy does not pertain to sales training materials.

B.    Advertising and promotional items include, but are not limited to, copy and visuals for brochures, sales aids, in-service materials, journal advertising, broadcast advertising, patient education materials, consumer promotional materials, published reprints, group promotional programs (e.g. CET, CEP, etc.), teleconference programs, press materials, premiums, and direct mail items.  This also includes product related copy on reminder items.

Advertisements and promotional labeling as defined in 21CFR Section 202.1(1) (1) and (2) will apply here.

Section 202.1(1) (1):  "Advertisements subject to section 502(n) of the act include advertisements in published journals, magazines, other periodicals, and newspapers, and advertisements broadcast through media such as radio, television, and telephone communication systems."

Section 202.1(1) (2):  "Brochures, booklets, mailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio or visual matter descriptive of a drug and references published (for example the "Physicians' Desk Reference®") for use by Medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act".

C.    Consideration of Intent:

1.    An advertisement or promotional labeling piece is not satisfactory if it is false or misleading as defined in the Code of Federal Regulations with respect to the following examples (which are not all inclusive):

a.    Side effects, contraindications, or effectiveness.

b.    Fair balance between information relating to side effects and contraindications and information relating to effectiveness.

c.    Failing to reveal facts in the light of consequence from use.

d.    Containing a representation or suggestion, not approved or permitted in the labeling.

CONFIDENTIAL                                                      ABTILSD-A000034739



ABBOTT LABORATORIES
PHARMACEUTICAL PRODUCTS DIVISION
QUALITY POLICY                                          PAGE 3
DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

II.    **SCOPE** (Cont.)

    C.   (Cont.)

        e.   Containing a product comparison that represents or suggests that a product is safer or more effective than another product.

        f.   Containing favorable information or opinions that have been rendered invalid.

        g.   Presenting information from a study in a way that implies greater experience than actually does.

        h.   Containing reference to literature or studies that misrepresent the degree of safety and/or effectiveness of a product.

        i.   Using a statement by a recognized authority that is favorable but is inconsistent with other data.

        j.   Using quote or paraphrase out of context to convey false or misleading idea.

        k.   Using literature or reference that intend to support a claim but do not.

        l.   Using literature or references recommending conditions of use that are not approved in the labeling.

III.   **POLICY**

    A.   Development and Approval

        1.   At the inception or reprinting of promotional labeling or advertising, Marketing (Creative Services Department) shall assign a commodity number and complete a review and approval form (Attachment A, yellow form) for initial review.

        2.   Each piece of promotional labeling or advertising of a program requires a separate routing form and should as a rule be routed together as a packet with companion pieces for review.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                                PAGE 4

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

III.   **POLICY** (Cont.)

    A.   Development and Approval (Cont.)

        3.   On a scheduled basis, Marketing (Creative Services) distributes promotional labeling or advertising for review by Medical and Regulatory.  This material, to be reviewed for the first time, will include copies of all new references cited in the piece.  All materials are formally discussed and approved within a meeting format attended by Medical, Regulatory, Marketing Product Management and Creative Services; though such material can be routed sequentially for review or approval, if agreed upon by all parties approving the materials.  The prescribed sequence for routing and approval signatures is:  Creative Services, Product Management, Medical and Regulatory.

           NOTE:   Business reply cards that offer product samples are additionally distributed for review and approval to Corporate Legal, Corporate Regulatory, and PPD Sales Services for review.

        4.   Creative Services is responsible for developing the meeting agenda and chairing the meeting.  All promotional labeling and advertising items on the agenda are reviewed and changes are made on the master copy which is then signed and dated by Marketing (Product Management), Medical and Regulatory.  Marketing (Creative Services) keeps the original copy in their files.

        5.   Following initial approval of copy/layout (yellow form), a second approval is required upon completion of the mechanical artwork production phase, and implementation of changes from initially approved copy.  Mechanical stats are distributed to Medical and Regulatory for review.  A pink form (Review and Approval for Final Circulation, Attachment B) is attached.  All three-dimensional pieces should have booked-up dimensional stats in final size distributed to Medical and Regulatory.  Mechanical stat review follows the same approval procedure as that of copy/layout for initial review (yellow form).  Where the initial copy was prepared as final art via computer design, the pink form may be used.  Reviewers may require a yellow form and a second review and approval.

        6.   Following final approval of the mechanical stats, no further changes except correction of spelling/typographical errors, will be made without approval by Medical and Regulatory Affairs.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 5

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

III.   **POLICY** (Cont.)

A.   Development and Approval (Cont.)

7.   After final approval of the mechanical stats the preproduction proof will be approved by QA (Attachment C, blue form).  Label Control will assure all approved promotional material will be 100% proofread by qualified proofreading personnel.  This includes proofing of the preproduction proof against the final approved mechanical stat prior to printing.

8.   The file of approved documents will be maintained in Creative Services.

9.   Subsequent revision to any promotional piece requires a new commodity number.

10.   Each subsequent reprint of previously approved promotional labeling requires generation and approval of yellow form (Review and Approval of Initial Circulation) where changes have been made, and/or a pink form (for Final Circulation) where minimal or no changes are made.  "Minimal changes" are understood to be those which have no impact on original copy.

B.   Purchase

1.   After final approval, Marketing (Creative Services) will proceed with final production.  All materials must be reviewed by Regulatory Affairs if not produced within two trimesters after approval.

2.   All purchase orders will require that the vendor identify shipping containers with the commodity number, purchase order number and quantity of contents.

CONFIDENTIAL                                          ABTILSD-A000034742



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 6

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

**III.   POLICY** (Cont.)

    C.   Release of Final Material

        1.   It is the responsibility of Creative Services to assure that representative copies of all final materials are forwarded to QA. QA (Label Control) will proof final samples of all materials, regardless of intended use or medium.  Label Control will proofread the final printed material against the preproduction proof as described in III.A.6. and complete a release form.  If a preproduction proof is not needed to produce the final material (i.e., material described in III. F., G., and H.) Label Control will proof final sample against the approved master documentation (Review and Approval for Final Circulation, Pink form) and complete a release form (Attachment D).  If the samples are consistent with the copy used to proofread against, a copy of the release form will be sent to Creative Services.  QA will send copies of the release form with two samples of the final piece to Medical and 4 samples will be sent to Regulatory Affairs; along with completed copies of the approval form to all approvers.  Regulatory Affairs is responsible for determining if materials require submission to FDA after release by QA.

        2.   For Run-of-Book Advertising, Creative Services will supply Label Control a blueline for approval.  Creative Services will also supply Regulatory with 3 copies of tear sheets from the first printing of each advertisement.

        3.   For Journal inserts, Creative Services will provide Label Controlwith copies of the final printed material as stated in Section III.C.1.

        4.   If the printed samples are inconsistent with the final approved copy, QA will note the discrepancies on an NCMR (Non-Conforming Materials Report QP.021), attached to and referenced on the Release form, and forward all samples, copies of the materials and the NCMR, back to Creative Services.  Creative Services may resubmit the final materials for review by all original approvers of the piece.  If all original approvers agree that the discrepancies are acceptable, the reviewers will sign and date the NCMR, which will then be returned to QA for review, approval and release as described in III. C. 1.

           If the discrepant piece requires modification, the original reviewers will indicate the necessary changes (e.g., replace pages, cover erroneous text with stickers, etc.) and sign a new Final Circulation Form.  Marketing (Creative Services and Product Management) will implement the necessary corrections.  Creative Services will forward samples of the corrected pieces to QA for disposition in the same manner described in III. C. 1.

CONFIDENTIAL                                          ABTILSD-A000034743



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                        **PAGE 7**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

III.   **POLICY** (Cont.)

    C.   Release of Final Material (Cont.)

        5.   In the event that DROP SHIPMENT, direct mailing of promotional labeling or advertising is required of the vendor, it will be the responsibility of Marketing (Creative Services) to obtain representative samples of the promotional labeling or advertising and forward them to QA (Label Control). Marketing (Creative Services) will assure that vendor material release does not take place until receipt of the respective approved release documents. QA will then proceed as defined in III. C. 1., above.

    D.   Storage and Inventory Control

        1.   Upon receipt of shipments of promotional labeling at the respective warehousing facility, a review of shipment containers shall be made to assure that appropriate case identification markings are present and that the labeling containers are intact.

        2.   When shipments received at ADH are approved for distribution, they are logged into their inventory system that includes the following data.

            a.   Commodity number

            b.   Quantity

            c.   Maximum order quantity and bundle size

            d.   Product

            e.   Title of the piece

            f.   Status (OK to distribute, or, quarantine/on hold)

        3.   For shipments to ADH, Dallas, all promotional labeling will be held in quarantine (on hold) upon receipt until a fax or other written communication referencing the shipment indicates it is approved for distribution. This written communication comes from Marketing (Creative Services) and is based on the release form from QA (Label Control).

        4.   Placing an item on "Regulatory/Quality Hold" needs to be done through Creative Services at the direction of Regulatory, Medical or QA management. Items that are put "Regulatory/Quality Hold", after an initial release, are not allowed to be distributed until Creative Services notifies ADH to release the "hold".

CONFIDENTIAL



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                          PAGE 8

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

III.  **POLICY** (Cont.)

    D.  Storage and Inventory Control (Cont.)

            a.  "Product Management Hold" whereby Creative Services personnel
                can release items.  The reasons for hold status are neither
                regulatory, medical nor quality related in nature.

            b.  "Regulatory/Medical/Quality Hold" whereby Creative Services
                may effect the release only based on written approval from
                Regulatory, Medical or QA.

        5.  All obsolete and rejected promotional labeling will be physically
            identified and the respective warehouse records will be identified
            with a prominent "OBSOLETE" or "REJECT" status.  Where ADH is
            involved, they will be notified in writing by Creative Services.
            All such notifications to ADH must be acknowledged by ADH in
            writing, along with a signed and dated statement of compliance.

        6.  a.  All "REJECT" promotional labeling and advertising shall be
                immediately removed from stock and subsequently destroyed
                within 60 days.

            b.  All "OBSOLETE" promotional labeling shall be immediately
                removed from stock and destroyed within 6 months.

        7.  Promotional labeling in ADH inventory shall be reviewed annually
            unless notified otherwise by Medical or Regulatory as outlined in
            Section III. B. 1., initiated by Creative Services.

    E.  Changes in Promotional Labeling

        1.  Regulatory and Medical will determine which product labeling
            changes will effect current promotional labeling.  This
            determination will be documented on the completed change request
            document on the product labeling; and will be communicated by
            approvers by D-44M (QA).

        2.  PPD Marketing (Product Management and Creative Services) shall
            cross-reference product label changes with existing promotional
            label package files to identify and resolve any promotional
            labeling inconsistencies.  Marketing will identify all active
            pieces.  Regulatory Affairs and Medical will then determine which
            pieces require change.

        3.  Where there are changes in promotional labeling, PPD Marketing
            (Creative Services) shall issue expiration dates of affected
            distributed promotional labeling, and destruction notices for
            obsoleted or rejected materials to ADH and any other vendors
            maintaining inventory.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                                  PAGE 9

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
| --- | --- |
| 07/05/1995 | 03/31/1994 |

III.    **POLICY** (Cont.)

    E.   Changes in Promotional Labeling

              For material that needs immediate withdrawal from field sales, PPD Marketing shall notify PPD Sales (Senior Management, North Chicago) who, in turn, shall notify PPD Sales Representatives/District and Regional Managers that their stock on hand should be destroyed.

              NOTE:   PPD Creative Services will assure the documented destruction of all affected promotional labeling.

    F.   Press Materials

       1.   Press (media) materials are promotional labeling and include, but are not limited to, press kits (brochures, fact sheets, Q & A), press backgrounders, press releases, video/audio news releases, and B-rolls.

       2.   In general, the development and approval of press materials follows this policy as described in Section III.A.  The following exceptions apply:

           a.   PPD Public Affairs is responsible for obtaining a project number assignment from Creative Services.

           b.   PPD Public Affairs routes press materials sequentially to Creative Services, Public Affairs, Medical and Regulatory. Corporate Public Affairs routes to Legal and Corporate Quality and Regulatory Affairs for review and approval, together with supporting references.  If necessay, Public Affairs arranges a meeting with Medical, Regulatory, and Legal to obtain approval of materials.

           c.   Medical Review, reviews and approves all press materials.  If the subject of press materials concerns pre-NDA PPD compounds, or in the case of a marketed product with a new indication pending approval or under development, approval from the investigating Venture or Clinical team is also required.  In this case, the Venture or Clinical team verifies the data presented and Medical Review reviews for overall medical message.  Venture/Clinical approval must be obtained before Medical Review approves the materials.

           d.   Public Affairs management is responsible for implementing all approved changes from the final approval materials into the press materials before release.  Final copies of materials with implemented changes are forwarded to Medical and Regulatory before release.  Final copies should include the date of planned release.



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**          PAGE 10

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

III.    **POLICY** (Cont.)

     G.    Recorded Audio/Visual Promotional Material and Non-interactive Software

         1.    Recorded audio/visual promotional material and non-interactive software will be developed and approved in the same manner as that described in Section III. A., including approval of the script at preliminary review. Final approval will be given for finished materials only.

         2.    Once approved Marketing (Creative Services) will supply QA (Label Control) with copies of the approved, signed-off promotional material script and the recorded promotional material for review prior to use, in accordance with III. C., above.

     H.    Interactive Software, Demonstration Programs, and Software Utilization/Demonstration/Access Programs

         1.    Software to be used as promotional material must follow the same review cycle as promotional printed material with the following additions:

            a.    Software must be validated and documented to assure it functions as intended, per PPD software validation requirement.

            b.    All software must be identified with a file name and a commodity number.

            c.    Master copy of software must be filed in Marketing (Creative Services).

            d.    Software program must be instructional or demonstrative only and not be presented for clinical or diagnostic applications.

            e.    Software must be designed, formatted and coded such that the program listing cannot be obtained by the user and the program cannot be modified by the user for Clinical or Diagnostic or other promotional application.

            f.    Software used as Promotional Labeling must be reviewed for continued applicability with each product change.

            g.    The Approval Request for Promotional items in this category should contain the following:

                (1)    Description of software program and purpose or intended use.

                (2)    Text of software screens and any accompanying literature, describing application.

        



**ABBOTT LABORATORIES**
**PHARMACEUTICAL PRODUCTS DIVISION**
**QUALITY POLICY**                                    PAGE 11
**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|---|---|
| 07/05/1995 | 03/31/1994 |

III.   **POLICY** (Cont.)

    H.   (Cont.)

                (3)  Plan for inventory control and distribution.

                (4)  Definition as to whether copyright is required.

                (5)  Certification as specified in G. 1. a. and e., above.

    I.   PDR® (Physicians' Desk Reference)

        1.   Product prescribing information should be sent to Medical (Label
             Coordinator), Regulatory and QA for review and approval.

        2.   Photos for the Product Identification Section should be reviewed
             and signed-off by QA and Product Development (using an approval
             copy of an issued PDR) prior to submission.  New photos of new
             products should also be signed-off by Product Development to assure
             conformance to actual product.

    J.   Package Insert/Brief Summary Copy

        1.   PPD Marketing (Creative Services) may access current product
             package insert/brief summary copy through HPD Graphics.  Label
             Control should review the printout from HPD Graphics for accuracy
             and return to Marketing (Creative Services) signed and dated.

        2.   QA should notify Medical, Regulatory and Marketing (Creative
             Services) of any changes in prescribing information which it
             believes may affect final material.  This includes notifying
             Marketing of changes to product prescribing information that would
             be in turn affect the product Brief Summary used in journal
             advertisements.

    K.   Record Retention

        1.   All master copy and approval documents, and related information
             should be retained in accordance with the PPD QA Policy for Record
             Retention (QP.006).



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 12

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
| --- | --- |
| 07/05/1995 | 03/31/1994 |

IV.   **RESPONSIBILITY**

Six functional areas are involved in the development and review of Promotional Labeling:

A.   MARKETING is responsible for developing promotional labeling, securing the required approvals and Creative Services incorporating the changes made by Medical, Regulatory and QA (Label Control) in the final piece. In addition, Creative Services is responsible for the distribution of promotional labeling and when necessary the destruction of obsolete, rejected, or recalled literature.  The Creative Services Department (D-321) within Marketing will be responsible for management of the promotional labeling review process.

B.   REGULATORY is responsible for reviewing and approving the promotional labeling to assure compliance with applicable regulations and consistency with current product labeling.  Regulatory is responsible for submission of promotional and advertising materials to FDA, as well as interfacing with FDA regarding promotional labeling or advertising. Regulatory may determine if materials should be placed on Regulatory Hold or Rejected.

C.   MEDICAL is responsible for reviewing and approving all promotional labeling for medical accuracy, and consistency with current product labeling.  In the case of Press Materials, Medical approval may be required by both Medical Review and a Venture or Clinical team, as determined by Medical Review, based on the filing status of the product or indication in question.  Medical may determine if materials should be placed on Medical Hold or Rejected.

D.   QA (LABEL CONTROL), is responsible for review and proofreading of all promotional labeling for accurate use of trademarks, logos, generic names, and prescribing information.  In addition Label Control reviews all final printed material to determine compliance to the final copy approval by Medical and Regulatory.  The Quality Assurance function is responsible for assuring all related PPD disciplines are operating in compliance with the requirements of this policy.

E.   SALES is responsible for notifying the Sales Force of any recalled literature and for providing direction regarding its destruction.

F.   PUBLIC AFFAIRS is responsible for developing promotional labeling associated with press materials implementing approved changes, and issuing final copy with implemented changes to Medical Review, Regulatory and Corporate QA in accordance with Section III. A.

CONFIDENTIAL                                                          ABTILSD-A000034749



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    PAGE 13

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 07/05/1995 | 03/31/1994 |

**DESCRIPTION OF CHANGE:**

| CR # | INITIATOR |
|------|-----------|
| 22864 | N. MERTINS |

**D OF C**

Add new III.F.  Press Materials
New Review and Approved form Attachment A
Revise Attachment B, add Attachment C & D
Section III.A. Development and Approval revise to reflect new process

**END OF DOCUMENT**

CONFIDENTIAL                                    ABTILSD-A000034750

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Info |
|---|

| | |
|---|---|
| **Checked Out By:** | |
| **Document ID:** | QP.009 |
| **Title:** | PROMOTIONAL LABELING |
| **Application Context:** | GPDQ2 |
| **Version Label:** | 3.0, Superseded |
| **Action Required:** | Create New / Revise |
| **Approved Date:** | 05-Jul-1995 |
| **Effective Date:** | |
| **Effective Date Type:** | Effective Date |
| **Division Name:** | Global Pharmaceutical Operations |
| **Control Site:** | GPO - PPD Lake County IL (Div QA) |
| **Abbott Document Type:** | Policy |
| **Disable Overlay:** | T |
| **Overlay Name:** | |
| **Translation Source:** | |
| **Abbott Owner:** | qdmprdoc |
| **Document Category:** | gdp_quality_system |
| **Document Date:** | |
| **Language:** | English(en) |
| **QMD Status:** | Superseded |
| **Status Date:** | 05-Jul-1995 |
| **Authors:** | |
| **Pending Agency Approval:** | F |
| **Departments/Areas Affected:** | |
| **Source Document:** | |
| **XML Document Source:** | |
| **CR Initiator:** | |
| **CR Number:** | N/A |
| **Description of Change:** | N/A, This document was migrated to QMD per GPO VCR # 09544, 22864, Add new III.F. Press Materials New Review and Approved form Attachment A Revise Attachment B, add Attachment C & D Section III.A. Development and Approval revise to reflect new process |
| **Legacy CR Numbers:** | N/A,22864 |
| **Legacy Control Site:** | Division |
| **Legacy SME:** | NVA |
| **Legacy SME Functional Areas:** | NVA |
| **Legacy User Site Effective Dates:** | |
| **Legacy User Sites:** | |

| Post Approval |
|---|

| | |
|---|---|
| **Business Type:** | N/A |
| **Governing Document:** | N/A |
| **Reference Document:** | B-1, C-0, D-0, NON-COMPUTERIZED A-1, QP.006, QP.021 |

CONFIDENTIAL

ABTILSD-A000034751

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Periodic Review |
|---|

**Periodic Review State:** Enabled
**Last Review Date:**
**Review Interval:** 0 months
**Next Review Date:** 05-Jul-1996
**Subject Matter Expert:** Helstad_Elizabeth_A
**SME Functional Area:** Documentation Control

| Site Effectivity |
|---|

< No Site Effectivity Data to Display >

**END OF DOCUMENT**

CONFIDENTIAL                                    ABTILSD-A000034752



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    PAGE 1

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|---|---|
| 03/31/1994 | 12/06/1993 |

**TITLE** PROMOTIONAL LABELING

**REFERENCE DOCUMENTS**

N/A

**DISTRIBUTION**

NC, AP16, API, D-30D, D-35T, D-417, D-418, D-443, D-44F, D-44K, D-491, D-49P, D-49S, D-50Z, D-6RA, D-487, D-553, D-316, D-866(5), D-86P(2), D-388, D-44N, D-49E, D-554

|  | DIR.,COMPL.&Q.SVCS. | REGULATORY AFFAIRS | DIR., PROF. COMM. |
|---|---|---|---|
| **NAME:** | M. SILVERBERG | A.K. HENRY | D. DAVID |
| **DATE:** | 02/21/1994 | 03/18/1994 | 03/11/1994 |
|  | **DIR., MED. AFFAIRS** | **VP PHARM. MKTG.** | **EDITOR, QA SYSTEMS** |
| **NAME:** | D. PIZZUTI | D. GOFFREDO | N. MERTINS |
| **DATE:** | 03/22/1994 | 03/24/1994 | 03/31/1994 |
|  | **VP, QA & RA** |  |  |
| **NAME:** | L. WYATT |  |  |
| **DATE:** | 03/28/1994 |  |  |

**ATTACHMENTS**

COMPUTERIZED A-0, B-0

**APPLICABLE DOCUMENTS**

N/A

I.   PURPOSE

To establish the necessary activities and responsibilities for developing, approving, and maintaining PPD Promotional Labeling in compliance with applicable sections of 21 Code of Federal Regulations and the Food, Drug and Cosmetic Act.

CONFIDENTIAL

ABTILSD-A000034753



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    **PAGE 2**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|---|---|
| 03/31/1994 | 12/06/1993 |

II.  <u>SCOPE</u>

A.  This policy covers all PPD advertising and promotional matter
descriptive of a marketed product which falls within the regulatory
definition of labeling or advertising.  This policy will provide
methods by which promotional labeling or advertising will be
developed and approved prior to final printing and the necessary
distribution, storage and inventory control requirements assuring
that unapproved or obsolete promotional labeling is not distributed.

This policy does not pertain to sales training materials.

B.  Advertising and promotional items include, but are not limited to,
copy and visuals for brochures, sales aids, in-service materials,
journal advertising, broadcast advertising, patient education
materials, consumer promotional materials, published reprints, group
promotional programs (e.g. CET, CEP, etc.), teleconference programs,
press materials, premiums, and direct mail items.  This also includes
product related copy on reminder items.

Advertisements and promotional labeling as defined in 21CFR Section
202.1(1) (1) and (2) will apply here.

Section 202.1(1) (1):  "Advertisements subject to section 502(n) of
the act include advertisements in published journals, magazines,
other periodicals, and newspapers, and advertisements broadcast
through media such as radio, television, and telephone communication
systems."

Section 202.1(1) (2):  "Brochures, booklets, mailing pieces, file
cards, bulletins, calendars, price lists, catalogs, house organs,
letters, motion picture films, film strips, lantern slides, sound
recordings, exhibits, literature, and reprints and similar pieces of
printed, audio or visual matter descriptive of a drug and references
published (for example the "Physicians Desk Reference") for use by
Medical practitioners, pharmacists, or nurses, containing drug
information supplied by the manufacturer, packer, or distributor of
the drug and which are disseminated by or on behalf of its
manufacturer, packer, or distributor are hereby determined to be
labeling as defined in section 201(m) of the act".

C.  Consideration of Intent:

1.  An advertisement or promotional labeling piece is not
satisfactory if it is false or misleading as defined in the Code
of Federal Regulations with respect to the following examples
(which are not all inclusive):

a.  Side effects, contraindications, or effectiveness.

CONFIDENTIAL                                                    ABTILSD-A000034754



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                           **PAGE 3**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 03/31/1994 | 12/06/1993 |

II.   C.   1.   (Continued)

    b.   Fair balance between information relating to side effects and contraindications and information relating to effectiveness.

    c.   Failing to reveal facts in the light of consequence from use.

    d.   Containing a representation or suggestion, not approved or permitted in the labeling.

    e.   Containing a product comparison that represents or suggests that a product is safer or more effective than another product.

    f.   Containing favorable information or opinions that have been rendered invalid.

    g.   Presenting information from a study in a way that implies greater experience than actually does.

    h.   Containing reference to literature or studies that misrepresent the degree of safety and/or effectiveness of a product.

    i.   Using a statement by a recognized authority that is favorable but is inconsistent with other data.

    j.   Using quote or paraphrase out of context to convey false or misleading idea.

    k.   Using literature or reference that intend to support a claim but do not.

    l.   Using literature or references recommending conditions of use that are not approved in the labeling.

III.   POLICY

    A.   Development and Approval

    1.   At the inception or reprinting of promotional labeling or advertising, Marketing (Creative Services Department) shall assign a commodity number and complete a review and approval form (copy attached, Attachment A, yellow form) for initial review.

    2.   Each piece of promotional labeling or advertising of a program requires a separate routing form and should as a rule be routed together as a packet with companion pieces for review.



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    **PAGE 4**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 03/31/1994 | 12/06/1993 |

III.   A.   (Continued)

3.   On a scheduled basis, Marketing (Creative Services) distributes promotional labeling or advertising for review by Medical and Regulatory.  This material, to be reviewed for the first time, will include copies of all new references cited in the piece. All materials are formally discussed and approved within a meeting format attended by Medical, Regulatory, Marketing Product Management and Creative Services; though such material can be routed sequentially for review or approval, if desired.  The prescribed sequence for routing is:  Creative Services, Product Management, Medical and Regulatory.

   NOTE:   Business reply cards that offer product samples are additionally distributed for review and approval to Corporate Legal, Corporate Regulatory, and PPD Sales Services for review.

4.   Creative Services is responsible for developing the meeting agenda and chairing the meeting.  All promotional labeling and advertising items on the agenda are reviewed and changes are made on the master copy which is then signed and dated by Marketing (Product Management), Medical and Regulatory.  Marketing (Creative Services) keeps the original copy in their files.

5.   Following initial approval of copy/layout (yellow form), a second approval is required upon completion of the mechanical artwork production phase, and implementation of changes from initially approved copy.  Mechanical stats are distributed to Medical, Regulatory, and QA (Label Control) for review.  A pink form (Review and Approval for Final Circulation) is attached.  All three-dimensional pieces should have booked-up dimensional stats in final size distributed to Medical, Regulatory and QA. Mechanical stat review follows the same approval procedure as that of copy/layout for initial review (yellow form).  Where the initial copy was prepared as final art via computer design, the pink form may be used.  Reviewers may require a yellow form and a second review and approval.

6.   Following final approval of the mechanical stats, no further changes except correction of spelling/typographical errors, will be made without approval by Medical, Regulatory Affairs and QA. Label Control will assure all approved promotional material will be 100% proofread by qualified proofreading personnel.  This includes proofing of the blue lines (proof) against the final approved mechanical stat prior to printing.

7.   The file of approved documents will be maintained in Creative Services.

CONFIDENTIAL                                              ABTILSD-A000034756



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 5

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
| --- | --- |
| 03/31/1994 | 12/06/1993 |

III.   A.   (Continued)

8.   Subsequent revision to any promotional piece requires a new commodity number.

9.   Each subsequent reprint of previously approved promotional labeling requires generation and approval of yellow form (Review and Approval of Initial Circulation) where changes have been made, and/or a pink form (for Final Circulation) where minimal or no changes are made.  "Minimal changes" are understood to be those which have no impact on original copy.

B.   Purchase

1.   After final approval, Marketing (Creative Services) will proceed with final production.  All materials must be reviewed by Regulatory Affairs if not produced within two trimesters after approval.

2.   All purchase orders will require that the vendor identify shipping containers with the commodity number, purchase order number and quantity of contents.

C.   Release of Final Material

1.   It is the responsibility of Creative Services to assure that representative copies of all final materials are forwarded to QA. QA (Label Control) will proof final samples of all materials, regardless of intended use or medium.  Label Control will proofread the final printed material against the proof as described in III.A.6. and complete a release form.  If a proof is not needed to produce the final material (i.e., material described in III. F., G., and H.) Label Control will proof final sample against the approved master documentation (Review and Approval for Final Circulation, Pink form) and complete a release form.  If the samples are consistent with the copy used to proofread against, a copy of the release form will be sent to Creative Services.  QA will send copies of the release form with two samples of the final piece to Medical and 4 samples will be sent to Regulatory Affairs; along with completed copies of the approval form to all approvers.  Regulatory Affairs is responsible for determining if materials require submission to FDA after release by QA.

                                    ABTILSD-A000034757



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 6

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 03/31/1994 | 12/06/1993 |

III.   C.   (Continued)

2.   If the printed samples are inconsistent with the final approved copy, QA will note the discrepancies on an NCMR (Non-Conforming Materials Report), attached to and referenced on the Release form, and forward all samples and copies of the materials back to Creative Services.  Creative Services may resubmit the final materials for review by all original approvers of the piece.  If all original approvers agree that the discrepancies are acceptable, the reviewers will sign and date the Final Circulation attached to the final piece, which will then be returned to QA for review and release as described in III. C. 1.

If the discrepant piece requires modification, the original reviewers will indicate the necessary changes (e.g., replace pages, cover erroneous text with stickers, etc.) and sign a new Final Circulation Form.  Marketing (Creative Services and Product Management) will implement the necessary corrections.  Creative Services will forward samples of the corrected pieces to QA for disposition in the same manner described in III. C. 1.

3.   In the event that DROP SHIPMENT, direct mailing of promotional labeling or advertising is required of the vendor, it will be the responsibility of Marketing (Creative Services) to obtain representative samples of the promotional labeling or advertising and forward them to QA (Label Control).  Marketing (Creative Services) will assure that vendor material release does not take place until receipt of the respective approved release documents.  QA will then proceed as defined in III. C. 1., above.

D.   Storage and Inventory Control

1.   Upon receipt of shipments of promotional labeling at the respective warehousing facility, a review of shipment containers shall be made to assure that appropriate case identification markings are present and that the labeling containers are intact.

2.   When shipments received at ADH are approved for distribution, they are logged into their inventory system that includes the following data.

a.   Commodity number

b.   Quantity

c.   Maximum order quantity and bundle size

d.   Product

e.   Title of the piece



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 7

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
| --- | --- |
| 03/31/1994 | 12/06/1993 |

III.   D.   2.   (Continued)

　　　f.   Status (OK to distribute, or, quarantine/on hold)

　3.   For shipments to ADH, Dallas, all promotional labeling will be held in quarantine (on hold) upon receipt until a fax or other written communication referencing the shipment indicates it is approved for distribution.  This written communication comes from Marketing (Creative Services) and is based on the release form from QA (Label Control).

　4.   Placing an item on "Regulatory/Quality Hold" needs to be done through Creative Services at the direction of Regulatory, Medical or QA management.  Items that are put "Regulatory/Quality Hold", after an initial release, are not allowed to be distributed until Creative Services notifies ADH to release the "hold".

　　　a.   "Product Management Hold" whereby Creative Services personnel can release items.  The reasons for hold status are neither regulatory, medical nor quality related in nature.

　　　b.   "Regulatory/Medical/Quality Hold" whereby Creative Services may effect the release only based on written approval from Regulatory, Medical or QA.

　5.   All obsolete and rejected promotional labeling will be physically identified and the respective warehouse records will be identified with a prominent "OBSOLETE" or "REJECT" status.  Where ADH is involved, they will be notified in writing by Creative Services.  All such notifications to ADH must be acknowledged by ADH in writing, along with a signed and dated statement of compliance.

　6.   a.   All "REJECT" promotional labeling and advertising shall be immediately removed from stock and subsequently destroyed within 60 days.

　　　b.   All "OBSOLETE" promotional labeling shall be immediately removed from stock and destroyed within 6 months.

　7.   Promotional labeling in ADH inventory shall be reviewed minimally every two trimesters, as outlined in Section III. B. 1., initiated by Creative Services.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 8

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 03/31/1994 | 12/06/1993 |

III.    (Continued)

    E.    Changes in Promotional Labeling

        1.    Regulatory and Medical will determine which product labeling changes will effect current promotional labeling.  This determination will be documented on the completed change request document on the product labeling; and will be communicated by approvers by D-44M (QA).

        2.    PPD Marketing (Product Management and Creative Services) shall cross-reference product label changes with existing promotional label package files to identify and resolve any promotional labeling inconsistencies.  Marketing will identify all active pieces.  Regulatory Affairs and Medical will then determine which pieces require change.

        3.    PPD Marketing (Creative Services) shall issue expiration dates of approved distributed promotional labeling, and destruction notices for obsoleted or rejected materials to ADH and any other vendors maintaining inventory.

            For material that needs immediate withdrawal from field sales, PPD Marketing shall notify PPD Sales (Senior Management, North Chicago) who, in turn, shall notify PPD Sales Representatives/District and Regional Managers that their stock on hand should be destroyed.

            NOTE:    PPD Creative Services will assure the documented destruction of all affected promotional labeling.

    F.    Recorded Audio/Visual Promotional Material and Non-interactive Software

        1.    Recorded audio/visual promotional material and non-interactive software will be developed and approved in the same manner as that described in Section III. A., including approval of the script at preliminary review.  Final approval will be given for finished materials only.

        2.    Once approved Marketing (Creative Services) will supply QA (Label Control) with copies of the approved, signed-off promotional material script and the recorded promotional material for review prior to use, in accordance with III. C., above.

    G.    Interactive Software, Demonstration Programs, and Software Utilization/Demonstration/Access Programs

CONFIDENTIAL                                    ABTILSD-A000034760



**ABBOT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    PAGE 9

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 03/31/1994 | 12/06/1993 |

III.   G.   (Continued)

    1.   Software to be used as promotional material must follow the same review cycle as promotional printed material with the following additions:

        a.   Software must be validated and documented to assure it functions as intended, per PPD software validation requirement.

        b.   All software must be identified with a file name and a commodity number.

        c.   Master copy of software must be filed in Marketing (Creative Services).

        d.   Software program must be instructional or demonstrative only and not be presented for clinical or diagnostic applications.

        e.   Software must be designed, formatted and coded such that the program listing cannot be obtained by the user and the program cannot be modified by the user for Clinical or Diagnostic or other promotional application.

        f.   Software used as Promotional Labeling must be reviewed for continued applicability with each product change.

        g.   The Approval Request for Promotional items in this category should contain the following:

            (1)   Description of software program and purpose or intended use.

            (2)   Text of software screens and any accompanying literature, describing application.

            (3)   Plan for inventory control and distribution.

            (4)   Definition as to whether copyright is required.

            (5)   Certification as specified in G. 1. a. and e., above.

  H.   PDR (Physician Desk Reference)

    1.   Product prescribing information should be sent to Medical (Label Coordinator), Regulatory and QA for review and approval.

CONFIDENTIAL



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                              PAGE 10

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 03/31/1994 | 12/06/1993 |

III.   H.   1.   (Continued)

If there are product summaries, they should be routed sequentially per Section III. A..  If no product summaries exist, such material can be routed to Creative Services, Medical, Regulatory and QA for review and approval.

2.   Photos for the Product Identification Section should be reviewed and signed-off by QA and Product Development (using an approval copy of an issued PDR) prior to submission.  New photos of new products should also be signed-off by Product Development to assure conformance to actual product.

I.   Package Insert/Brief Summary Copy

1.   PPD Marketing (Creative Services) may access current product package insert/brief summary copy through HPD Graphics.  Label Control should review the printout from HPD Graphics for accuracy and return to Marketing (Creative Services) signed and dated.

2.   QA should notify Medical, Regulatory and Marketing (Creative Services) of any changes in prescribing information which it believes may affect final material.  This includes notifying Marketing of changes to product prescribing information that would be in turn affect the product Brief Summary used in journal advertisements.

J.   Record Retention

1.   All master copy and approval documents, and related information should be retained in accordance with the PPD QA Policy for Record Retention.

IV.   RESPONSIBILITY

Six functional areas are involved in the development and review of Promotional Labeling:

A.   MARKETING is responsible for developing promotional labeling, securing the required approvals and Creative Services incorporating the changes made by Medical, Regulatory and QA (Label Control) in the final piece.  In addition, Creative Services is responsible for the distribution of promotional labeling and when necessary the destruction of obsolete, rejected, or recalled literature.  The Creative Services Department (D-321) within Marketing will be responsible for management of the promotional labeling review process.

CONFIDENTIAL



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 11

DOCUMENT QP.009

**ISSUE DATE    SUPERCEDES**

03/31/1994    12/06/1993

IV.    (Continued)

B.    REGULATORY is responsible for reviewing and approving the promotional labeling to assure compliance with applicable regulations and consistency with current product labeling.  Regulatory is responsible for submission of promotional and advertising materials to FDA, as well as interfacing with FDA regarding promotional labeling or advertising.  Regulatory may determine if materials should be placed on Regulatory Hold or Rejected.

C.    MEDICAL is responsible for reviewing and approving of all promotional labeling for medical accuracy, and consistency with current product labeling.  Medical may determine if materials should be placed on Medical Hold or Rejected.

D.    QA (LABEL CONTROL), is responsible for review and proofreading of all promotional labeling for accurate use of trademarks, logos, generic names, and prescribing information.  In addition Label Control reviews all final printed material to determine compliance to the final copy approval by Medical and Regulatory.  The Quality Assurance function is responsible for assuring all related PPD disciplines are operating in compliance with the requirements of this policy.

E.    SALES is responsible for notifying the Sales Force of any recalled literature and for providing direction regarding its destruction.

F.    PUBLIC AFFAIRS is responsible for developing promotional labeling associated with press releases, in accordance with Section III. A..

                                    ABTILSD-A000034763

QP.009
Attachment A-0
Page 12

☐ **Sign-off Meeting/Date:**_____        **For initial circulation**
☐ **Routing**         **copy/layout**

---

## REVIEW   AND   APPROVE

| Product | Date |
|---|---|
| Description | No. |

Total Number of Pages    _____

RETURN TO APPROVAL COORDINATOR BY:  _____  *to Dept. 321, Bldg. AP30*

---

### To be filled out by Product Manager or Project Initiator.

Audience:   ☐  Physician Leave-behind – promotional
            ☐  To be used with physician, but intended NOT to be left with doctor – promotional
            ☐  Physician Leave-behind – educational
            ☐  Reps Use Only (Sales Training) – non-promo.
            ☐  RM/DM Use Only – non-promotional
            ☐  Other (please explain)

Quantity:_____        Bundled in:  _____
Quantity to be distributed per rep:

Sales Force: ☐  PMR  ☐  PPR  ☐  HR  ☐  SR  ☐  Other_____

Approximate date of distribution to Sales Force:  _____
If Journal Ad, approximate date of issue:  _____
If Direct Mail, approximate date of mailings:  _____

| | Signature | Date | OK as is | Note Changes |
|---|---|---|---|---|
| Approval Coordinator | _____ | _____ | ☐ | ☐ |
| Project Manager | _____ | _____ | ☐ | ☐ |
| Product Manager | _____ | _____ | ☐ | ☐ |
| Assoc. Product Manager | _____ | _____ | ☐ | ☐ |
| Label Control Reviewer | _____ | _____ | ☐ | ☐ |
| Medical Physician | _____ | _____ | ☐ | ☐ |
| Medical Reviewer | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| Regulatory Reviewer | _____ | _____ | ☐ | ☐ |
| PPI Requirements | ☐  No PPI | ☐  Full PPI | ☐  Brief PPI | |
| Other | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |

Label: (Comments)

---

Medical: (Comments)

---

Regulatory: (Comments)

---

Stamped "For Reps Use Only"  ☐  Yes   ☐  No

---

### Please be sure all questions are answered – yellow slip is signed and date.

☐ Legal File    ☐ Hold for production

Comments:
_____

CONFIDENTIAL              ABTILSD-A000034764

## REVIEW   AND   APPROVE

Product _____   Date _____

Description _____   No. _____

Total # Pages _____

RETURN TO APPROVAL COORDINATOR BY: _____ *to Dept. 321, Bldg. AP30*

| | Signature | Date | OK as is | Note Changes |
|---|---|---|---|---|
| Approval Coordinator | _____ | _____ | ☐ | ☐ |
| Project Manager | _____ | _____ | ☐ | ☐ |
| Product Manager | _____ | _____ | ☐ | ☐ |
| Assoc. Product Manager | _____ | _____ | ☐ | ☐ |
| Label Control Reviewer | _____ | _____ | ☐ | ☐ |
| Medical Physician | _____ | _____ | ☐ | ☐ |
| Medical Reviewer | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| Regulatory Reviewer | _____ | _____ | ☐ | ☐ |
| PPI Requirements | ☐  No PPI | ☐  Full PPI | ☐  Brief PPI | |
| Other | | | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |

**PLEASE BE SURE YOU HAVE INITIALED AND DATED THIS SLIP**

☐  Legal File

ABTILSD-A000034765



ABBOTT LABORATORIES
PHARMACEUTICAL PRODUCTS DIVISION
QUALITY POLICY                                    PAGE 14
DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 03/31/1994 | 12/06/1993 |

**DESCRIPTION OF CHANGE:**

| CR # | INITIATOR |
|------|-----------|
| 07065 | S. Madsen |

**D OF C**

Revise III.C.1. to allow use of blueline (proof) for proofreading of final printed.

END OF DOCUMENT

CONFIDENTIAL                                              ABTILSD-A000034766

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Info |
|------|

| | |
|---|---|
| **Checked Out By:** | |
| **Document ID:** | QP.009 |
| **Title:** | PROMOTIONAL LABELING |
| **Application Context:** | GPDQ2 |
| **Version Label:** | 2.0, Superseded |
| **Action Required:** | Create New / Revise |
| **Approved Date:** | 31-Mar-1994 |
| **Effective Date:** | |
| **Effective Date Type:** | Effective Date |
| **Division Name:** | Global Pharmaceutical Operations |
| **Control Site:** | GPO - PPD Lake County IL (Div QA) |
| **Abbott Document Type:** | Policy |
| **Disable Overlay:** | T |
| **Overlay Name:** | |
| **Translation Source:** | |
| **Abbott Owner:** | qdmprdoc |
| **Document Category:** | gdp_quality_system |
| **Document Date:** | |
| **Language:** | English(en) |
| **QMD Status:** | Superseded |
| **Status Date:** | 31-Mar-1994 |
| **Authors:** | |
| **Pending Agency Approval:** | F |
| **Departments/Areas Affected:** | |
| **Source Document:** | |
| **XML Document Source:** | |
| **CR Initiator:** | |
| **CR Number:** | N/A |
| **Description of Change:** | N/A, This document was migrated to QMD per GPO VCR # 09544, 7065, Revise III.C.1. to allow use of blueline (proof) for proofreading of final printed. |
| **Legacy CR Numbers:** | N/A,7065 |
| **Legacy Control Site:** | Division |
| **Legacy SME:** | NVA |
| **Legacy SME Functional Areas:** | NVA |
| **Legacy User Site Effective Dates:** | |
| **Legacy User Sites:** | |

| Post Approval |
|---------------|

| | |
|---|---|
| **Business Type:** | N/A |
| **Governing Document:** | N/A |
| **Reference Document:** | B-0, COMPUTERIZED A-0, N/A, N/A |

CONFIDENTIAL                                                                     ABTILSD-A000034767

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Periodic Review |
|---|

**Periodic Review State:** Enabled
**Last Review Date:**
**Review Interval:** 0 months
**Next Review Date:** 31-Mar-1995
**Subject Matter Expert:** Helstad_Elizabeth_A
**SME Functional Area:** Documentation Control

| Site Effectivity |
|---|

< No Site Effectivity Data to Display >

**END OF DOCUMENT**

---

CONFIDENTIAL                                                                    ABTILSD-A000034768



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 1

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
| --- | --- |
| 01/24/1996 | 07/05/1995 |

**TITLE**  PROMOTIONAL LABELING

**REFERENCE DOCUMENTS**

N/A

**DISTRIBUTION**

NC, AP16, API, D-30D, D-353, D-417, D-418, D-443, D-44F, D-44K,
D-41J, D-49P, D-498, D-50Z, D-6RA, D-487, D-553, D-316, 866(5),
D-86P(2), D-388, D-44N(2), D-551, D-554, D-6RK, D-916

| | MED SERVICES | REG AFFAIRS | DIVISION QA |
| --- | --- | --- | --- |
| **NAME:** | T. HEIMBERGER | A.K. HENRY | W. DONOVAN |
| **DATE:** | 11/06/1995 | 11/06/1995 | 10/16/1995 |
| | **LABEL CONTROL** | **DIR PROF COMM** | **VP PHAR MKTG** |
| **NAME:** | L. GLASSMAN | J. NISSEN | E. FIORENTINO |
| **DATE:** | 10/18/1995 | 11/17/1995 | 05/10/1995 |
| | **DIR PUBLIC AFFAIRS** | **VP QA OP** | **VP OPERATIONS** |
| **NAME:** | D. PETKUS | K. PEEL | R. MORRISON |
| **DATE:** | 05/11/1995 | 11/30/1995 | 11/20/1995 |
| | **EDITOR** | **VP QA** | |
| **NAME:** | N. MERTINS | K. PEEL FOR L. WYATT | |
| **DATE:** | 12/06/1995 | 11/30/1995 | |

**ATTACHMENTS**

NON-COMPUTERIZED A-1, B-1, C-0, D-0

**APPLICABLE DOCUMENTS**

QP.006, QP.021

I.      **PURPOSE**

      To establish the necessary activities and responsibilities for developing,
approving, and maintaining PPD Promotional Labeling in compliance with
applicable sections of 21 Code of Federal Regulations and the Food, Drug and
Cosmetic Act.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 2

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

II.    **SCOPE**

A.   This policy covers all PPD advertising and promotional matter descriptive of a marketed product which falls within the regulatory definition of labeling or advertising.  This policy will provide methods by which promotional labeling or advertising will be developed and approved prior to final printing and the necessary distribution, storage and inventory control requirements assuring that unapproved or obsolete promotional labeling is not distributed.

B.   Advertising and promotional items include, but are not limited to, copy and visuals for brochures, sales aids, in-service materials, journal advertising, broadcast advertising, patient education materials, consumer promotional materials, published reprints, group promotional programs (e.g. CET, CEP, etc.), teleconference programs, press materials, premiums, and direct mail items.  This also includes product related copy on reminder items.

Advertisements and promotional labeling as defined in 21CFR Section 202.1(1) (1) and (2) will apply here.

Section 202.1(1) (1):  "Advertisements subject to section 502(n) of the act include advertisements in published journals, magazines, other periodicals, and newspapers, and advertisements broadcast through media such as radio, television, and telephone communication systems."

Section 202.1(1) (2):  "Brochures, booklets, mailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio or visual matter descriptive of a drug and references published (for example the "Physicians' Desk Reference®") for use by Medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act".

C.   Consideration of Intent:

1.   An advertisement or promotional labeling piece is not satisfactory if it is false or misleading as defined in the Code of Federal Regulations with respect to the following examples (which are not all inclusive):

a.   Side effects, contraindications, or effectiveness.
b.   Fair balance between information relating to side effects and contraindications and information relating to effectiveness.
c.   Failing to reveal facts in the light of consequence from use.

                                          ABTILSD-A000034770



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                              PAGE 3

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

**II. SCOPE** (Cont.)

    C. Consideration of Intent: (Cont.)

        d.  Containing a representation or suggestion, not approved or permitted in the labeling.

        e.  Containing a product comparison that represents or suggests that a product is safer or more effective than another product.

        f.  Containing favorable information or opinions that have been rendered invalid.

        g.  Presenting information from a study in a way that implies greater experience than actually does.

        h.  Containing reference to literature or studies that misrepresent the degree of safety and/or effectiveness of a product.

        i.  Using a statement by a recognized authority that is favorable but is inconsistent with other data.

        j.  Using quote or paraphrase out of context to convey false or misleading idea.

        k.  Using literature or reference that intend to support a claim but do not.

        l.  Using literature or references recommending conditions of use that are not approved in the labeling.

**III.   POLICY**

    A.  Development and Approval

        1.  At the inception or reprinting of promotional labeling or advertising, Marketing (Creative Services Department) shall assign a commodity number and complete a review and approval form (Attachment A, yellow form) for initial review.

        2.  Each piece of promotional labeling or advertising of a program requires a separate routing form and should as a rule be routed together as a packet with companion pieces for review.

        3.  On a scheduled basis, Marketing (Creative Services) distributes promotional labeling or advertising for review by Medical and Regulatory.  This material, to be reviewed for the first time, will include copies of all new references cited in the piece.  All materials are formally discussed and approved within a meeting format attended by Medical, Regulatory, Marketing Product Management and Creative Services; though such material can be routed sequentially for review or approval, if agreed upon by all parties approving the materials.  The prescribed sequence for routing and approval signatures is:  Creative Services, Product Management, Medical and Regulatory.

                                                              ABTILSD-A000034771



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 4

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

**III. POLICY** (Cont.)

    A. Development and Approval (Cont.)

        NOTE:    Business reply cards that offer product samples are additionally distributed for review and approval to Corporate Legal, Corporate Regulatory, and PPD Sales Services for review.

      4. Creative Services is responsible for developing the meeting agenda and chairing the meeting.  All promotional labeling and advertising items on the agenda are reviewed and changes are made on the master copy which is then signed and dated by Marketing (Product Management), Medical and Regulatory.  Marketing (Creative Services) keeps the original copy in their files.

      5. Following initial approval of copy/layout (yellow form), a second approval is required upon completion of the mechanical artwork production phase, and implementation of changes from initially approved copy.  Mechanical stats are distributed to Medical and Regulatory for review.  A pink form (Review and Approval for Final Circulation, Attachment B) is attached.  All three-dimensional pieces should have booked-up dimensional stats in final size distributed to Medical and Regulatory.  Mechanical stat review follows the same approval procedure as that of copy/layout for initial review (yellow form).  Where the initial copy was prepared as final art via computer design, the pink form may be used. Reviewers may require a yellow form and a second review and approval.

      6. Following final approval of the mechanical stats, no further changes except correction of spelling/typographical errors, will be made without approval by Medical and Regulatory Affairs.

CONFIDENTIAL



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 5

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

III.   **POLICY** (Cont.)

    A.   Development and Approval (Cont.)

        7.   After final approval of the mechanical stats the preproduction proof will be approved by QA (Attachment C, blue form).  Label Control will assure all approved promotional material will be 100% proofread by qualified proofreading personnel.  This includes proofing of the preproduction proof against the final approved mechanical stat prior to printing.

        8.   The file of approved documents will be maintained in Creative Services.

        9.   Subsequent revision to any promotional piece requires a new commodity number.

      10.   Each subsequent reprint of previously approved promotional labeling requires generation and approval of yellow form (Review and Approval of Initial Circulation) where changes have been made, and/or a pink form (for Final Circulation) where minimal or no changes are made.  "Minimal changes" are understood to be those which have no impact on original copy.

    B.   Purchase

        1.   After final approval, Marketing (Creative Services) will proceed with final production.  All materials must be reviewed by Regulatory Affairs if not produced within two trimesters after approval.

        2.   All purchase orders will require that the vendor identify shipping containers with the commodity number, purchase order number and quantity of contents.

CONFIDENTIAL



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 6

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

**III. POLICY** (Cont.)

    C.   Release of Final Material

        1.   It is the responsibility of Creative Services to assure that representative copies of all final materials are forwarded to QA. QA (Label Control) will proof final samples of all materials, regardless of intended use or medium.  Label Control will proofread the final printed material against the preproduction proof as described in III.A.6. and complete a release form.  If a preproduction proof is not needed to produce the final material (i.e., material described in III. F., G., and H.) Label Control will proof final sample against the approved master documentation (Review and Approval for Final Circulation, Pink form) and complete a release form (Attachment D).  If the samples are consistent with the copy used to proofread against, a copy of the release form will be sent to Creative Services.  QA will send copies of the release form with two samples of the final piece to Medical and 4 samples will be sent to Regulatory Affairs; along with completed copies of the approval form to all approvers.  Regulatory Affairs is responsible for determining if materials require submission to FDA after release by QA.

        2.   For Run-of-Book Advertising, Creative Services will supply Label Control a blueline for approval.  Creative Services will also supply Regulatory with 3 copies of tear sheets from the first printing of each advertisement.

        3.   For Journal inserts, Creative Services will provide Label Controlwith copies of the final printed material as stated in Section III.C.1.

        4.   If the printed samples are inconsistent with the final approved copy, QA will note the discrepancies on an NCMR (Non-Conforming Materials Report QP.021), attached to and referenced on the Release form, and forward all samples, copies of the materials and the NCMR, back to Creative Services.  Creative Services may resubmit the final materials for review by all original approvers of the piece.  If all original approvers agree that the discrepancies are acceptable, the reviewers will sign and date the NCMR, which will then be returned to QA for review, approval and release as described in III. C. 1.

           If the discrepant piece requires modification, the original reviewers will indicate the necessary changes (e.g., replace pages, cover erroneous text with stickers, etc.) and sign a new Final Circulation Form.  Marketing (Creative Services and Product Management) will implement the necessary corrections.  Creative Services will forward samples of the corrected pieces to QA for disposition in the same manner described in III. C. 1.

                                                      ABTILSD-A000034774



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 7

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

III.    **POLICY** (Cont.)

    C.    Release of Final Material (Cont.)

        5.    In the event that DROP SHIPMENT, direct mailing of promotional labeling or advertising is required of the vendor, it will be the responsibility of Marketing (Creative Services) to obtain representative samples of the promotional labeling or advertising and forward them to QA (Label Control).  Marketing (Creative Services) will assure that vendor material release does not take place until receipt of the respective approved release documents. QA will then proceed as defined in III. C. 1., above.

    D.    Storage and Inventory Control

        1.    Upon receipt of shipments of promotional labeling at the respective warehousing facility, a review of shipment containers shall be made to assure that appropriate case identification markings are present and that the labeling containers are intact.

        2.    When shipments received at ADH are approved for distribution, they are logged into their inventory system that includes the following data.

            a.    Commodity number

            b.    Quantity

            c.    Maximum order quantity and bundle size

            d.    Product

            e.    Title of the piece

            f.    Status (OK to distribute, or, quarantine/on hold)

        3.    For shipments to ADH, Dallas, all promotional labeling will be held in quarantine (on hold) upon receipt until a fax or other written communication referencing the shipment indicates it is approved for distribution.  This written communication comes from Marketing (Creative Services) and is based on the release form from QA (Label Control).

        4.    Placing an item on "Regulatory/Quality Hold" needs to be done through Creative Services at the direction of Regulatory, Medical or QA management.  Items that are put "Regulatory/Quality Hold", after an initial release, are not allowed to be distributed until Creative Services notifies ADH to release the "hold".



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    PAGE 8

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

III.   **POLICY** (Cont.)

    D.   Storage and Inventory Control (Cont.)

        a.   "Product Management Hold" whereby Creative Services personnel can release items.  The reasons for hold status are neither regulatory, medical nor quality related in nature.

        b.   "Regulatory/Medical/Quality Hold" whereby Creative Services may effect the release only based on written approval from Regulatory, Medical or QA.

      5.   All obsolete and rejected promotional labeling will be physically identified and the respective warehouse records will be identified with a prominent "OBSOLETE" or "REJECT" status.  Where ADH is involved, they will be notified in writing by Creative Services. All such notifications to ADH must be acknowledged by ADH in writing, along with a signed and dated statement of compliance.

      6.   a.   All "REJECT" promotional labeling and advertising shall be immediately removed from stock and subsequently destroyed within 60 days.

          b.   All "OBSOLETE" promotional labeling shall be immediately removed from stock and destroyed within 6 months.

      7.   Promotional labeling in ADH inventory shall be reviewed annually unless notified otherwise by Medical or Regulatory as outlined in Section III. B. 1., initiated by Creative Services.

    E.   Changes in Promotional Labeling

      1.   Regulatory and Medical will determine which product labeling changes will effect current promotional labeling.  This determination will be documented on the completed change request document on the product labeling; and will be communicated by approvers by D-44M (QA).

      2.   PPD Marketing (Product Management and Creative Services) shall cross-reference product label changes with existing promotional label package files to identify and resolve any promotional labeling inconsistencies.  Marketing will identify all active pieces.  Regulatory Affairs and Medical will then determine which pieces require change.

      3.   Where there are changes in promotional labeling, PPD Marketing (Creative Services) shall issue expiration dates of affected distributed promotional labeling, and destruction notices for obsoleted or rejected materials to ADH and any other vendors maintaining inventory.

ABTILSD-A000034776



ABBOTT LABORATORIES
PHARMACEUTICAL PRODUCTS DIVISION
QUALITY POLICY                                                    PAGE 9
DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 01/24/1996 | 07/05/1995 |

III.   **POLICY** (Cont.)

    E.   Changes in Promotional Labeling

        For material that needs immediate withdrawal from field sales, PPD Marketing shall notify PPD Sales (Senior Management, North Chicago) who, in turn, shall notify PPD Sales Representatives/District and Regional Managers that their stock on hand should be destroyed.

        NOTE:   PPD Creative Services will assure the documented destruction of all affected promotional labeling.

    F.   Press Materials

        1.   Press (media) materials are promotional labeling and include, but are not limited to, press kits (brochures, fact sheets, Q & A), press backgrounders, press releases, video/audio news releases, and B-rolls.

        2.   In general, the development and approval of press materials follows this policy as described in Section III.A.  The following exceptions apply:

            a.   PPD Public Affairs is responsible for obtaining a project number assignment from Creative Services.

            b.   PPD Public Affairs routes press materials sequentially to Creative Services, Public Affairs, Medical and Regulatory. Corporate Public Affairs routes to Legal and Corporate Quality and Regulatory Affairs for review and approval, together with supporting references.  If necessay, Public Affairs arranges a meeting with Medical, Regulatory, and Legal to obtain approval of materials.

            c.   Medical Review, reviews and approves all press materials.  If the subject of press materials concerns pre-NDA PPD compounds, or in the case of a marketed product with a new indication pending approval or under development, approval from the investigating Venture or Clinical team is also required.  In this case, the Venture or Clinical team verifies the data presented and Medical Review reviews for overall medical message.  Venture/Clinical approval must be obtained before Medical Review approves the materials.

            d.   Public Affairs management is responsible for implementing all approved changes from the final approval materials into the press materials before release.  Final copies of materials with implemented changes are forwarded to Medical and Regulatory before release.  Final copies should include the date of planned release.

ABTILSD-A000034777



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                    **PAGE 10**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

III.   **POLICY** (Cont.)

G.   Recorded Audio/Visual Promotional Material and Non-interactive Software

1.   Recorded audio/visual promotional material and non-interactive software will be developed and approved in the same manner as that described in Section III. A., including approval of the script at preliminary review.  Final approval will be given for finished materials only.

2.   Once approved Marketing (Creative Services) will supply QA (Label Control) with copies of the approved, signed-off promotional material script and the recorded promotional material for review prior to use, in accordance with III. C., above.

H.   Interactive Software, Demonstration Programs, and Software Utilization/Demonstration/Access Programs

1.   Software to be used as promotional material must follow the same review cycle as promotional printed material with the following additions:

a.   Software must be validated and documented to assure it functions as intended, per PPD software validation requirement.

b.   All software must be identified with a file name and a commodity number.

c.   Master copy of software must be filed in Marketing (Creative Services).

d.   Software program must be instructional or demonstrative only and not be presented for clinical or diagnostic applications.

e.   Software must be designed, formatted and coded such that the program listing cannot be obtained by the user and the program cannot be modified by the user for Clinical or Diagnostic or other promotional application.

f.   Software used as Promotional Labeling must be reviewed for continued applicability with each product change.

g.   The Approval Request for Promotional items in this category should contain the following:

(1)   Description of software program and purpose or intended use.

(2)   Text of software screens and any accompanying literature, describing application.

                                    ABTILSD-A000034778



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                      **PAGE 11**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

**III.    POLICY** (Cont.)

    H.   (Cont.)

           (3)  Plan for inventory control and distribution.

           (4)  Definition as to whether copyright is required.

           (5)  Certification as specified in G. 1. a. and e., above.

      2.   100% proofreading will occur only between the final approval copy and the final piece.

    I.   PDR® (Physicians' Desk Reference)

      1.   Product prescribing information should be sent to Medical (Label Coordinator), Regulatory and QA for review and approval.

      2.   Photos for the Product Identification Section should be reviewed and signed-off by QA and Product Development (using an approval copy of an issued PDR) prior to submission.  New photos of new products should also be signed-off by Product Development to assure conformance to actual product.

    J.   Package Insert/Brief Summary Copy

      1.   PPD Marketing (Creative Services) may access current product package insert/brief summary copy through HPD Graphics.  Label Control should review the printout from HPD Graphics for accuracy and return to Marketing (Creative Services) signed and dated.

      2.   QA should notify Medical, Regulatory and Marketing (Creative Services) of any changes in prescribing information which it believes may affect final material.  This includes notifying Marketing of changes to product prescribing information that would be in turn affect the product Brief Summary used in journal advertisements.

    K.   Record Retention

      1.   All master copy and approval documents, and related information should be retained in accordance with the PPD QA Policy for Record Retention (QP.006).

CONFIDENTIAL                                        ABTILSD-A000034779



**ABBOTT LABORATORIES**

**PHARMACEUTICAL PRODUCTS DIVISION**

**QUALITY POLICY**                                             **PAGE 12**

**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

IV.    **RESPONSIBILITY**

Six functional areas are involved in the development and review of Promotional Labeling:

A.    MARKETING is responsible for developing promotional labeling, securing the required approvals and Creative Services incorporating the changes made by Medical, Regulatory and QA (Label Control) in the final piece. In addition, Creative Services is responsible for the distribution of promotional labeling and when necessary the destruction of obsolete, rejected, or recalled literature.  The Creative Services Department (D-321) within Marketing will be responsible for management of the promotional labeling review process.

B.    REGULATORY is responsible for reviewing and approving the promotional labeling to assure compliance with applicable regulations and consistency with current product labeling.  Regulatory is responsible for submission of promotional and advertising materials to FDA, as well as interfacing with FDA regarding promotional labeling or advertising. Regulatory may determine if materials should be placed on Regulatory Hold or Rejected.

C.    MEDICAL is responsible for reviewing and approving all promotional labeling for medical accuracy, and consistency with current product labeling.  In the case of Press Materials, Medical approval may be required by both Medical Review and a Venture or Clinical team, as determined by Medical Review, based on the filing status of the product or indication in question.  Medical may determine if materials should be placed on Medical Hold or Rejected.

D.    QA (LABEL CONTROL), is responsible for review and proofreading of all promotional labeling for accurate use of trademarks, logos, generic names, and prescribing information.  In addition Label Control reviews all final printed material to determine compliance to the final copy approval by Medical and Regulatory.  The Quality Assurance function is responsible for assuring all related PPD disciplines are operating in compliance with the requirements of this policy.

E.    SALES is responsible for notifying the Sales Force of any recalled literature and for providing direction regarding its destruction.

F.    PUBLIC AFFAIRS is responsible for developing promotional labeling associated with press materials implementing approved changes, and issuing final copy with implemented changes to Medical Review, Regulatory and Corporate QA in accordance with Section III. A.

                                             ABTILSD-A000034780



**ABBOTT LABORATORIES**
**PHARMACEUTICAL PRODUCTS DIVISION**
**QUALITY POLICY**                                        **PAGE 13**
**DOCUMENT QP.009**

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 01/24/1996 | 07/05/1995 |

**DESCRIPTION OF CHANGE:**

| CR # | INITIATOR |
|------|-----------|
| 28854 | S. MADSEN |

**D OF C**

Added new III. H. 2.: 100% proofreading will occur only between the final approval copy and the final piece.

**END OF DOCUMENT**

                                        ABTILSD-A000034781

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Info |
|------|

| | |
|---|---|
| **Checked Out By:** | |
| **Document ID:** | QP.009 |
| **Title:** | PROMOTIONAL LABELING |
| **Application Context:** | GPDQ2 |
| **Version Label:** | 5.0, Superseded |
| **Action Required:** | Create New / Revise |
| **Approved Date:** | 24-Jan-1996 |
| **Effective Date:** | |
| **Effective Date Type:** | Effective Date |
| **Division Name:** | Global Pharmaceutical Operations |
| **Control Site:** | GPO - PPD Lake County IL (Div QA) |
| **Abbott Document Type:** | Policy |
| **Disable Overlay:** | T |
| **Overlay Name:** | |
| **Translation Source:** | |
| **Abbott Owner:** | qdmprdoc |
| **Document Category:** | gdp_quality_system |
| **Document Date:** | |
| **Language:** | English(en) |
| **QMD Status:** | Superseded |
| **Status Date:** | 24-Jan-1996 |
| **Authors:** | |
| **Pending Agency Approval:** | F |
| **Departments/Areas Affected:** | |
| **Source Document:** | |
| **XML Document Source:** | |
| **CR Initiator:** | |
| **CR Number:** | N/A |
| **Description of Change:** | N/A, This document was migrated to QMD per GPO VCR # 09544, 28854, Added new III. H. 2.: 100% proofreading will occur only between the final approval copy and the final piece. |
| **Legacy CR Numbers:** | N/A,28854 |
| **Legacy Control Site:** | Division |
| **Legacy SME:** | NVA |
| **Legacy SME Functional Areas:** | NVA |
| **Legacy User Site Effective Dates:** | |
| **Legacy User Sites:** | |

| Post Approval |
|---------------|

| | |
|---|---|
| **Business Type:** | N/A |
| **Governing Document:** | N/A |
| **Reference Document:** | B-1, C-0, D-0, NON-COMPUTERIZED A-1, QP.006, QP.021 |

CONFIDENTIAL                                                                    ABTILSD-A000034782

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Periodic Review |
|---|

**Periodic Review State:** Enabled
**Last Review Date:**
**Review Interval:** 0 months
**Next Review Date:** 24-Jan-1997
**Subject Matter Expert:** Helstad_Elizabeth_A
**SME Functional Area:** Documentation Control

| Site Effectivity |
|---|

< No Site Effectivity Data to Display >

**END OF DOCUMENT**

CONFIDENTIAL                                                                                    ABTILSD-A000034783

# EXHIBIT "C"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **B.P., A MINOR, BY DAWN FRAGNOLI INDIVIDUALLY AS PARENT AND NEXT FRIEND,** | ) **Case No. 13-cv-324-SCW** <br> ) <br> ) <br> ) |
| **PLAINTIFFS,** | ) <br> ) |
| **J.B., A MINOR, BY LINDA LEJEUNE INDIVIDUALLY AS LEGAL CUSTODIAN AND NEXT FRIEND,** | ) **Case No. 13-cv-326-SCW** <br> ) <br> ) <br> ) |
| **PLAINTIFFS,** | ) |
| **v.** | ) <br> ) |
| **ABBOTT LABORATORIES, INC.,** | ) **JURY TRIAL DEMANDED** <br> ) **ON ALL COUNTS** |
| **DEFENDANT.** | ) |

**TO: DEFENDANT ABBOTT LABORATORIES, INC. AND THEIR ATTORNEYS OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that Plaintiffs will take the deposition upon oral examination of a witness designated by Defendant Abbott Laboratories, Inc. to testify on its behalf pursuant to Federal Rules of Civil Procedure 26 and 30. Defendant has designated Scott Anderson as its representative to testify about information known or reasonably available to the organization on the following issue set forth in Exhibit A to the general notice served December 18, 2013:

> Plaintiffs seek to depose a witness or witnesses who can testify regarding Depakote for the time period 1974 through the date of implementation of the boxed warning and migraine approval in 1996 on the issues noted below:
>
> 1. Whether and how Abbott verified the accuracy of scientific and/or medical information contained in marketing, sales, informational, and/or promotional materials concerning Depakote;

PLEASE TAKE FURTHER NOTICE that the deposition will take place on March 13, 2014, beginning at 8:30 a.m., and will continue until completed at the following location: Hyatt Deerfield, 1750 Lake Cook Rd., Deerfield, IL 60015. Said deposition will be taken before a court reporter authorized to administer oaths, pursuant to Federal Rule of Civil Procedure 28, and will be recorded on videotape. This deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as are permitted under the Federal Rules of Civil Procedure and the local rules.

PLEASE TAKE FURTHER NOTICE that the deponent should produce copies of all prior sworn testimony and portions of his personnel file reflecting compensation and/or bonuses and all performance reviews related to Depakote prior to the deposition.

Dated: March 5, 2014

By:     */s/ Christopher Cueto*
Christopher Cueto, #06192248
Michael Gras, #06303414
Law Office of Christopher Cueto, Ltd.
7110 West Main Street
Belleville, IL 62223
Phone: (618) 277-1554
Fax: (618) 277-0962

Ralph D. McBride
Phillip L. Sampson, Jr.
Heath A. Novosad
Blair R. Loocke
Nancy R. McEvily
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 223-2300
Fax: (713) 221-1212

Jennifer M. Salim
Bracewell & Giuliani LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Phone: (214) 468-3800
Fax: (214) 468-3888
John E. Williams, Jr.
John T. Boundas
Steven J. Kherkher
Sejal K. Brahmbhatt
Margot G. Trevino
Williams Kherkher Hart Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200
Fax: (713) 643-6226

William M. Audet
Joshua C. Ezrin

Audet & Partners, LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Phone: (415) 568-2555
Fax: (415) 568-2556
Jeff Meyer
The Meyer Law Firm, P.C.
6363 Woodway Drive, Suite 720
Houston, Texas 77057
Phone: (713) 974-4100
Fax: (713) 974-0225

Kenneth T. Fibich
Erin Copeland
Fibich Hampton Leebron Briggs & Josephson, LLP
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 751-0025
Fax: (713) 751-0030

Robert L. Salim
Salim-Beasley, LLC
1901 Texas Street
Natchitoches, Louisiana 71457
Phone: (318) 352-5999
Fax: (318) 352-5998

Kathryn Harrington
Mark Ekonen
Amanda S. Williamson
Heninger Garrison Davis, LLC
2224 1st Avenue North
P. O. Box 11310
Birmingham, Alabama 35202
Phone: (205) 326-3336
Fax: (205) 326-3332

George Erick Rosemond
Rosemond Law Group, PC
8441 Gulf Freeway
Suite 600
Houston, TX 77017
Phone: (713) 230-2342
Fax: (713) 649-3470

Jay Henderson
Jay Henderson, PLLC
5020 Montrose Blvd., Suite 300

Houston, Texas 77006
Phone:  (713) 275-4050

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned herby certifies that a copy of the foregoing was served via electronic mail on the 5th day of March, 2014, to the following counsel of record for Defendant:

BRYAN CAVE LLP
Dan H. Ball
dhball@bryancave.com
Peter W. Herzog III
pwherzog@bryancave.com
Stefan A. Mallen
samallen@bryancave.com
211 North Broadway, Suite 3600
St. Louis, MO  63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Paul F. Strain
Stephen E. Marshall
Dino Sangiamo
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD  21202
(410) 244-7400

ATTORNEYS FOR DEFENDANT

*/s/ Margot G. Trevino*_____
Margot G. Trevino

# EXHIBIT "D"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **B.P., A MINOR, BY DAWN FRAGNOLI INDIVIDUALLY AS PARENT AND NEXT FRIEND,** | ) ) ) | **Case No. 13-cv-324-SCW** |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **J.B., A MINOR, BY LINDA LEJEUNE INDIVIDUALLY AS LEGAL CUSTODIAN AND NEXT FRIEND,** | ) ) ) | **Case No. 13-cv-326-SCW** |
| | ) | |
| **PLAINTIFFS,** | ) | |
| **v.** | ) | |
| | ) | |
| **ABBOTT LABORATORIES, INC.,** | ) | **JURY TRIAL DEMANDED** |
| | ) | **ON ALL COUNTS** |
| **DEFENDANT.** | ) | |

**TO: DEFENDANT ABBOTT LABORATORIES, INC. AND THEIR ATTORNEYS OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure, Rule 30 and Rule 30(b)(6), the Plaintiffs will take the deposition upon oral examination of a witness designated by the defendant to testify on its behalf. The defendant has designated Michael Murray as its representative to testify about information known or reasonably available to the organization on the following issues:

C. Sales, Marketing, and Promotional Activities, for the time period from 1974 through 1996:

    2. Materials that were used to train Abbott sales representatives about VPA drugs;

    3. Product information materials and marketing materials, whether intended for physicians or patients, concerning VPA drugs;

    4. The tracking or analysis of physician prescribing behavior for VPA drugs or drugs in their class;

    5. Sales, expense, and budget information on the following: annual sales of each of the VPA drugs, expenses incurred for marketing and sales activities with regard to each of the VPA drugs, expenses incurred for research and development with regard to the VPA drugs, and profits earned for each year with regard to each VPA drug; and

      6.   Names, job titles and responsibilities of Abbott employees who were most knowledgeable about the above topics.

D.  Medical Affairs,  for the general time period from 1974 through 1996:

      1.   Call notes or other means of documenting interactions with physicians by sales representatives;

      2.   Communications with prescribing physicians to promote VPA drugs and tangible or intangible information used in connection with promotional activities;

      6.   Tracking of physician prescribing behavior via IMS or any other service.

PLEASE TAKE FURTHER NOTICE that the deposition will commence on December 10, 2013 at 8:30 a.m. and will continue until completed at the following location: Chicago Marriott O'Hare, 8535 West Higgins Road, Chicago, Illinois 60631. Said deposition will be taken before a court reporter authorized to administer oaths, pursuant to Federal Rule of Civil Procedure 28, and will be recorded on videotape. This deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as are permitted under the Federal Rules of Civil Procedure and the local rules.

PLEASE TAKE FURTHER NOTICE that the deponent should produce, no later than 15 days before the deposition, his complete "custodial file" to the extent it has not yet been produced, copies of all prior sworn testimony, and portions of his personnel file reflecting compensation and/or bonuses and all performance reviews related to Depakote.

Dated: December 3, 2013

By:    */s/ Christopher Cueto*
Christopher Cueto, #06192248
Michael Gras, #06303414
Law Office of Christopher Cueto, Ltd.
7110 West Main Street
Belleville, IL 62223
Phone: (618) 277-1554
Fax: (618) 277-0962

Ralph D. McBride
Phillip L. Sampson, Jr.
Heath A. Novosad
Blair R. Loocke
Nancy R. McEvily
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300

Houston, Texas 77002
Phone: (713) 223-2300
Fax: (713) 221-1212

Jennifer M. Salim
Bracewell & Giuliani LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Phone: (214) 468-3800
Fax: (214) 468-3888

John E. Williams, Jr.
John T. Boundas
Steven J. Kherkher
Sejal K. Brahmbhatt
Margot Trevino
Williams Kherkher Hart Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200
Fax: (713) 643-6226

William M. Audet
Joshua C. Ezrin
Audet & Partners, LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Phone: (415) 568-2555
Fax: (415) 568-2556

Jeff Meyer
The Meyer Law Firm, P.C.
6363 Woodway Drive, Suite 720
Houston, Texas 77057
Phone: (713) 974-4100
Fax: (713) 974-0225

Kenneth T. Fibich
Erin Copeland
Fibich Hampton Leebron Briggs & Josephson, LLP
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 751-0025
Fax: (713) 751-0030

Robert L. Salim

Salim-Beasley, LLC
1901 Texas Street
Natchitoches, Louisiana 71457
Phone: (318) 352-5999
Fax: (318) 352-5998

Kathryn Harrington
Mark Ekonen
Amanda S. Williamson
Heninger Garrison Davis, LLC
2224 1st Avenue North
P. O. Box 11310
Birmingham, Alabama 35202
Phone: (205) 326-3336
Fax: (205) 326-3332

George Erick Rosemond
Rosemond Law Group, PC
8441 Gulf Freeway
Suite 600
Houston, TX 77017
Phone: (713) 230-2342
Fax: (713) 649-3470

Jay Henderson
Jay Henderson, PLLC
5020 Montrose Blvd., Suite 300
Houston, Texas 77006
Phone:  (713) 275-4050

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned herby certifies that a copy of the foregoing was served via electronic mail on the 3rd day of December, 2013, to the following counsel of record for Defendant:

Dan H. Ball
dhball@bryancave.com
Peter W. Herzog III
pwherzog@bryancave.com
Stefan A. Mallen
samallen@bryancave.com
BRYAN CAVE LLP

211 North Broadway, Suite 3600
St. Louis, MO  63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Paul F. Strain
pfstrain@venable.com
Stephen E. Marshall
semarshall@venable.com
Dino S. Sangiamo
dssangiamo@venable.com
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD  21202
(410) 244-7400

ATTORNEYS FOR DEFENDANT ABBOTT LABORATORIES, INC.

*/s/ Margot G. Trevino*
Margot G. Trevino

# EXHIBIT "E"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **B.P., A MINOR, BY DAWN FRAGNOLI INDIVIDUALLY AS PARENT AND NEXT FRIEND,** ) ) ) ) | **Case No. 13-cv-324-SCW** |
| **PLAINTIFFS,** ) ) | |
| **J.B., A MINOR, BY LINDA LEJEUNE INDIVIDUALLY AS LEGAL CUSTODIAN AND NEXT FRIEND,** ) ) ) ) | **Case No. 13-cv-326-SCW** |
| **PLAINTIFFS,** ) **v.** ) ) | |
| **ABBOTT LABORATORIES, INC.,** ) ) | **JURY TRIAL DEMANDED ON ALL COUNTS** |
| **DEFENDANT.** ) | |

**TO: DEFENDANT ABBOTT LABORATORIES, INC. AND THEIR ATTORNEYS OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that Plaintiffs will take the deposition upon oral examination of a witness designated by Defendant Abbott Laboratories, Inc. to testify on its behalf pursuant to Federal Rule of Civil Procedure 30(b)(6). Defendant has designated Mary Kay Rybicki as its representative to testify about information known or reasonably available to the organization on the following issues:

    B. Regulatory Affairs and Product Labeling. Plaintiffs seek to depose a witness or witnesses who can address the following topics for the time period from 1978 through 1996:

        6.    Communications with FDA regarding marketing, promotional or advertising materials for the VPA drugs;

PLEASE TAKE FURTHER NOTICE that the deposition will commence on January 29, 2014 at 8:30 a.m. and will continue until completed at the following location: Chicago Marriott O'Hare, 8535 West Higgins Road, Chicago, Illinois 60631. Said deposition will be taken before a court reporter authorized to administer oaths, pursuant to Federal Rule of Civil Procedure 28, and will be recorded on videotape. This deposition is being taken for the purposes of discovery, for use at trial, and for such other purposes as are permitted under the Federal Rules of Civil Procedure and the local rules.

PLEASE TAKE FURTHER NOTICE that the deponent should produce copies of all prior sworn testimony and portions of her personnel file reflecting compensation and/or bonuses and all performance reviews related to Depakote prior to her deposition.

Dated: January 24, 2014

By:      */s/ Christopher Cueto*
Christopher Cueto, #06192248
Michael Gras, #06303414
Law Office of Christopher Cueto, Ltd.
7110 West Main Street
Belleville, IL 62223
Phone: (618) 277-1554
Fax: (618) 277-0962

Ralph D. McBride
Phillip L. Sampson
Heath A. Novosad
Blair R. Loocke
Nancy R. McEvily
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 223-2300
Fax: (713) 221-1212

Jennifer M. Salim
Bracewell & Giuliani LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Phone: (214) 468-3800
Fax: (214) 468-3888

John E. Williams, Jr.
John T. Boundas
Steven J. Kherkher
Sejal K. Brahmbhatt
Margot G. Trevino
Williams Kherkher Hart Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200

Fax: (713) 643-6226

William M. Audet
Joshua C. Ezrin
Audet & Partners, LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Phone: (415) 568-2555
Fax: (415) 568-2556
Jeff Meyer
The Meyer Law Firm, P.C.
6363 Woodway Drive, Suite 720
Houston, Texas 77057
Phone: (713) 974-4100
Fax: (713) 974-0225

Kenneth T. Fibich
Erin Copeland
Fibich Hampton Leebron Briggs & Josephson, LLP
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 751-0025
Fax: (713) 751-0030

Robert L. Salim
Salim-Beasley, LLC
1901 Texas Street
Natchitoches, Louisiana 71457
Phone: (318) 352-5999
Fax: (318) 352-5998

Kathryn Harrington
Mark Ekonen
Amanda S. Williamson
Heninger Garrison Davis, LLC
2224 1st Avenue North
P. O. Box 11310
Birmingham, Alabama 35202
Phone: (205) 326-3336
Fax: (205) 326-3332

George Erick Rosemond
Rosemond Law Group, PC
8441 Gulf Freeway
Suite 600
Houston, TX 77017

Phone: (713) 230-2342
Fax: (713) 649-3470


Jay Henderson
Jay Henderson, PLLC
5020 Montrose Blvd., Suite 300
Houston, Texas 77006
Phone:  (713) 275-4050

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

The undersigned herby certifies that a copy of the foregoing was served via electronic mail on the 24th day of January, 2014, to the following counsel of record for Defendant:

BRYAN CAVE LLP
Dan H. Ball
dhball@bryancave.com
Peter W. Herzog III
pwherzog@bryancave.com
Stefan A. Mallen
samallen@bryancave.com
211 North Broadway, Suite 3600
St. Louis, MO  63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)


Paul F. Strain
Stephen E. Marshall
Dino Sangiamo
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD  21202
(410) 244-7400


Attorneys for Abbott Laboratories, Inc.


*/s/ Margot G. Trevino*_____
Margot G. Trevino

# EXHIBIT "F"

# WILLIAMS ◆ KHERKHER

**John Boundas**
Partner

Direct (713) 230-2359
jboundas@williamskherkher.com

OF COUNSEL
Ned Barnett
Robert C. Kuehm

December 6, 2013

<u>VIA EMAIL</u>

Dino S. Sangiamo, Esquire                    Dan H. Ball, Esquire
dssangiamo@venable.com                       dhball@bryancave.com
Venable LLP                                  Bryan Cave, LLP
750 East Pratt Street, Suite 900             211 North Broadway, Suite 3600
Baltimore, MD  21202                         St. Louis, MO 63102

      **Re:**   **In re Depakote Cases**
             **United States District Court for the Southern District of Illinois**
             _____

Dear Counsel:

      In accordance with the Court's November 25, 2013 Discovery Order, Plaintiffs are providing a list of discovery issues that the Court has ordered Abbott to produce and certify the completion of production regarding same.  According to the Court's Order, "Abbott shall respond and certify the items on [this] list, or explain why they cannot do so, no later than December 13, 2013."

      Please certify that Abbott has conducted a reasonable search for sources of information and/or documents that are likely to lead to the discoverable information below and has produced all responsive documents in the following categories:

| Issue No. | Description of Responsive Documents | Order(s) |
|---|---|---|
| Issue No. 1 | Internal adverse event assessments, summaries, reports, analyses, or other documents discussing or pertaining to references to birth defects in Depakote adverse event Reports | 4/24/2013; 4/30/2013 |
| Issue No. 2 | Internal documents discussing or referencing Abbott's policy on submitting Depakote adverse event reports to the FDA, including the timing of how soon after its receipt of such a report that the report would be submitted to the FDA | 4/24/2013 |
| Issue No. 3 | Internal documents discussing, referencing, studying, evaluating, or assessing any relationship or association between any form of birth defect and Depakote | 4/24/2013; 4/30/2013 |

| Issue No. 4 | Internal documents discussing, referencing, studying, evaluating, or assessing any relationship or association between any form of birth defect and any anti-epileptic drug other than Depakote | 4/24/2013; 4/30/2013 |
|---|---|---|
| Issue No. 6 | Internal documents and external communications discussing or referencing the activities of or communications with the Antiepileptic Drug Pregnancy Registry and/or Dr. Lewis Holmes and/or any employee or representative of Massachusetts General Hospital concerning an association of birth defects with the use of Depakote | 4/30/2013 |
| Issue No. 7 | Internal documents that analyze, list or reference publications, studies, registries, trials, or analyses involving an association or relationship between any form of birth defect and any anti -epileptic drug | 4/30/2013 |
| Issue No. 8 | All publications, studies, registries, trials, or analyses (whether published or unpublished and whether completed or incomplete) that involve or discuss any association or relationship between any form of birth defect and any anti-epileptic drug | 4/30/2013 |
| Issue No. 9 | All materials that have been edited, created, sponsored, or financed by Abbott and that concern the use of Depakote, and documents reflecting Abbott's agreements with third parties to publish medical articles relating to Depakote; narrowed to request identification of ghost written or financially funded documents identified in Issue No. 8 | 4/30/2013 |
| Issue No. 10 | Internal documents discussing, referencing, studying, or assessing the risks of using Depakote for women who are or may become pregnant | 4/30/2013 |
| Issue No. 11 | All documents containing or relating to discussions by Abbott of the potential teratogenic effects of Depakote | 4/30/2013 |
| Issue No. 12 | Internal documents discussing, referencing, studying, evaluating, or assessing any dose relationship between taking Depakote and the risks of birth defects | 4/30/2013 |
| Issue No. 13 | Internal documents discussing or referencing the language included in or that could be included in Depakote's label concerning (i) any form of birth defect, (ii) any other anti-epileptic drugs, and/or (iii) risks for women (or their children) who are or may become pregnant, including any drafts of proposed labeling or warnings | 4/30/2013 |
| Issue No. 14 | All documents relating to the knowledge, perception or awareness of physicians of the potential teratogenic effects of Depakote; the Court clarified this to be internal documents referencing outside physicians' knowledge, perception, and awareness of the potential teratogenic effects of Depakote | 4/30/2013; 4/29 Tr. at 69 |

| Issue No. 16 | Internal documents discussing or referencing how or whether information about birth defects or pregnancy risks in a Depakote label may affect the sales, marketing, and/or revenue for Depakote | 4/30/2013 |
|---|---|---|
| Issue No. 17 | Internal documents discussing or referencing Depakote information and/or materials that Abbott sales representatives should and/or should not provide to or discuss with doctors, pharmacists, or any other members of the medical community. This includes sales training materials and all documents relating to the training of sales representatives | 4/29 Tr. at 82-83 |
| Issue No. 18 | All Depakote promotional items | 4/30/2013 |
| Issue No. 19 | Depakote information and/or materials that Abbott or its sales representatives provided to or discussed with doctors, pharmacists, or any other members of the medical community | 4/30/2013 |
| Issue No. 25 | Custodial files of the sales representatives who spoke with the doctors who treated Plaintiffs | 4/30/2013 |
| Issue No. 32 | Abbott must take additional steps to search for and produce documents and information requested in Defendant's Fact Sheets | 6/14/2013 |
| Issue No. 37 | Depakote marketing plans, Depakote strategic or tactical plans, Depakote brand strategies, Depakote marketing and/or sales reports, and internal documents, emails or office correspondence regarding same | No Abbott objection; 6/14/2013 |
| Issue No. 38 | Depakote sales and marketing research and/or analysis, and internal documents, emails or office correspondence regarding same; narrowed by party agreement at 6/6 hearing to exclude searches for RFP 156-158 (average daily dose), 159-161 (average length of therapy), and 199-201 (rebates) | 6/14/2013; 6/6 Tr. at 104-106 |
| Issue No. 39 | Depakote sales representative training materials, including but not limited to "backgrounders," and internal documents, emails or office correspondence regarding same | No Abbott objection; 6/14/2013 |
| Issue No. 40 | Written materials or other promotional items/materials distributed or communicated by Abbott to health care providers or other third-parties concerning the use of Depakote, including but not limited to mail-outs or "mailers," package inserts, scientific/medical articles, "sales aids," "care giver/patient education materials," pamphlets, email blasts, and dear doctor letters | No Abbott objection; 6/14/2013 |
| Issue No. 41 | Depakote-related advertising/promotional materials submitted to the FDA | No Abbott objection; 6/14/2013 |

| Issue No. 46 | Documents and things used in connection with focus groups concerning Depakote | No Abbott objection; 6/14/2013 |
| Issue No. 48 | Communications between Abbott and each health care provider, group, or other person/entity who received financial support from Abbott in connection with their research or writing about the occurrence of birth defects in relation to Depakote | No Abbott objection; 6/14/2013 |
| Issue No. 49 | Communications about Depakote between Abbott and any third-party advertising, marketing, sales, medical writing, medical education, lobbying or public relations firms or group | No Abbott objection; 6/14/2013 |
| Issue No. 50 | Depakote-related documents, visual depictions, and/or other materials used in connection with direct marketing or direct to consumer programs | No Abbott objection; 6/14/2013 |
| Issue No. 55 | Standard Operating Procedures regarding pharmacovigilance, risk management, product safety and regulatory affairs from 1978 to present | No Abbott objection; 6/14/2013 |
| Issue No. 56 | All documents referring to or relating to the safety of Depakote, including non-final drafts of such documents; narrowed to such documents concerning birth defects; Abbott to produce such documents and reports that it has, and Plaintiffs then to identify which draft reports Plaintiffs would like to see | 6/14/2013 |
| Issue No. 57 | Draft and final reports for all studies concerning Depakote sponsored or financed in whole or in part by Abbott, regardless of whether the studies were published; limited to studies addressing birth defects and noted as covered by Issue No. 8 | 6/14/2013 |
| Issue No. 58 | Reports, minutes, agenda or other records of any meeting or discussion of Depakote label changes | No Abbott objection; 6/14/2013 |
| Issue No. 59 | Any document relating to any discussion or analysis of whether to require females taking Depakote to submit to pregnancy testing | No Abbott objection; 6/14/2013 |
| Issue No. 60 | Documents comparing the teratogenic effects of Depakote to Accutane, other anti-epileptic drugs, other Abbott products, or any other products known or suspected of having teratogenic effects in humans | No Abbott objection; 6/14/2013 |
| Issue No. 61 | Organizational charts or human resources lists of personnel having any involvement with Depakote from 1978 to the present | No Abbott objection; 6/14/2013 |

| Issue No. 62 | Internal Abbott documents and external communications between Abbott and third parties (including the FDA) regarding the relationship between folic acid and Depakote or mentioning both folic acid/folate and Depakote | No Abbott objection; 6/14/2013 |
|---|---|---|
| Issue No. 63 | Documents relating to any attempt by Abbott to reduce or eliminate the teratogenic effects of Depakote, through warnings or dissemination of information or otherwise, including but not limited to any attempt to require women to take pregnancy tests and/or birth control while on Depakote | No Abbott objection; 6/14/2013 |
| Issue No. 71 | Abbott ordered to produce IMS data in connection with the fact sheets and to produce unredacted copies of previously-redacted IMS information after IMS approves | 6/14/2013 |
| Issue No. 73 | Documents stored in the RIMS, Pharmadocs, Edocs and GEARS databases | 6/28/2013 |
| Issue No. 65 | Accurate copies of all final versions of Depakote package inserts; Defendant received index from Plaintiffs on November 20, 2013 with a request to verify that no other final versions have been produced and to identify and produce the package inserts that have not been produced[1] | 6/14/2013 |
| Issue No. 74 | Abbott to certify completion of production of FDA marketing submissions, including, but not limited to From 2253s. | 7/3/2013 |
| Issue No. 75 | Production of manufacturing line-related documents from Chicago, Puerto Rico, Kansas, Argentina, and Mexico relevant to: (1) practices, instructions, procedures, and preferences in place (or that have been in place – 7/11 Tr. at 20) at Abbott's manufacturing plants regarding women working with Depakote; (2) disclosures and warnings of risks to women who work on Depakote manufacturing lines; and (3) documents that explain or discuss why any such practices are or were in place at such plants | 7/16/2013 |
| Issue No. 76 | One consent form per year | 7/3/2013; 8/22/2013 |
| Issue No. 77 | Information from foreign Abbott affiliates regarding (a) all communications with foreign Abbott affiliates involving Depakote's risks for birth defects and/or teratogenicity; (b) all communications with foreign Abbott affiliates involving information in Depakote's label concerning risks for birth defects and/or teratogenicity; at later hearing, ordered to produce | 7/16/2013; |

---

[1] *See* November 20, 2013 E-mail from M. Trevino to D. Sangiamo and corresponding index, attached hereto as "Exhibit A."

| Issue No. 77 | Company Core Data Sheets and ex-US labels housed at Abbott Park | No Abbott objection on 8/9/2013 |
| Issue No. 80 | Documents segregated pursuant to Abbott's litigation hold | 7/16/2013 |
| Issue No. 86 | Marketing communications between: Abbott and Abcomm, Inc., Abbott and its Key Opinion Leaders, and Continuing Medical Education materials that were used during the times of the births in the bellwether cases for 1990-1995 as well as internal documents that relate to CME's through 1995 | 8/9/2013; 8/7/2013 Tr. at 69 |
| Issue No. 89 | Documents from custodians who have communicated with Drs. Meador, Delgado-Escueta, and Janz | 8/9/2013 |
| Issue No. 95 | Defendant to look for exhibits, testimony, documents and depositions in their prior litigation files that are potentially relevant to this case | 8/30/2013 |
| Issue No. 96 | Personnel files from the Abbott employees that Plaintiffs have noticed for deposition: file to include performance reviews and compensation information as it relates to Depakote, transcript copies for testimony of these employees in any product liability cases involving Depakote; name of any other litigation that employee testified in related to Depakote; any documents related to employee's compensation and bonus being tied to the sale or performance of Depakote.[2] | 9/17/2013 |
| Issue No. 71 | IMS data for Plaintiffs' prescribing physicians up to the present | 10/28/2013 |
| Issue No. 98 | Certify completion of search of DOJ files for responsive documents and production of same; production of remaining files from the RIMS database | 11/8/2013 |
| Issue No. 104 | Defendant to certify complete production of all regulatory files and documents, including Annual, Periodic and Supplemental Drug Reports | 10/28/2013; 11/8/2013 |
| | Production of regulatory and other responsive documents updated through 2013. | Fed. R. Civ. P. 26(e) |

---

[2] Thus far, those employees include: Cherilyn Spath, Mridula Menon, Blasine Penkowski, Lee Muraoka, James Embrescia, Micahel Murray, Matthew Lopour, Mary Kay Rybicki, Jeffrey Haas, Brian Enright, and Michael Jarvis.

In addition to the Issues above, Abbott has agreed to produce, or the Court has ordered production of 115 custodial files.[3]  Attached as "Exhibit B" is a list of the custodial files to be produced.  Please certify completion of production of each file, or, if not complete, please explain the circumstances.

Please contact me if you would like to discuss the foregoing.

Sincerely,

John Boundas

---

[3] *See*, e.g., Issue No. 80 ordering Abbott on 7/16/2013 to produce (a) 15 sales and marketing custodial files and (b) 35 custodial files, and Issue No. 99 ordering Abbott on 11/27/13 to produce the custodial files of Leonard, Mason, Leidon, Funck, Gonzalez, Schoelhorn, White, Carr, Chmiel, Jordan, and Mini.

# EXHIBIT "G"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| B.P., a minor by DAWN FRAGNOLI, individually as parent and next friend | ) ) ) |
| Plaintiff, | ) ) |
| H.C., a minor by MICHELLE CASSIDY, individually as parent and next friend | ) ) ) ) |
| Plaintiff, | ) ) |
| J.B., a minor by LINDA LEJUNE, individually as parent and next friend | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| ABOTT LABROATORIES, INC., | ) ) |
| Defendant. | ) ) |

Case No. 12-cv-52-GPM
Case No. 13-cv-324-SCW
Case No. 13-cv-325-SCW
Case No. 13-cv-326-SCW

# ORDER

**WILLIAMS, Magistrate Judge:**

On June 6, 2013, the Court held a discovery dispute conference regarding various discovery disputes among the parties. The following is a memorialization of the Court's findings and rulings at that hearing.

### THE LITIGATION HOLD

The Court finds Abbott's litigation hold to be work product under Fed. R. Civ. Pro. 26(b)(3), and thus not discoverable. If Plaintiffs make a substantial showing that Abbott's efforts to preserve documents were inadequate, the Court may re-examine this issue. At this point, no showing has been made. There may be deficiencies, but the Court finds that both parties are working very hard to comply with discovery. The Court notes that its holding is based on the

Federal Rules of Civil Procedure, and not attorney-client privilege. Defendant has not shown that the litigation hold implicates attorney-client privilege under the control group test. **See Consolidation Coal Co. v. Bucyrus-Erie Co., 89 Ill.2d 103, 432 N.E.2d 250 (1982).** Further, the Court believes that Judge Gleeson's ruling was correct under Illinois law relating to attorney work product privilege. The litigation hold at issue here does not relate to trial strategy, but simply reflects an effort comply with one's duties to preserve evidence. The order directing production under Illinois law was correct at that time, however, Federal rules now apply and do not allow for additional discovery concerning the hold without a threshold showing. Plaintiffs may not pursue discovery as to the ins and outs of Abbott's document production. Therefore, to the extent that Plaintiffs request further discovery into the process of Abbott's litigation hold beyond that names of the employees subject to the hold and the dates the hold was issued, their requests are **DENIED**.

### REQUESTS FOR ADMISSIONS

As to Abbott's general objections to Consolidated Plaintiffs' Second Set of Requests for Admissions (Doc. 25), all general objections to are **OVERRULED**. Additionally, Abbott's objection to request to admit 3 is **OVERRULED** with the understanding that the request refers to the April 2013 version of the orange book.

The parties indicated that they will attempt to resolve their differences on Requests to Admit 4-13 during a meet and confer that is to take place between the next hearing on the discovery issues presented by this case on June 28, 2013. The parties have indicated that they believe they can resolve those differences on those requests to admit and are strongly encouraged to do so.

Abbott objects to Requests to Admit 15 through 38, and 41-43 on the basis of the general definition of the relevant time period. The Court finds that these Requests to Admit ask for information about Abbott's knowledge on the date of admission and address issues of causation. Any admissions would be construed as based on current knowledge, and the Court would be willing

to instruct a jury accordingly.  These admissions are not subject to the general definition of the relevant time period.  Therefore, Abbott's objections to fifteen and sixteen are **OVERRULED**.  If an admission or denial subsequently needs changing due to the evolution of scientific knowledge, the proper means to address this is to file a motion with the Court.  The Court also finds that Abbott's language about what the labeling says is not responsive.  Abbott must admit or deny the Requests to Admit.  To the extent that Abbot qualifies an admission or denial, the Court will later address the admissibility of the qualifying language and/or take up requests on instructing the jury accordingly.  The parties shall meet and confer on the other requests to admit.

### GENERAL TOPICS

As to issue number 31, the parties have agreed to have an additional meet and confer on the issues raised therein prior to the next status conference on June 28, 2013.

As to issue number 32, Abbott indicated that in an attempt to answer questions raised by the Defendant Fact Sheets ("DFS"), it had queried its systems and databases, despite the fact that these databases do not cover the relevant time period for the Plaintiffs born in 1994 and 1995.  The Court finds that this is not a reasonable search and that Defendants must take other steps to attempt to locate the requested information before they will be excused from production.

Issue 33 addresses the timeline for production of documents.  Previously the Court ordered that certain documents be turned over to Plaintiffs on or before June 10, 2013.  (Doc. 23).  Abbott indicated that it would not be able to meet this deadline and requested an extension until June 25, 2013.  Additionally, Abbott proposed rolling document production within this timeframe, starting on Monday, June 10, 2013.  The Court will **GRANT** the extension until June 25, with the understanding that production will be rolling.  The Court is not prepared to order Defendants to produce all documents by June 25.  Abbott will produce documents according to the procedures they outlined at the June 6, 2013 hearing.

Issue 34 addresses Abbott's Rule 26 Initial Disclosures. The Court agrees with Abbott's position that the Rule 26 disclosures only require them to identify witnesses that they will rely on to support their case, not to identify anyone with relevant information. That information is subject to other forms of discovery.

As to issue 35, the Court had previously overruled Abbott's objections to the scope of discovery based on the timeframe of the requested production. All objections to date continue to be **OVERRULED** absent further order of the Court. Likewise, this ruling applies to issue 36, which seeks the production of non-epilepsy documents. Abbott's objections on this point continue to be **OVERRULED**. The issue is preserved for appeal.

### SALES AND MARKETING DOCUMENTS

With regards to the issues raised under the "sales and marketing documents" heading, Abbott has indicated that it has no objection to Issues 37, 39-41, 46, and 48-50. As to issue no. 38, Plaintiffs agree to withdraw Requests for Production 159-161 and 199-201. Abbott is **ORDERED** to produce relevant sales and marketing documents as defined by Issue 38 in accordance with the parties' agreement as articulated on the record at the June 6, 2013 hearing. Issues 42-45, 47, 51 are held until further discovery development.

### RESPONSES TO IVY DISCOVERY

Abbott further indicated that they had no objections to Issues 52-55, 58-63. With regards to issue 56, which seeks the production of all drafts of all safety reports for Depakote, the Court finds that Plaintiffs' requests are properly limited to the relevant adverse event, i.e. birth defects. Abbott is to produce what reports they have, and then Plaintiff may identify from that group which draft reports they would like to see, if available. The Court declines to set a deadline for this production at this time. As to Issue 57, the Court **GRANTS** Abbott's objection, limiting the scope of the relevant request to studies addressing birth defects specifically, not general efficacy. The Court

notes that its grant of Plaintiff's request relating to Category #8 adequately covers the relevant documents.

**MISCELLANEOUS**

As to Issue 64, to the extent that Abbott has specifically identified relevant, discoverable documents, not otherwise produced, in the course of executing their litigation hold, they are **ORDERED** to produce those documents. As to Issue 65, Abbott will produce accurate copies of all final versions of Depakote package inserts by June 21, 2013. The Court declines to address Issue 67 at this time. Issues 68-70 are subject to the Court's rulings regarding the Consolidated Plaintiffs' Requests for Admissions, as more fully set out above.

With regards to Issue 71, Abbott had informed the Court that IMS is a third-party to this litigation. Abbott further informs the Court that it is their understanding that IMS will grant them approval to release the IMS data on June 28, 2013. The Court therefore **ORDERS** Abbott to produce IMS data in connection with the fact sheets on June 28, 2013. Abbott shall also begin producing unredacted copies of previously-redacted IMS information as soon as practicable after they receive approval from IMS.

With regards to issue 72, the parties indicated at the hearing that they were now in agreement on the issue of the privilege log.

**IT IS SO ORDERED**.

DATED: June 14, 2013

/s/   *Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge

# EXHIBIT "H"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **B.P., A MINOR, BY DAWN FRAGNOLI INDIVIDUALLY AS PARENT AND NEXT FRIEND,** | ) ) ) | **Case No. 13-cv-324-SCW** |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **H.C., A MINOR, BY MICHELLE CASSIDY INDIVIDUALLY AS PARENT AND NEXT FRIEND,** | ) ) ) | **Case No. 13-cv-325-SCW** |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **J.B., A MINOR, BY LINDA LEJEUNE INDIVIDUALLY AS LEGAL CUSTODIAN AND NEXT FRIEND,** | ) ) ) | **Case No. 13-cv-326-SCW** |
| | ) | |
| **PLAINTIFFS,** | ) | |
| **v.** | ) | |
| | ) | |
| **ABBOTT LABORATORIES, INC.,** | ) ) | **JURY TRIAL DEMANDED ON ALL COUNTS** |
| **DEFENDANT.** | ) | |

**DISCOVERY ISSUES FOR CONSIDERATION
AT THE JUNE 6, 2013 DISCOVERY CONFERENCE**

Plaintiffs respectfully submit the following issues for consideration at the June 6, 2013 Discovery Conference. These issues were discussed by the Parties during telephone conferences on May 14, May 20 and June 3, 2013.

**A.    GENERAL TOPICS**

**31.    Abbott's Databases**

In its April 30, 2013 Memorandum and Order (the "April 30 Order"),[1] the Court ordered Abbott to provide certain information about its databases to Plaintiffs and directed the parties to meet and confer on how Abbott should search those databases. Abbott provided some information on its databases on May 9,[2] then provided information on additional databases on

---

[1] Dkt. No. 22 in Cause No. 13-cv-324-SCW, *B.P., a minor, by Dawn Fragnoli, individually as parent and next friend v. Abbott Laboratories, Inc.* (the "Fragnoli Dkt."). Unless otherwise noted, documents cited to from the Fragnoli Dkt. were similarly entered in the Cassidy and LeJeune dockets before this Court.

[2] *See* May 9, 2013 letter from D. Sangiamo, attached as Exhibit A.

May 13.[3]  During the parties' May 14, 2013 meet and confer, Plaintiffs provided their position that Abbott should search each of its databases for responsive documents and produce those documents.  When Plaintiffs asked Abbott for its proposal on searching its own databases, Abbott had no suggestions.  Abbott specifically stated, "we did not come into this call with a particular thought in mind."  Abbott agreed to provide additional information on its databases to Plaintiffs by May 17.  On May 17, Abbott responded to the Ivy Requests for Production ("Ivy RFPs").[4]  In response to RFPs regarding its databases, including basic requests for field lists and standard operating procedures, Abbott did not produce the discoverable and responsive documents but rather simply stated that "production of documents from Abbott databases is the subject of ongoing negotiations with Plaintiffs."[5]  On May 22, Abbott provided a series of reports from 3 of the 24 databases identified in its May 13 letter.[6]  As of May 31, Plaintiffs have received no additional information from Abbott.  In essence, the parties are only very minimally further along than they were at the last hearing before this Court.  For example, on the critical subject of Abbott's RIMS database (that catalogs many of Abbott's archived Depakote documents which may have particular importance in some of the bellwether trials), Abbott still has not produced the field data it represented over a month ago in Court it would produce, nor has it produced any report from the RIMS database despite repeated requests from Plaintiffs and this Court's order that Abbott search its databases.

Therefore, Plaintiffs respectfully request that the Court order Abbott (i) to fully search all databases that may contain data responsive to Plaintiffs' discovery requests; (ii) to produce (a) a field list from the RIMS database, (b) all metadata in the RIMS database relating to any Depakote-related documents, (c) a searchable index of all documents in the RIMS database relating to Depakote and (d) all reports or responsive documents generated from any searches of the RIMS database for responsive documents; and (iii) to produce to Plaintiffs all responsive, non-privileged documents by no later than June 10, 2013.

**<u>Abbott's Response:</u>**

Perhaps not surprisingly, Abbott disagrees entirely with Plaintiffs' description of what has occurred and where matters currently stand.

First, Abbott takes issue with Plaintiffs' suggestion that Abbott was unprepared for the May 14, 2013 meet and confer.  Plaintiffs acknowledge that the Court's April 30, 2013 Memorandum and Order required the parties to confer on how Abbott should search its databases once Abbott provided Plaintiffs with information about the nature of the databases.  Despite having been informed about the content of and different search capabilities of the various databases, Plaintiffs displayed little interest in conferring about how these databases should be searched.  Rather, Plaintiffs' position during the May 14, 2013 meet and confer, with the exception of Mr. Boundas who expressed an interest in prioritizing the RIMS database, was simply that Abbott should search everything and give them everything.

---

[3] *See* May 13, 2013 letter from D. Sangiamo, attached as Exhibit B.
[4] Abbott's Responses and Objections to Plaintiffs' First Set of Requests for Production Originally Served in *Eiyana Ivy*, et al. v. Abbott Laboratories, Inc. are attached as Exhibit C.
[5] *Id.* at Response to Ivy RFP Nos. 26-35, 38-40.
[6] *See* May 22, 2013 letter from J. Rose, attached as Exhibit D.

With Plaintiffs unwilling to engage in the process for searching the databases, Abbott generated its own proposal and provided it to Plaintiffs on May 20, 2013.[7]  Any mention of that detailed proposal is absent from Plaintiffs' summary above.  Abbott proposed to search the following databases and provide Plaintiffs with a report of the search results for Plaintiffs' review: EDocs, GEARS, PharmaDocs, RIMS, GMI Lit / PRI Lit, IMPACT and INSIGHT. Abbott also informed Plaintiffs that in connection with the Defendant Fact Sheet it would produce sales-related documents from four other databases—SNAP, MAX, Keystone and OMEGA—and documents about Abbott's responses to inquiries the company receives about Depakote from the AIRMS and MIRSWeb databases.  Abbott similarly proposed that it would produce responsive documents from the EPass database, which contains sales training and promotional materials.  Abbott did not propose to conduct searches in the GLS or RACM databases, which contain documents duplicative of what was contained in regulatory files already produced.  Thus, Plaintiffs' suggestion that Abbott merely provided reports on 3 of 24 databases is misleading and ignores the rest of Abbott's proposal and the rationale underlying that proposal.

Without any guidance from Plaintiffs, Abbott initially worked on searches and search reports for the databases that appeared to have the most relevant documents.  On May 22, 2013, two days after Abbott's proposal, Abbott provided to Plaintiffs a 194-page report from EDocs, five reports from GEARS, and eight reports from PharmaDocs.  While Plaintiffs complain that they have not received more from other databases, in the two weeks since they received the reports from these databases they have yet to provide Abbott with any response or feedback about the content of the reports or the documents they would like produced from those databases.

Early this morning, Abbott produced a 935-page report of search results from the RIMS database.  After initially generating the RIMS search results, Abbott found that some of the descriptions contain privileged or work product information.  As a result, production of the search report for RIMS took additional time to understand the report and to allow for redactions to be made.  With a searchable index from RIMS in hand, the next step should be for Plaintiffs to review the results and inform Abbott of the documents they wish to be produced.  To the extent there is any disagreement, that can be taken up with the Court.

## 32.   Defendant Fact Sheets

Abbott states in each of the Defendant Fact Sheets ("DFS") it provided:

**Abbott states that the information provided herein was obtained by conducting queries of systems and/or databases likely to contain responsive information. The information provided by Abbott is subject to the time limitations of its available databases.** Abbott further states that if data is not provided in response to a given section of the DFS, a query of the necessary systems and/or databases yielded no data or the requested data was otherwise

---

[7] *See* May 20, 2013 Letter from J. Rose to Plaintiffs' Counsel, attached hereto as Exhibit 1.

unavailable or inaccessible to Abbott. It is a limitation of any system and/or database that, in certain circumstances, reliable data cannot be obtained.[8]

Abbott's position that it is only required to query its systems and databases, when it knows that these systems and databases do not have data going back to the mid-1990s (or earlier), is inappropriate, especially considering that two of the three bellwether plaintiffs were born in 1994 and 1995. The idea that this remotely fulfills Abbott's discovery obligations is simply absurd. This position has led to severely deficient DFS that contain virtually no information.[9] Abbott should be ordered to undertake a good-faith effort to find and then should produce discoverable information beyond its existing "systems and databases," and provide substantive responses to the DFS in each bellwether case, by no later than June 10, 2013.

### Abbott's Response:

The DFSs cover information that may be in the defendant's possession that is specific to the plaintiff's case. The kinds of information at issue are (1) identification of sales representatives who made sales calls to a given doctor, (2) the existence of inquiries from doctors/plaintiffs and responses thereto, (3) details concerning distribution of product samples to a given doctor, (4) supervisors and territories, (5) investigations of sales representatives, (6) information about attendance of doctors at conferences, and (7) notes of meetings between sales representatives and individual doctors. This type of information is maintained by Abbott in databases, each of which goes back only for a finite period of time. There is no other repository of this information to which Abbott can turn. The fact that plaintiffs elected to wait more than 15 years to file suit naturally has consequences regarding the scope of information that will be available. There is no other source of information that Abbott can reasonably search.

### 33.    Firm Deadline for Abbott to Produce all Documents Ordered by the Court

With just over six (6) months left before the discovery cut-off in this case, it is absolutely critical that Abbott exhibit good faith in its discovery conduct. It is also essential that Abbott respond expeditiously and adequately to all discovery requests and produce all responsive documents. Despite the previous discovery hearings before this Court, Abbott's current discovery conduct reflects its continued propensity to delay the discovery process to Plaintiffs' substantial detriment. By way of example, since the three bellwether cases were opened in this Court on April 4, 2013, and after two discovery hearings resulting in two orders from this Court, Abbott has produced a mere 19,852 pages directly in these Illinois Depakote cases.[10] When questioned recently by Plaintiffs about its lack of production, Abbott responded that it did not know when it would make additional production, and it did not know of any deadline for its production. Abbott also stated that it did not know what percentage of the responsive documents it had produced, and it planned to make rolling productions but did not know how voluminous or frequent that rolling production would be. Further, as demonstrated by Abbott's deficient responses to the Defendant Fact Sheet, discussed in more detail below, Abbott is not taking good faith measures to search for responsive documents – it is not enough that Abbott merely search

---

[8] *See* Fragnoli DFS, attached as Exhibit E, Cassidy DFS, attached as Exhibit F, and LeJeune DFS, attached as Exhibit G, at Section I (emphasis added).

[9] *See generally* Exhibits E-G.

[10] Plaintiffs also recently received approximately 110,000 pages of additional "custodial file" hardcopy documents in the *Dotegowski* case that were omitted in many cases for many months from Abbott's initial production of those "custodial files." And these were only produced after Plaintiffs questioned whether Abbott had actually searched and produced hard copy documents or merely relied upon electronic searches.

databases (although as discussed above it has not even yet done that), some of which Abbott knows are date-limited and therefore will not contain all responsive documents.   Abbott must also take measures to actually locate and identify responsive documents or information.  Abbott should be ordered to produce the responsive documents in its possession, period.  In order to instill in Abbott the requisite sense of urgency to fully and timely comply with all of its discovery obligations, Plaintiffs respectfully request that the Court order a hard deadline of June 10, 2013, for Abbott to provide full and complete document production and full and complete answers to written discovery.

**Abbott's Response:**

Needless to say, Abbott rejects out-of-hand plaintiffs' suggestion that Abbott has not "exhibited good faith in its discovery conduct" and that "Abbott is not taking good faith measures to search for responsive documents."  Abbott has produced well over 2.5 million pages of documents in this litigation and long ago produced to plaintiffs the extract from the AEGIS database that gives plaintiffs access to, and even searching capability of, all relevant Depakote adverse event data.

When discovery reopened in the Southern District of Illinois in early April 2013, plaintiffs initiated a discovery barrage, serving in the ensuing 60 days:

- 11 sets of requests for production totaling approximately 350 requests;

- multiple sets of requests for admission totaling 172 requests;

- a 49-topic corporate representative notice, with an additional 11 document requests; and

- multiple sets of interrogatories, containing interrogatories such as:  "Provide the gender and age of each individual employed by Abbott to work on any Depakote manufacturing line as of January 1, April 1, July 1 and October 1 for each year from 1978 to the present."

It appears that service of discovery is a goal in itself.

In addition to responding to this avalanche of paper, Abbott has produced over 125,000 pages of documents since discovery resumed in April, is in the process of searching for documents from 40 additional custodians (in addition to the original 21 and in addition to custodial files of sales representatives as called for in the DFSs), gathered and provided considerable information concerning its databases, and gathered and provided considerable information in the DFSs.  Despite its best efforts, Abbott anticipates that it will need an additional 15 days – up to June 25 – to complete its production of the documents described in the Court's April 30th order.[11]  Abbott proposes to continue to produce these responsive documents on a rolling basis within this additional time period, the next such production occurring on June 10.

---

[11] This is subject to whatever requests plaintiffs may ultimately make based on the database reports that Abbott has provided.

Just so that there is no mistaking Abbott's position, Abbott absolutely stands behind its discovery efforts in this litigation and believes that it has produced a tremendous volume of documents in light of the fact that there has been essentially ten months of active discovery in these cases.

Abbott proposes that the parties proceed as follows. As is standard in litigation of this type, Abbott will continue its production of documents on a rolling basis. By June 30, or at such other time at which plaintiffs will have stopped serving document requests and will have identified for Abbott which documents they would like from the database reports that Abbott has submitted to them, the parties will attempt to agree to a schedule for the completion of document productions and will seek guidance from the Court if they are unable to agree. Abbott commits to continuing to work in good faith. As always, Abbott remains open to guidance from plaintiffs on prioritization of productions. For example, to the extent that plaintiffs seek to depose an Abbott witness whose custodial file has not yet been produced, Abbott will expedite the production of that file so that the deposition can go forward. Similarly, if, for example, plaintiffs would like to accelerate Abbott's supplementation of its production of marketing plans, Abbott can do that as well.

## 34.   Abbott's Rule 26 Initial Disclosures[12]

Abbott's Rule 26 disclosures are emblematic of Abbott's lax approach to the discovery process. Despite the facts that (a) Depakote (in some formulation) has been on the market for nearly 35 years; (b) Abbott currently employs over 90,000 individuals (and has employed countless others since Depakene's introduction in the United States in 1978); (c) Abbott sent its legal hold to over 110 current employees; (d) Abbott has "voluntarily" produced portions of 21 custodians' files and is apparently "voluntarily" searching 17 additional custodians' files; and (e) Abbott has known the name of the bellwether plaintiffs' treating physicians for several weeks, Abbott has identified only **four** people that may have relevant knowledge that Abbott may use to support its defense. That list simply strains credulity.

Even more incredible, however, is Abbott's cursory listing of only **three** categories of documents in its possession, custody or control that may support its defenses. Despite the clear language of Rule 26(a)(1)(A)(ii) that Abbott either produce a copy of "all" such documents or provide "a description by category **and location**," Abbott has done neither.

Plaintiffs request that the Court order Abbott to fully supplement its Rule 26 disclosures to provide a good-faith listing of individuals with relevant knowledge and documents, as well as produce all such documents or provide the location for such documents, by no later than June 10, 2013.

### Abbott's Response:

Plaintiffs' request that the Court order Abbott to provide a listing "of individuals with relevant knowledge and documents" reflects a fundamental misunderstanding of Fed. R. Civ. P. 26(a)(1).

---

[12] Abbott's Rule 26 Disclosures are attached hereto as Exhibit H.

The initial disclosure obligations do not require that a party identify all individuals with knowledge of the issues in the case or all relevant documents, but rather require that parties disclose information that they "may use to support [their] claims or defenses." Fed. R. Civ. P. Civ. 26(a)(1)(A)(i), 26(a)(1)(A)(ii) & amendment notes ("The scope of the disclosure obligation is narrowed to cover only information that the disclosing party may use to support its position."). See also Robinson v. Moran, 2007 WL 2915620, at *3-4 (C.D. Ill. Oct. 5, 2007) (defendants not required to disclose document in initial disclosures, as there had been no showing that they intended "to *use* the [document] in any way" and thus "they were not required to disclose it'") (emphasis in original); Traveler v. CSX Transp., Inc., 2006 WL 2051732, at *1 & n.1, *2 (N.D. Ind. July 20, 2006) (defendant not required to list particular person as a potential witness in its Rule 26(a) disclosure because there was no showing that defendant might use this person in support of its defenses; focus of Rule 26(a)(1)(A) was not on "each individual who had anything to do with the case"). The standard is intent to use, not relevance.

Abbott's Rule 26(a) disclosure was entirely proper. Abbott's defense of these cases is not complicated: Plaintiffs sue for failure to warn of an injury. Abbott unambiguously warned of that injury. It does not take a lot of company witnesses or documents to present that case.[13] Abbott may also use testimony from plaintiffs' treating physicians, particularly the prescribing physician who will testify about his or her knowledge of the risk of birth defects. Plaintiffs will presumably attempt to find ways to avoid the effect of the warning. As Abbott does not yet know what evidence plaintiffs will attempt to use to accomplish that objective, Abbott is unable to identify witnesses and documents that it will use in response.

## 35.   <u>Abbott's Objections regarding Timeframe</u>

Consistent with Abbott's general disregard for court orders with which it disagrees, Abbott consistently objects to responding and/or producing documents after the births of the bellwether plaintiffs. *See, e.g.*, Exhibit I (Response to Subpoena Duces Tecum) Category No. 11; Exhibit J (Response to 30(b)(6) Deposition) Topic Nos. 18-21, 23, 25, 26, 28, 30-31, 34-41; and Exhibit K (Response to Requests for Production) Nos. 21, 70, 71, 78-86, 93-95, 99-101, 111, 117-122, 132-143, 147-152, 162-183, 190-195, 205-207, 211-213. This issue has already been resolved by the Court. The Court ruled on April 19, 2013 that discovery should not be cut off after the 2003 birth of the youngest bellwether plaintiff.[14] The Court should overrule all of Abbott's objections that certain requests seek documents and/or information after the births of the bellwether plaintiffs.

Abbott's Response:

In response to plaintiffs' requests for marketing documents only, Abbott has preserved an objection to production of documents that post-date the date of birth of the latest of the bellwether plaintiffs and to production of documents that relate to marketing of Depakote for mania and migraines, uses of the product inapplicable to the bellwether plaintiffs. Abbott has explained to plaintiffs that it does not intend to withhold documents on these grounds for purposes of the collections and productions it is currently conducting. Abbott nevertheless feels that it is appropriate to maintain the objections to avoid a claim of waiver should circumstances warrant their invocation. For example, should there be a discrete set of documents that relate to marketing Depakote specifically for mania in 2012, and that set of documents would require a separate collection undertaking, Abbott would like to preserve its right not to undertake to collect those documents as they would be plainly irrelevant and would not warrant the burden associated with the collection, particularly as the parties are working to get the bellwether cases ready for trial in March 2014.

---

[13] Expert witnesses will also testify in this matter, but they are not required to be disclosed under Rule 26 at this time.

[14] *See* Fragnoli Dkt. No. 19.

### 36.   <u>Non-Epilepsy Documents</u>

Several of Plaintiffs' discovery requests, including Subpoena Duces Tecum ("SDT") Category No. 11[15] and Consolidated Plaintiffs' Request for Production ("CP RFP") Nos. 62, 63 and 251[16] seek information specifically related to migraine or mania or general off-label promotion.  Abbott seeks to limit its production by excluding documents related to the use of Depakote for anything other than epilepsy/seizure disorder, arguing that each of the three bellwether Plaintiffs' mothers were prescribed Depakote only for epilepsy.  Abbott's position is untenable.  Like the relevant time period issue this Court has previously addressed, there are numerous Plaintiffs among the 320 on file in Illinois who were prescribed Depakote for something other than epilepsy/seizure disorder.  Further, documents on indications other than epilepsy/seizure disorder are likely to lead to the discovery of relevant and admissible evidence of, among other things, risks associated with taking Depakote.  The Court should overrule Abbott's objections and order Abbott to produce all responsive documents and fully respond to discovery about all uses of Depakote – not just epilepsy.

<u>Abbott's Response:</u>

See response to Item 35.

## B.   SALES AND MARKETING DOCUMENTS

A series of requests have sought the production of critical sales and marketing documents.  *See, e.g.*, Subpoena Duces Tecum Category Nos. 1, 7, 11;[17] Request for Production Nos. 5, 11, 13-15, 21, 61-77, 99-101, 111-134, 141-143, 147-149, 153-207, 211-213, 223, 232, 236, 238-242, and 247-251.[18]  To date, Abbott has made one targeted sales/marketing production comprising less than 20,000 pages.  None of the custodians selected by Abbott for production in the *Dotegowski* case were directly involved in sales or marketing.  Abbott has successfully avoided making a substantial sales/marketing production to date, and it is long past time for Abbott to produce these highly relevant documents.  The Court should overrule Abbott's objections and order Abbott to fully produce all responsive sales and marketing documents by no later than June 10, 2013.  The items below (36-50) describe sales- and marketing-related documents that Abbott must be ordered to produce by June 10, 2013:

<u>Abbott's Response:</u>

Plaintiffs had essentially no pending requests for internal marketing documents of the type on which they are now focused until April 2, 2013, when they served their Second, Third, Fourth, and Fifth Requests for Production and Subpoena Duces Tecum accompanying Plaintiffs' Notice of 30(b)(6) Deposition (collectively "Requests") totaling 271 separate document requests, nearly half of which sought sales and marketing documents.  As of that time, Abbott had already

---

[15] *See* Exhibit I.
[16] *See* Exhibit K.
[17] *See* Exhibit I.
[18] *See* Exhibit K.

produced a substantial number of internal marketing documents (e.g., marketing plans). Contrary to Plaintiffs' statement above, the initial 21 custodians included Jeffrey Haas, Divisional Vice President, Health Care Policy.  This portion of the production of internal documents totaled more than 16,500 documents.  Abbott has also produced approximately 20,000 pages of promotional and sales training materials, as Plaintiffs' apparently concede. Plaintiffs' statement that Abbott has "successfully avoided making a substantial sales/marketing production and it is long past time for Abbott to produce these highly relevant documents" thus misleadingly suggests that Abbott has been under a long-standing duty to do so and understates the nature and volume of Abbott's production to date.

On May 7, 2013, Abbott served its responses to the Requests.  Contrary to the strong suggestion created by Plaintiffs' introductory paragraph above and many of the individual items that follow, Abbott's responses to the Requests stated that Abbott would be producing responsive documents after conducting reasonable searches.  Moreover, as noted above, Abbott has explained to Plaintiffs that although in its responses Abbott preserved its objections to producing sales and marketing documents which either: (1) post-date the time period after the birth of the bellwether plaintiffs; and/or (2) relate to the migraine and mania indications for Depakote, Abbott will be producing its sales and marketing documents without either of these limitations. (See items 35 and 36, supra, for a further explanation of this point.)

Plaintiffs' position that Abbott should have to make its production of these documents by June 10 is unreasonable and entirely out of sync with how discovery is conducted in litigation of this scope and magnitude.  Abbott refers the Court to its position as stated in Item 33, supra.

| | | |
|---|---|---|
| **37.** | **Documents requested:** | Depakote marketing plans, Depakote strategic or tactical plans, Depakote brand strategies, Depakote marketing and/or sales reports, and internal documents, emails or office correspondence regarding same |
| | **Corresponding Request(s):** | SDT 11, CP RFP 5, 21, 70-71, 111-113, 117-122, 205-207, 238 |
| | **Abbott's Response:** | |

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36 supra, which illustrate Abbott's undertaking to produce responsive documents.

| | | |
|---|---|---|
| **38.** | **Documents requested:** | Depakote sales and marketing research and/or analysis, and internal documents, emails or office correspondence regarding same |
| | **Corresponding Request(s):** | CP RFP 5, 21, 99-101, 141-149, 153-176, 199-201, 214, 248-250 |
| | **Abbott's Response:** | |

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

In addition, as stated in Abbott's responses to these Requests, Abbott objects to producing the documents requested in Request for Production Nos. 153-161 and 199-201, consisting of documents related to "Depakote's Rx share summary by condition" and market share (Request Nos. 153-155), "Depakote average daily dose" (Request Nos. 156-158), "Depakote average length of therapy" (Request Nos. 159-161) and "rebates" (Request Nos. 199-201). It is not evident how these documents are relevant or how the request for them is reasonably calculated to lead to the discovery of admissible evidence.

**39.** **Documents requested:** Depakote sales representative training materials, including but not limited to "backgrounders," and internal documents, emails or office correspondence regarding same

**Corresponding Request(s):** SDT 1, CP RFP 5, 21, 72-74, 177-183, 211-213, 240-241

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

**40.** **Documents requested:** Written materials or other promotional items/materials distributed or communicated by Abbott to health care providers or other third-parties concerning the use of Depakote, including but not limited to mail-outs or "mailers," package inserts, scientific/medical articles, "sales aids," "care giver/patient education materials," pamphlets, e-mail blasts, and dear doctor letters

**Corresponding Request(s):** CP RFP 5, 21, 61-69, 126-128, 184-189, 196-198, 236, 239

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

**41.** **Documents requested:** Depakote-related advertising/promotional materials submitted to the FDA

**Corresponding Request(s):** CP RFP 5, 11, 21, 232

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, <u>supra</u>, which illustrate Abbott's undertaking to produce responsive documents.

42.   **Documents requested:**   Abbott organizational charts or lists of personnel responsible for Depakote, including but not limited to each of the departments enumerated in SDT 7 and CP RFP 223

**Corresponding Request(s):** SDT 7, CP RFP 5, 21, 223

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, <u>supra</u>, which illustrate Abbott's undertaking to produce responsive documents.

43.   **Documents requested:**   Continuing medical education – "CME" – materials concerning the use of Depakote for seizure disorders/epilepsy, mania and/or migraine, and internal documents, emails or office correspondence concerning same

**Corresponding Request(s):** CP RFP 5, 21, 75-77, 190-192, 243

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, <u>supra</u>, which illustrate Abbott's undertaking to produce responsive documents.

In addition and as stated in Abbott's responses to the Requests, Abbott objects to producing the documents requested in Request for Production No. 190-192 and 243, which relate to continuing medical education regarding Depakote. In the absence of evidence that plaintiffs' prescribing physicians attended continuing medical education programs for Depakote, there is no reason why Abbott should have to undertake the burden of separately collecting such documents.

44.   **Documents requested:**   Identification of Abbott's "Key Opinion Leaders" relating to Depakote, and internal documents, emails or office correspondence regarding same

**Corresponding Request(s):** CP RFP 5, 21, 123-125, 202-204, 243

**Abbott's Response:**

11

Abbott agreed to produce information in its Defendant Fact Sheets regarding whether Plaintiffs' prescribing physicians were Key Opinion Leaders.  It is not evident how other documents related to Key Opinion Leaders are relevant or how the request for them is reasonably calculated to lead to the discovery of admissible evidence.

45.     **Documents requested:**          Depakote-related documents and materials used or disclosed in connection with conventions, meeting symposia or advisory board meetings

**Corresponding Request(s):** CP RFP 5, 21, 129-131, 243

**Abbott's Response:**

As stated in Abbott's responses to the Requests, Abbott objects to producing the documents requested in Request for Production No. 129-131 and 243.  In the absence of evidence that Plaintiffs' prescribing physicians attended any of the events described in these requests, there is no reason why Abbott should have to undertake the burden of separately collecting such documents.

46.     **Documents requested:**          Documents and things used in connection with focus groups concerning Depakote

**Corresponding Request(s):** CP RFP 5, 21, 132-134

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

47.     **Documents requested:**          Depakote-related communications between Abbott and industry speakers (including, but not limited to, CME faculty)

**Corresponding Request(s):** CP RFP 5, 21, 208-210

**Abbott's Response:**

As stated in Abbott's responses to the Requests, Abbott objects to producing the documents requested in Request for Production Nos. 208-210.  In the absence of evidence that Plaintiffs' prescribing physicians were such speakers or participated in CME programs, there is no reason why Abbott should have to under the burden of separately collection such documents.

48.   **Documents requested:**   Communications between Abbott and each health care provider, group, or other person/entity who received financial support from Abbott in connection with their research or writing about the occurrence of birth defects in relation to Depakote

**Corresponding Request(s):** CP RFP 5, 21, 244-45

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

49.   **Documents requested:**   Communications about Depakote between Abbott and any third-party advertising, marketing, sales, medical writing, medical education, lobbying or public relations firms or group

**Corresponding Request(s):** CP RFP 5, 21, 247

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

50.   **Documents requested:**   Depakote-related documents, visual depictions, and/or other materials used in connection with direct marketing or direct to consumer programs

**Corresponding Request(s):** CP RFP 5, 21, 193-195

**Abbott's Response:**

Abbott refers the Court to Abbott's responses to these Requests, and items 35 and 36, supra, which illustrate Abbott's undertaking to produce responsive documents.

51.   **Documents requested:**   Documents reflecting any analysis or investigation of the propriety of Abbott's marketing/sales practices regarding Depakote

**Corresponding Request(s):** CP RFP 5, 21, 260

**Abbott's Response:**

As stated in Abbott's responses to these Requests, Abbott objects to producing the documents requested in Request for Production No. 260.   The request is grossly

overbroad.  For example, it is not limited to analyses or investigations related to marketing/sales practices that could be in any way relevant to the plaintiffs in the instant cases.

## C.    RESPONSES TO IVY DISCOVERY[19]

**52.    Information requested:**    Information about individuals working on a variety of issues related to Depakote.  Abbott provided names only, and did not provide titles and years of employment.

**Corresponding Request(s):**  Ivy Rog. Nos. 1, 3-4, 7-8, 10-13, 16-17

**Abbott's Response:**

Abbott's response to Ivy Interrogatory Nos. 1, 3-4, 7-8, 10-13, and 16-17 stated that Abbott would supplement its responses with the date of employment for each individual listed.  Abbott has further agreed to provide the titles of each of the employees listed in these interrogatories.  Abbott has committed to providing this information by June 17, but, at plaintiffs' request, will attempt to provide it by June 7.

**53.    Information requested:**    Information about individuals working on medical affairs, business analytics, training and education. Abbott objected and refused to provide any information.

**Corresponding Request(s):**  Ivy Rog. Nos. 5, 6, 15

**Abbott's Response:**

As noted in Abbott's response to Ivy Interrogatory Nos. 5-6, and 15, Plaintiffs' used the vague and ambiguous terms "Medical Affairs Department," "Business Analytics Department," and "Training and Education Department," without more specific information, in these interrogatories, and Abbott was unable to determine which personnel within what department might be responsive.  On June 3rd, Plaintiffs provided additional identifying information and as such, Abbott has agreed to supplement its response to the interrogatories by June 17.

**54.    Information requested:**    Information about individuals working on global labeling responsibilities.  Abbott only referred Plaintiffs to documents.

**Corresponding Request(s):**  Ivy Rog. No. 9

---

[19] Abbott's Responses and Objections to Plaintiffs' First Set of Interrogatories Originally Served in *Eiyana Ivy, et al. v. Abbott Laboratories, Inc.* are attached as Exhibit L.

<u>**Abbott's Response:**</u>

Abbott has agreed to supplement its response to this interrogatory by June 17.

**55.**   <u>**Documents requested:**</u>   Standard Operating Procedures regarding pharmacovigilance, risk management, product safety and regulatory affairs from 1978 to present.

<u>**Corresponding Request(s):**</u> Ivy RFP No. 4

<u>**Abbott's Response:**</u>[20]

As stated in Abbott's response to Ivy Request for Production No. 4, Abbott noted that its productions to date contained responsive documents and that it will undertake additional reasonable searches of relevant sources for additional responsive documents.

**56.**   <u>**Documents requested:**</u>   All documents referring to or relating to the safety of Depakote, including non-final drafts of such documents.

<u>**Corresponding Request(s):**</u> Ivy RFP No. 5

<u>**Abbott's Response:**</u>

Ivy Request for Production No. 5 does not seek the documents described in Item 56's "Documents requested." Ivy Request for Production No. 5 seeks "Drafts of all Safety Reports for Depakote, whether or not ultimately submitted to the FDA, prepared in connection with YOUR obligations under 21 C.F.R. § 312.32 or 21 C.F.R. § 312.33."

As stated in Abbott's response to Ivy Request for Production No. 5, Abbott objects to this Request as it seeks drafts of documents covering a time period of more than three decades, and such drafts for that span of time may not be maintained in a reasonably available location, if at all. Abbott also objected to this Request to the extent it sought drafts of "Safety Reports" without any limitation as to the relevant adverse event, i.e. birth defects.

**57.**   <u>**Documents requested:**</u>   Draft and final reports for all studies concerning Depakote sponsored or financed in whole or in part

---

[20] For items 55 through 63, Plaintiffs recited and/or paraphrased (sometimes incorrectly) each of the identified Ivy Requests for Production. Plaintiffs have not indicated any reason why these Requests for Production are included in this submission or any reason why Plaintiffs are taking issue with Abbott's response to each Request. Consequently, Abbott has provided the Court with a summary of its response to each Request, which are more fully provided in Exhibit C, as well as other relevant information with respect to each Request, where necessary.

by Abbott, regardless of whether the studies were published.

**Corresponding Request(s):** Ivy RFP No. 6

**Abbott's Response:**

As stated in Abbott's response to Ivy Request for Production No. 6, Abbott has already produced responsive documents, and is continuing to produce documents from the files of key players in the Depakote clinical study program.

58.  **Documents requested:**   Reports, minutes, agenda or other records of any meeting or discussion of Depakote label changes.

**Corresponding Request(s):** Ivy RFP No. 7

**Abbott's Response:**

As stated in Abbott's response to Ivy Request for Production No. 7, Abbott has already produced responsive documents, and it is continuing to produce documents from the files of key players in Depakote label changes.

59.  **Documents requested:**   Any document relating to any discussion or analysis of whether to require females taking Depakote to submit to pregnancy testing.

**Corresponding Request(s):** Ivy RFP No. 16

**Abbott's Response:**

As stated in Abbott's response to Ivy Request for Production No. 16, Abbott has already produced responsive documents, if any, from the electronically stored information of 21 key Abbott employees as a result of searching these documents for "Depakote" and "pregnan*," and it is continuing to gather documents from current and former employees.  These additional documents may include responsive documents.

60.  **Documents requested:**   Documents comparing the teratogenic effects of Depakote to Accutane, other anti-epileptic drugs, other Abbott products, or any other products known or suspected of having teratogenic effects in humans.

**Corresponding Request(s):** Ivy RFP No. 17

**Abbott's Response:**

As stated in Abbott's response to Ivy Request for Production No. 17, Abbott has already produced responsive documents, if any, from the electronically stored information of 21 key Abbott employees as a result of searching these documents for "Depakote" and "teratogen*," and it is continuing to gather documents from current and former employees.   These additional documents may include responsive documents.

61.   **Documents requested:**   Organizational charts or human resources lists of personnel having any involvement with Depakote from 1978 to the present.

**Corresponding Request(s):** Ivy RFP No. 18

**Abbott's Response:**

As stated in Abbott's response to Ivy Request for Production No. 18, Abbott has already produced responsive documents, and additional responsive documents may be found in the upcoming productions of additional custodial files.

62.   **Documents requested:**   Internal Abbott documents and external communications between Abbott and third parties (including the FDA) regarding the relationship between folic acid and Depakote or mentioning both folic acid/folate and Depakote.

**Corresponding Request(s):** Ivy RFP Nos. 19-22

**Abbott's Response:**

As stated in Abbott's responses to Ivy Request for Production Nos. 19-22, Abbott has already produced responsive documents, if any, from the electronically stored information of 21 key Abbott employees as a result of searching these documents for "Depakote" and "folate" or "folic acid;" that responsive documents, if any, can be found in Abbott's production of the regulatory files for its Depakote products; and that Abbott is continuing to gather documents from current and former employees. These additional documents may include responsive documents.

63.   **Documents requested:**   Documents relating to any attempt by Abbott to reduce or eliminate the teratogenic effects of Depakote, through warnings or dissemination of information or otherwise, including but not limited to any attempt to require women to take pregnancy tests and/or birth control while on Depakote.

**Corresponding Request(s):** Ivy RFP Nos. 23-25

**Abbott's Response:**

As stated in Abbott's responses to Ivy Request for Production Nos. 23-25, Abbott has already produced responsive documents, if any, from the electronically stored information of 21 key Abbott employees as a result of searching these documents for "Depakote" and "teratogen*" or "pregnan*," and it is continuing to gather documents from current and former employees. These additional documents may include responsive documents.

## D.   MISCELLANEOUS

### 64.   "Custodial" Files

Plaintiffs ask the Court to order Abbott to produce "custodial files," which shall include, but not be limited to, all e-mails, letters, memoranda and other communications to any from such persons regarding Depakote, from all individuals identified in (a) Abbott's Rule 26 disclosures; (b) Abbott's response to the Ivy Rogs; and (c) the recipients of Abbott's Legal Hold.

**Abbott's Response:**

As an initial matter, Abbott has been using the search terms proposed by plaintiffs for its document productions and does not feel that it is appropriate for plaintiffs to change those terms mid-stream, as they are attempting to do here.

As plaintiffs are aware, Abbott's production of custodial files includes the witnesses identified in Abbott's Rule 26 disclosures.

In the Ivy answers to interrogatories, Abbott identified 68 current and former employees who had Depakote responsibilities covering several decades in the areas inquired into. Of these, 55 are among either the 21 original production custodians or the additional current and former employees from whom Abbott is searching for responsive documents.

For reasons Abbott has already expressed in court, Abbott believes it is inappropriate and bad policy to require a party to produce documents from all employees that it has put on a litigation hold.

Abbott has offered to plaintiffs throughout this litigation that they should feel free to identify additional employees from whom they would like for Abbott to collect and produce documents, subject to Abbott's right to object and then discuss that selection. To date, plaintiffs have not taken Abbott up on that offer. Abbott submits that a request of this type from plaintiffs should be made in good faith based on their review of Abbott's documents.

### 65.   Abbott's Responses to RFPs Quoting Abbott's Legal Hold

CP RFP Nos. 3-15 seek documents that Abbott directed over 110 people to preserve in its litigation hold.[21] In fact, these RFPs directly quote Abbott's litigation hold. Abbott presumably believed that these categories of documents were potentially relevant and discoverable, and

---

[21] *Compare* Exhibit K at 4-12 *with* Abbott's Legal Hold, attached as Exhibit M.

Plaintiffs seek production of these categories of documents.  The Court should overrule Abbott's objections and order Abbott to produce all responsive documents by no later than June 10, 2013.

**Abbott's Response:**

As shown in Abbott's responses to these requests, Abbott has agreed to produce, and has produced, responsive documents.  Plaintiffs' concern is not apparent to Abbott, unless this is the same as their contention that Abbott should produce documents from everyone that it has put on litigation hold.  Abbott's position on that request is addressed in Item 64, supra.

### 66.    Identification of Accurate Depakote Labels

As first mentioned in a March 5, 2013 letter to Abbott's counsel, Plaintiffs believe that the identification of a complete and correct set of labels for the various Depakote formulations since 1978 should not be a source of dispute in this lawsuit.[22]  Abbott failed to respond to the March 5 letter, forcing Plaintiffs to issue CP RFA No. 14 and corresponding CP RFP No. 22.  Attached to CP RFA No. 14 were excerpts from the Physicians' Desk Reference ("PDR") from 1979-2012 that Plaintiffs intended to include all Depakote labels for that time period.[23]  Plaintiffs used the PDR versions of the labels, as that is what Abbott produced as labels in the *Rix* case.  Abbott's response to CP RFA 14 was a non-response (admitting only that the attached documents "appear[ed] to be copies of pages from" the PDR "and that the publishers of the [PDR] represent that the information contained therein is in compliance with 21 C.F.R. § 201.100(d).").[24]

In response to CP RFP 22, which requires Abbott to produce any Depakote labels not captured in the attachment to CP RFA 14, "Abbott states that it will produce non-privileged, responsive documents, if any and to the extent available, in response to this Request."[25]  Plaintiffs fail to comprehend how any Depakote label – which, by definition, was supplied to health care professionals and the public – could be privileged.  Moreover, Plaintiffs fail to understand how Abbott would not have at its ready disposal all of the labels used for Depakote.

Plaintiffs ask the Court to order Abbott to (a) confirm that the PDR excerpts are the complete labels from 1979-2012 or (b) produce a complete set of labels for that timeframe, by no later than June 10, 2013.

**Abbott's Response:**

As an initial matter, plaintiffs' statement that Abbott produced PDR excerpts as labels in the Rix case is erroneous.  Plaintiffs are apparently referring to the fact that an expert for the plaintiff in Rix brought a set of PDR excerpts to her deposition and she claimed that they were a set of labels.

---

[22] *See* March 5, 2013 letter from H. Novosad, attached as Exhibit N.
[23] *See* Fragnoli Dkt. No. 25 at 10 and Fragnoli Dkt. Nos. 27-31.
[24] Fragnoli Dkt. No. 26, at 13.
[25] Exhibit K at 17.

As noted in Abbott's Opposition to Plaintiffs' Motion to Compel and Motion for Sanctions filed in these cases on June 3, 2013, PDR excerpts are not identical to labels, or "package inserts" as they are known.

As shown by its discovery responses, Abbott has not taken the position that it should not have to produce package inserts. Abbott will undertake to produce a copy of all final versions of Depakote package inserts in Abbott's possession by June 21st.

## 67. <u>Lack of Preparation and Improper Instructions to Not Respond During 30(b)(6) Deposition</u>

Abbott should be ordered to re-produce one or more corporate representative(s) for deposition. Generally, the topics for the deposition were the storage, deletion, backup, preservation, identification and collection of electronically stored information ("ESI") related to Depakote. This is basic information Plaintiffs have been trying to obtain virtually since the inception of these cases nearly three years ago. The corporate representative Abbott proffered for these topics (a) was not prepared to testify about a significant portion of the topics for which he was designated and (b) was improperly instructed not to answer a host of question on topics for which he was designated and that are appropriate deposition topics. For a complete discussion of these issues, please see the Motion to Compel, at 2-8. Abbott should be ordered to produce one or more corporate representatives who are adequately prepared to provide this testimony. Plaintiffs further request reimbursement of fees and costs incurred with this 30(b)(6) deposition due to Abbott's conduct.

### <u>Abbott's Response:</u>

Abbott refers the Court to its Opposition to Plaintiffs' Motion to Compel and Motion for Sanctions filed in these cases on June 3, 2013 providing Abbott's position regarding this topic.

## 68. <u>Abbott's Responses to Consolidated Plaintiffs' RFA Nos. 3-13</u>

Consolidated Plaintiffs' Request for Admission ("CP RFA") Nos. 3–13 seek basic information regarding Abbott's responsibilities for the various formulations of its VPA (Depakote) drug products.[26] Abbott refused to provide clear, objection-free responses to these RFAs.[27] As more fully discussed in Plaintiffs' Motion to Compel and Motion for Sanctions ("Motion to Compel"),[28] Abbott's objections to RFA Nos. 3-13 should be overruled, and the Court should either deem these RFAs admitted or should order Abbott to provide clear, unqualified responses thereto by June 10, 2013.

### <u>Abbott's Response:</u>

Abbott refers the Court to its Opposition to Plaintiffs' Motion to Compel and Motion for Sanctions filed in these cases on June 3, 2013 providing Abbott's position regarding this topic.

---

[26] Fragnoli Dkt. No. 25, at 7-10.
[27] Fragnoli Dkt. No. 26, at 6-12.
[28] The Motion to Compel, including all exhibits thereto, is attached as Exhibit O.

**69.    Abbott's Responses to Consolidated Plaintiffs' RFA Nos. 15-43**

RFA Nos. 15–43 ask Abbott to admit certain statements recited verbatim from Abbott's current labeling for its VPA products.[29]  While acknowledging that these "statement[s were] made in labeling accompanying [VPA] products manufactured by or for Abbott,"[30] Abbott nonetheless asserted a host of meritless objections that should be overruled.  Stated simply, if the statements in Abbott's current labels are true, Abbott should give unqualified admissions to RFA Nos. 15–43; conversely, if the statements in Abbott's current labels are not true, Abbott should give unqualified denials to RFA Nos. 15–43.

**Abbott's Response:**

Abbott refers the Court to its Opposition to Plaintiffs' Motion to Compel and Motion for Sanctions filed in these cases on June 3, 2013 providing Abbott's position regarding this topic.

**70.    Abbott's Responses to Consolidated Plaintiffs' RFA Nos. 59-70**

RFA Nos. 59–70 seek Abbott's admissions regarding the content of its VPA Drug Products' labels.[31]  Abbott denied each of these requests, asserting objections based on the "relevant time period" and Plaintiffs' use of terms in its requests, and further stated that Abbott's VPA drug product labeling included "a statement regarding rates found in registry data of congenital malformation among infants born to mothers using [VPA] as compared to rates among infants born to epileptic mothers using other anti-seizure monotherapies."[32]  Abbott's answers are simply not responsive to Plaintiffs' requests.  As more fully discussed in the Motion to Compel, Abbott's objections to RFA Nos. 59-70 should be overruled, and the Court should either deem these RFAs admitted or should order Abbott to provide clear, unqualified responses thereto by June 10, 2013.

**Abbott's Response:**

Abbott refers the Court to its Opposition to Plaintiffs' Motion to Compel and Motion for Sanctions filed in these cases on June 3, 2013 providing Abbott's position regarding this topic.

**71.    IMS Data**

Plaintiffs have requested IMS prescriber data, which tracks drug prescriptions by pharmacy, prescriber, and other methods.  Plaintiffs have issued multiple requests for production of such data.[33]  Abbott responded by directing Plaintiffs to its Defendant Fact Sheets.[34]

---

[29] Fragnoli Dkt. No. 25, at 10-18.
[30] Fragnoli Dkt. No. 26, at 13-36.
[31] Fragnoli Dkt. No. 25, at 30-32.
[32] Fragnoli Dkt. No. 26, at 54-62.
[33] *See* Abbott's Responses and Objections to Consolidated Plaintiffs' Second Set of Interrogatories and Sixth Requests for Production, attached hereto as Exhibit P, at Response to RFP No. 271; *see also* Exhibit C, at Response to Ivy RFP Nos. 8, 36.
[34] *Id.*

However, in the Defendant Fact Sheets, Abbott stated that it "does not yet have authority to provide information in response to [a request regarding prescriber data]."[35]  Further, despite the existence of a protective order in these cases, Abbott has redacted IMS data from its production to Plaintiffs.[36]  Plaintiffs ask the Court to order Abbott to produce responsive IMS data by no later than June 10, 2013.

**Abbott's Response:**

A protective order in and of itself is not sufficient to authorize the release of IMS data.  Abbott is in the process of attempting to secure the authority for such release.  Abbott believes it will be in a position to provide that information by June 28th.

## 72.    **Privilege Log**

To date, Plaintiffs have only received a single privilege log listing two documents – a litigation hold and a litigation hold standard operating procedures document.  However, Abbott has been, at the very least, redacting documents based on assertions of privilege.[37]  Abbott should provide Plaintiffs an updated privilege log by June 10, 2013.

**Abbott's Response:**

Abbott proposes to produce a privilege log for all productions made to date by June 30. Abbott also proposes to produce a privilege log for subsequent productions within 45 days of each such production, as specified in the ESI protocol entered in this case.

Respectfully submitted,

*s./Christopher Cueto*
Christopher Cueto, #06192248
Michael Gras, #06303414
LAW OFFICE OF CHRISTOPHER CUETO, LTD.
7110 West Main Street
Belleville, IL 62223
Phone: (618) 277-1554
Fax: (618) 277-0962

Ralph D. McBride
Tony L. Visage
Phillip L. Sampson, Jr.
Heath A. Novosad
Blair R. Loocke

---

[35] *See* Exhibits E-G, at Section IV.A.
[36] *See, e.g.*, ABTDOT00343565-580, attached hereto as Exhibit Q.
[37] *See, e.g., id.* at ABTDOT00343566.

Nancy R. McEvily
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 223-2300
Fax: (713) 221-1212

Jennifer M. Salim
BRACEWELL & GIULIANI LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Phone: (214) 468-3800
Fax: (214) 468-3888

John E. Williams, Jr.
John T. Boundas
Steven J. Kherkher
Sejal K. Brahmbhatt
WILLIAMS KHERKHER HART BOUNDAS, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200
Fax: (713) 643-6226

William M. Audet
Joshua C. Ezrin
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Phone: (415) 568-2555
Fax: (415) 568-2556

Jeff Meyer
THE MEYER LAW FIRM, P.C.
6363 Woodway Drive, Suite 720
Houston, Texas 77057
Phone: (713) 974-4100
Fax: (713) 974-0225
Kenneth T. Fibich
Erin Copeland
FIBICH HAMPTON LEEBRON BRIGGS &
JOSEPHSON, LLP
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 751-0025
Fax: (713) 751-0030

Robert L. Salim
SALIM-BEASLEY, LLC
1901 Texas Street
Natchitoches, Louisiana 71457
Phone: (318) 352-5999
Fax: (318) 352-5998

Kathryn Harrington
Mark Ekonen
Amanda S. Williamson
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
P. O. Box 11310
Birmingham, Alabama 35202
Phone: (205) 326-3336
Fax: (205) 326-3332

George Erick Rosemond
ROSEMOND LAW GROUP, PC
8441 Gulf Freeway
Suite 600
Houston, TX 77017
Phone: (713) 230-2342
Fax: (713) 649-3470

**ATTORNEYS FOR PLAINTIFFS**


   AND


  BRYAN CAVE LLP

By:  /s/ Dan H. Ball (with consent)
     Dan H. Ball
     dhball@bryancave.com
     Peter W. Herzog III
     pwherzog@bryancave.com
     Stefan A. Mallen
     samallen@bryancave.com
     211 North Broadway, Suite 3600
     St. Louis, MO  63102
     (314) 259-2000 (telephone)
     (314) 259-2020 (facsimile)

     Paul F. Strain
     Stephen E. Marshall
     Dino Sangiamo
     VENABLE LLP

750 East Pratt Street, Suite 900
Baltimore, MD  21202
(410) 244-7400

*Attorneys for Abbott Laboratories Inc.*

# EXHIBIT "I"


**VENABLE**®LLP

750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

Dino S. Sangiamo

**T (410) 244-7679**
**F (410) 244-7742**
dssangiamo@venable.com

December 13, 2013

<u>VIA EMAIL</u>

John T. Boundas, Esquire
Williams Kherkher
8441 Gulf Freeway, Suite 600
Houston, Texas  77017-5051

Heath A. Novosad, Esquire
Bracewell & Giuliani
Pennzoil Place, South Tower
711 Louisiana Street, Suite 2300
Houston, Texas  77002-2770

Re:   In Re Depakote Cases (Bonner and LeJeune)
      **United States District Court for the Southern District of Illinois**
      **Case Nos. 13-cv-324-SCW and 13-cv-326-SCW**

Dear Counsel:

This is in response to your letter of December 6, 2013.  Abbott certifies that it has conducted reasonable searches to collect, and has produced, the documents enumerated in the chart in your December 6th letter except as stated below.

Issue 8

As you know, this issue has been the subject of additional discussion with the Court, including its order of December 13th.

Issue 95

We consider this production complete, but we are aware that during the hearing on December 11th, the parties expressed some disagreement on the proper interpretation of this topic.  That disagreement is still being resolved.

Issue 96

Abbott agrees with this statement of the parameters of production for witnesses whom plaintiffs identify and notice for deposition, except that documents were only to be produced up through the time on which the witness was working on Depakote and compensation documents were to be produced only insofar as they pertained to bonus and incentive awards being tied to the sale or performance of Depakote.  Such information, if available, has been produced for Cherilyn Spath, Mridula Menon, and Blasine Penkowski, and will be produced for Tracey Heimberger.  The footnote to your letter, however, lists witnesses designated by Abbott in response to plaintiffs' request for deponents pursuant to Fed. R. Civ. P. 30(b)(6).  Abbott does not agree that documents of this type should be produced for such witnesses.

# VENABLE®LLP

John T. Boundas, Esquire
Heath A. Novosad, Esquire
December 13, 2013
Page 2

### Issue 98

#### DOJ production

Our analysis of this issue in not complete and we will provide an update on or before December 20th.

#### RIMS

The status of the production in response to plaintiffs' June 12, 2013 request for documents from the RIMS database print-out has not changed.  That is, there are 44 files, which I have previously identified for you, that could not be located.

The majority of the files from the plaintiffs' September 4, 2013 request from the RIMS database print-out have been produced.  I will provide you with a more specific breakdown regarding the files, as well as some concerns that we have about a portion of the remaining files.

### Issue 104

As regards the 230 files within the regulatory files as to which Abbott was confirming production, the vast majority of these files either had already been produced or were produced on December 5, 2013.  Abbott anticipates being able to produce the remainder of these files by January 7, 2014.

In addition, Abbott is bringing the regulatory file production current.  Abbott anticipates that it will begin producing those documents the week of December 23rd and will complete that production by January 7, 2014.

As regards 15-day reports, Abbott began submitting them electronically in XML format beginning in approximately 2005.  These submissions were not also made in hard copy, and we therefore do not have copies to provide to you.  Information concerning the date of submission to FDA of any given report, however, is available in the AEGIS database.  Accordingly, we do not intend to make an additional production of 15-day reports, but we are available to discuss further.

### Unnumbered last item in chart

Other than the updating the regulatory file, discussed above, the parties have not discussed updating productions.

# VENABLE® LLP

John T. Boundas, Esquire
Heath A. Novosad, Esquire
December 13, 2013
Page 3

## Custodial production and legal hold segregation employees

   The reasonable searches that we have conducted include employees for whom we are producing custodial files and employees for whom we are producing documents that they segregated pursuant to the legal hold order. The first group of employees is listed on Exhibit A hereto and the second group of employees is listed on Exhibit B hereto. In addition, and in connection with Issue 25, production of the files of sales representatives who called upon plaintiffs' prescribing physicians was made pursuant to the terms of the defendant's fact sheets.

   We have not completed the custodial file productions of Robert Carr, Robert Funck, Richard Gonzalez, Jeffrey Leiden, John Leonard, and Miles White.

   As I stated previously, the productions made in this litigation have excluded foreign language documents (except in the case of the agreement to produce foreign product labels) and documents that could not be converted for technical reasons.

   Please contact me if you would like to discuss the foregoing.

       Sincerely,

       Dino S. Sangiamo

Attachments
DSS/jmc
7483749

## Attachment A
## to December 13, 2013 Letter from Dino Sangiamo, Esquire

Noreen Arnold
Jeff Baker
Ingrid Bryzinski
Joanne Celba
Joseph Chmiel
Michelle Collins
Kimberly Dahmen
Helen Eliopoulos
James Embrescia
Sherri Gallas
Mary Garofalo
Jeff Haas
Tracie Haas
Tracey Heimberger
Robert Hoff
Stephen Hough
Rebecca Jenrow
David Jordan
Amy Kendall
John Kody
Bill Kormany
John Larson
James Lavery
Diane Lawson
Nadine Lindley
Scott Luce
Richard Marks
Heather Mason
Jeremy McCumber
Suzanne McDonald
Jay McGuffin
Mark McLoudrey
Kevin McRaith
Jane Meinhold
Babs Menon
Louis Mini
David Molnar
Mark Mularski
Lee Muraoka
Steve Niemcryk
Faith O'Neil
Greg Pawell
Blasine Penkowski

Ron Reed
Robert Reder
Mario Saltarelli
Charles Schwamlein
Theodora Siettas
Cherilyn Spath
Sharon Stec
James Steck
Steve Townsend
Kathy Tracy
Jennifer Trenn
Richard Tresley
Marleen Verlinden
Jill Wilcox
Medgar Williams
Bruce Yamamoto

**Attachment B**
**to December 13, 2013 Letter from Dino Sangiamo, Esquire**

Laura Anderson
William Axelsen
Lindsay Bensman
Alice Boswell
Leigh Bruhn
Teresa Cappetta
Dawn Carlson
Diane Carpenter
Bella Cohen
Ann Drew
Regula Egli
Mary Faulkner
Helmuth Fendel
Julie Fugate
Sharon Gardner
Nicholas Greco
Shelley Hecker
Holtzman-Belcher
Troy Iaconis
Brian Idstein
Kuldeep Johnson
Catherine Kacos
Yovita Kraeger
Kim Kubik
Pavit Kukreja
Richard Leber
David Ludolph
Jeanne Martin
Kim Martini
Julie Mayew
Dawnell McNeill
Jill Milam
Julie Nguyen
James Notorfrancesco
Alyssa O'Neill
James Pellettiere
Wendy Plyman

Weining Robieson

Eva Rohrer

Sheri Salzeider

Beth Santi

Chuck Santora

Teresa Stotts

Kim Troxell

Kent Ulveling

Matthew Villano

# EXHIBIT "J"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **B.P., A MINOR, BY DAWN FRAGNOLI INDIVIDUALLY AS PARENT AND NEXT FRIEND,** | ) **Case No. 13-cv-324-SCW** |
| | ) |
| | ) |
| | ) |
| **PLAINTIFFS,** | ) |
| | ) |
| **H.C., A MINOR, BY MICHELLE CASSIDY INDIVIDUALLY AS PARENT AND NEXT FRIEND,** | ) **Case No. 13-cv-325-SCW** |
| | ) |
| | ) |
| | ) |
| **PLAINTIFFS,** | ) |
| | ) |
| **J.B., A MINOR, BY LINDA LEJEUNE INDIVIDUALLY AS LEGAL CUSTODIAN AND NEXT FRIEND,** | ) **Case No. 13-cv-326-SCW** |
| | ) |
| | ) |
| **PLAINTIFFS,** | ) |
| **v.** | ) |
| | ) |
| **ABBOTT LABORATORIES, INC.,** | ) **JURY TRIAL DEMANDED** |
| | ) **ON ALL COUNTS** |
| **DEFENDANT.** | ) |

**DISCOVERY ISSUES FOR CONSIDERATION
AT THE JULY 11, 2013 DISCOVERY CONFERENCE**

Plaintiffs respectfully submit the following issues for consideration at the July 11, 2013 Discovery Conference.  These issues were discussed by the Parties during a telephone conference on June 21, 2013 and/or July 8, 2013.

**75.     Manufacturing Line Discovery**

Consolidated Plaintiffs' Interrogatory ("CP Rog") No. 6 and RFP No. 282 seek information regarding the gender and age of Depakote manufacturing line workers and communications with such workers.  At this time, Plaintiffs are limiting the information they want from Abbott on this topic to: (a) whether any women of childbearing potential have worked on Abbott's Depakote manufacturing line from 1978 to the present, and if so (b) identify those years between 1978 and the present during which women of childbearing potential worked on Abbott's Depakote manufacturing line and (c) produce all disclosures/warnings provided to such women of childbearing potential concerning risks associated with Depakote.  This limited discovery is relevant to Abbott's knowledge of Depakote's birth defect risks and its willingness and ability to warn of and disclose such risks, at least to its own employees.  It is also relevant to Depakote safety precautions generally.  The Court should overrule Abbott's objections to CP

Rog. No. 6 and CP RFP Nos. 281 and 282 and order Abbott to answer questions (a) and (b) above and produce documents responsive to (c) above by July 22, 2013.

Abbott's Initial Response:

None of the information requested in ROG 6, the documents sought in RFPs 281 and 282, nor the narrowing of the same Plaintiffs have undertaken in this submission have any relevance to the matters at issue in this litigation. The gender and age of the personnel manufacturing Depakote and the safety precautions Abbott employs when Depakote is manufactured are irrelevant as the exposures involved in manufacturing the product are wholly different. For example, individuals manufacturing Depakote are not ingesting it as the Biological Mothers did, but rather are handling the product and its individual components. Plaintiffs have presented no reason to believe that these very different forms of exposure pose similar medical risks, and they certainly have not shown how considerations of proportionality are satisfied by requiring Abbott to track down 35 years of human resources and manufacturing line data and documentation. As such, the information and documents requested by Plaintiffs in ROG 6 and RFPs 281 and 282 are not relevant to this litigation, and Abbott should not be required to provide the same.

Abbott's Supplemental Response:

The API for Depakene, Depacon and Depakote is manufactured in North Chicago and Puerto Rico. The Depakote-family drug products are manufactured in Puerto Rico, Kansas, Argentina and Mexico. The drug products are also packaged in several locations in the Western Hemisphere. Women may have worked on the chemical manufacturing in some plants, while only working on inspection, packaging, and testing in other plants. To this point, we have determined that Abbott had no policy restricting women from working on the Depakote manufacturing lines. Abbott has an employee medical surveillance procedure for hazardous chemicals, and Depakote is included among the substances addressed by that procedure. We continue to investigate the particulars of questions (a) and (b) as posed by Plaintiffs, but have not identified any centralized source for the information sought, even as to the situation as it currently exists in the various locations in which some form of Depakote or its API is manufactured, processed, or packaged.

**76. <u>Consent Forms</u>**

CP RFP No. 278 asks for exemplar consent forms from Depakote studies and clinical trials. Discovery regarding the consent forms Abbott required its clinical trial participants to execute is proper as such documents likely reflect Abbott's knowledge of Depakote's birth defect risks and its disclosure of such risks to trial participants (as opposed to the general public). It is also relevant to Depakote safety precautions generally. The Court should overrule Abbott's objections to CP RFP No. 278 and order that Abbott produce exemplar consent forms (at least one example per year from 1978 to the present, and at least two examples for any year in which more than one trial was conducted) for its Depakote clinical trials by no later than July 22, 2013.

2

Abbott's Initial Response:

Abbott's production to date has included consent forms. Nevertheless, Abbott proposes to make an additional production of consent forms for three clinical trials per decade, starting in the 1980s, for Depakote clinical trials that did not exclusively involve pediatric or elderly patients.

Plaintiffs' request for yearly consent forms spanning a 35-year time period is disproportionate to the needs of the case, particularly given the irrelevance of those forms. Plaintiffs apparently seek to compare Abbott's description of birth defect risks in its Depakote product labeling to the description of those risks in consent forms that are used by clinical study investigators in Depakote clinical trials. This is not reasonably calculated to lead to the discovery of admissible evidence because informed consents are directed toward patient participants, not prescribing physicians (21 C.F.R. 50.20); the issue in the instant cases is whether Abbott provided adequate warnings to the prescribing physicians. A side by side comparison of the language used in the two documents directed at entirely different audiences is therefore not meaningful. In fact, due to the unique circumstances of use associated with clinical trials, the entire consent form process of seeking a patient signature on an FDA-regulated form prior to use of the drug renders the forms even less relevant to the ordinary prescription scenario. Significantly, informed consents in clinical trials are governed by a different set of federal regulations than those governing drug labeling. Compare 21 C.F.R. §§ 50.20-27 (regulating clinical trial informed consents) to 21 C.F.R. §§ 201.56, 201.57, 201.80 (regulating drug labeling). Expansive discovery of clinical trial consent forms is therefore inappropriate.

Abbott's Supplemental Response:

The clinical trial consent forms, to the extent they exist, are contained within individual clinical trial files housed in the Records Information Center. A review of the scope necessary to meet Plaintiffs' demand requires manually pulling and reviewing files identified through an index search as potentially containing the consent forms. At this point, the number of candidate files exceeds 1,300 and is growing. These files are not uniformly organized, and the consent forms are not expected to be maintained in the same folder or sub-file of any given file. A preliminary review is underway in an effort to determine whether the identification and review process can be streamlined.

### 77.   **Foreign Abbott Affiliates**

CP RFP Nos. 286, 287, 289 and 295 seek documents from Foreign Abbott Affiliates. Specifically, CP RFP Nos. 286, 287 and 289 seek information regarding publications, studies, trials, analyses and registries from Foreign Abbott Affiliates concerning birth defects and anti-epileptic drugs, and CP RFP No. 295 seeks foreign Depakote labels, draft labels, and discussions regarding labels. Abbott appears to have categorically objected to such requests and refused to produce any responsive documents from foreign affiliates. At this time, Plaintiffs are limiting the documents they seek from Foreign Abbott Affiliates to (a) all communications with Foreign Abbott Affiliates involving Depakote's risks for birth defects and/or teratogenicity; (b) all communications with Foreign Abbott Affiliates involving information in Depakote's label

concerning risks for birth defects and/or teratogenicity; (c) a complete set of foreign Depakote labels; and (d) documents reflecting (i) the number of pregnancies and (ii) the results of any pregnancies occurring in any Foreign Abbott Affiliate Depakote clinical trial.  Responsive documents in the possession of foreign affiliates are discoverable, the Court should overrule Abbott's objections to CP RFP Nos. 286, 287, 289 and 295 and order Abbott to produce documents responsive to CP RFP Nos. 286, 287, 289 and 295 by no later than July 22, 2013.

Abbott's Initial Response:

Abbott proposes that this issue be tabled until the next discovery conference, scheduled for two weeks from now, so that Abbott has time to consider plaintiffs' proposal, which Abbott did not see until yesterday morning.

The RFPs at issue are part of a series that, by their terms, would require Abbott to gather internal documents in the possession of "any Foreign Abbott Affiliate."  See CP RFPs 286 to 295.  Although counsel has not investigated to determine the exact number of such affiliates, they may exist in more than 60 different countries.  During the meet and confer held by the parties on June 21, plaintiffs indicated that they would only press CP RFP Nos. 286, 287, 289 and 295 for now, but those RFPs, as written, would still require Abbott (a) to collect internal documents from all of its foreign affiliates (see RFPs 286 and 295) and (b) to conduct inquiries with respect to whether all of those affiliates send every analysis to Abbott (see RFP 287) and send every agreement with a third-party about publication to Abbott (see RFP 289), and then to collect those documents from each foreign affiliate if the answer were no.  Needless to say, the burden associated with those undertakings would be immense and, in Abbott's view, entirely disproportionate to an appropriate scope of discovery.

Plaintiffs' most recent proposal received yesterday appears to eliminate the requirement of gathering documents from foreign affiliates and to conduct the investigations described above with respect to RFPs 287 and 289.  Abbott notes that aspects of plaintiffs' narrowed proposal continue to appear improper.  For example, subparts (b) and (c) are contrary to the case law recognizing that foreign regulatory and labeling issues are inappropriate for consideration in a failure to warn trial concerning use of a pharmaceutical product in the United States.  Moreover, subpart (d) seems needlessly burdensome.  Nevertheless, Abbott does not feel that it has had adequate time to consider and present its position on the current proposal and believes that no prejudice will result to plaintiffs if the issue is addressed on July 11th instead of June 28th.

Abbott's Supplemental Response:

Subparts (a) and (b):  The reporting and processing of ex-US serious adverse events, including birth defects, is centralized.  That is to say that individual birth defect cases reported by the foreign affiliates are sent to and analyzed by the safety surveillance employees at Abbott Park, who are also responsible for analysis of birth defect issues, and whose documents are being produced.  These cases are also entered into the AEGIS database, a searchable extract of which was produced to the Plaintiffs in 2011.  To the extent that the resulting analysis (which takes place in Abbott Park, not in the foreign affiliates) gives rise to a change in labeling for ex-US use, Abbott revises the Company Core Data Sheet, which is then sent in local country packages

4

that are distributed out to the foreign affiliates.  Those affiliates then prepare the necessary local submissions based on the guidance received from Abbott Park.  The communications relating to the CCDS are maintained in Abbott Park, and Abbott agrees to produce them to the extent that they are centrally maintained.

Subpart (c):  Abbott proposes to produce the CCDS to the extent that they are centrally maintained.  Abbott's counsel has not yet determined a location for the labels as they exist in every country in which Depakote is sold even today, let alone going back in time.  In addition, differences between the CCDS and the labeling as it exists in other countries would likely be attributable to differences in local regulations and custom and therefore of no relevance to the instant litigation involving the adequacy of Abbott's warnings under United States law.

Subpart (d):   As the Court is aware, pregnant women are generally excluded from Depakote clinical trials.  If a woman participating in a clinical were to become pregnant and the child of that woman were to be born with a birth defect, that case would be reported to Abbott and entered into the AEGIS database, which is available to Plaintiffs.  Abbott submits that this production should suffice for purposes of Plaintiffs' subpart (d).  For Abbott to respond otherwise, it would have to identify which clinical trials were undertaken under the sponsorship of foreign affiliates, and from there to determine how many Clinical Study Reports will have to be examined in an effort to identify any pregnancy-related issues that may have arisen, and how burdensome the review of those files would be.  Our working assumption is that this is a task that can be accomplished in a matter of a few weeks, but we cannot set forth a specific time frame at this point, and the process may be more cumbersome than presently understood.  Pregnant women are generally excluded from trials, which makes the likelihood of the existence of birth defect cases remote.  Moreover, because the data concerning any such cases, if they did occur, would be sent to the database that is in Plaintiffs' possession, an additional production of the type Plaintiffs request in subpart (d) would be inappropriate.

## 80.    Timeliness and Completeness of Abbott Production

In our recent meet-and-confer, Abbott did not provide meaningful information regarding the burden of producing documents at a faster pace.  With just over five months of fact discovery remaining, and with no indication of any true burden to Abbott of prompt production, Plaintiffs ask the Court order Abbott to produce all responsive documents by July 31, including but not limited to:

a. The 15 sales and marketing custodial files Abbott said it would produce;
b. The 35 custodians whose files Plaintiffs have specifically requested and/or Abbott has agreed to produce;[1]
c. The production of documents segregated pursuant to Abbott's litigation hold (Abbott acknowledged that certain litigation hold recipients did segregate documents, but Abbott has not searched or produced those responsive documents); and
d. The production of the categories of documents that this Court has previously ruled are discoverable.

_____
[1] The list of 35 custodians is attached as Exhibit A.

Abbott's Response:

General

Abbott has been producing documents at a rapid pace. Since discovery resumed with plaintiffs' service of discovery requests in April, Abbott has produced a substantial quantity of documents from numerous sources. There is more in the pipeline and Abbott intends to continue to roll out its productions as it has done so far.

At a meet and confer on Monday, July 8th, plaintiffs asked specific questions about the time it takes to produce a given custodian's documents, and other factors. As Abbott indicated on the call, the amount of time it takes to collect and produce a custodial file varies depending on the volume of the custodian's documents. Particularly as regards electronic data, until the data are collected, it is not possible to predict the volume. In addition, the other calls on the time of the Abbott personnel involved, as well as the other Depakote document-related burdens of the Abbott vendors and lawyers, play a role. That makes predictions about rates, and thus, completion dates, difficult.

The basic steps in the process for electronic data are collection of the data by the Abbott IT department; processing of the collected data by a vendor that also runs the search terms across it; review by another vendor of the documents on which there were search term hits to identify privileged material and material that needs to be redacted; creation by the first vendor of production sets; and then uploading of the production set by counsel for transmission to plaintiffs. The variables at play include other competing obligations of the Abbott IT group, the amount of data that the various vendors are dealing with, and the extent to which the document sets are redaction intensive.

At the July 8th meet and confer, Abbott stated a projected target production date for all outstanding productions of August 31st. Abbott would continue its prior practice of rolling the productions out during that time frame. The August 31st date depends somewhat on the Court's guidance on Subpart c below. Abbott submits that completion of production by that date would reflect a continuing rapid pace of production. In addition, plaintiffs have a tremendous quantity of produced documents available to them for review already.

Subpart (a) of plaintiffs' request

Seven of the 15 custodians at issue in this Subpart are former employees. Abbott has produced all of the electronic files for three of these former employees. Two of the former employees had no electronic files. With respect to the remaining two former employees, Abbott is on track to produce their electronic files during the week of July 15th. Abbott anticipates that it will be able to produce any hard copy documents for these employees by July 25th.

Abbott believes that the remaining eight custodians in this category should be part of the August 31st target. Abbott has proposed to plaintiffs that it prioritize the production of these

documents such that it produce earlier documents from these custodians first and later documents from these custodians subsequently.

### Subpart (b) of plaintiffs' request

With respect to the 35 custodians identified by plaintiffs on June 28, for 18 Abbott does not have any electronic custodial documents and Abbott is still confirming whether it will have any hard copy documents for these 18.  Thirteen of the remaining 17 are among the custodians described in Subpart a for whom Abbott will be producing documents.  Abbott is gathering and will produce documents from the remaining four.  Abbott believes that these custodians should be part of the August 31st target.  Abbott is willing to prioritize these productions if plaintiffs so desire.

### Subpart (c) of plaintiffs' request

Abbott's inquiry in not complete, but some employees subject to the hold are segregating their Depakote documents, as distinguished from retaining them without segregating them.  The Court's June 14, 2013 Order directed that "to the extent that Abbott has specifically identified relevant, discoverable documents, not otherwise produced, in the course of executing their litigation hold, they are ORDERED to produce those documents."

Abbott requests clarification as to whether documents about Depakote that an employee has segregated pursuant to the litigation hold fall within the Court's definition of a document set from which Abbott must make a production, where counsel has not collected or reviewed such documents.

### Subpart (d) of plaintiffs' request

Abbott believes that this should also be subject to the August 31st target.

**81.**    **Sufficiency of Abbott Searches for Documents**

A primary issue with the searches Abbott has conducted for responsive documents is that Abbott's protocol may not capture many older documents from, for example the 1990s or earlier, that are particularly important in the bellwether cases but also are important to all cases.  Plaintiffs have previously raised this issue in Topic No. 32 with respect to the Defendant Fact Sheets.  In that instance, the Court ruled that Abbott's statement that it only queried certain databases in connection with the bellwether cases from 1994 and 1995, and therefore produced little to no responsive information, was "not a reasonable search and that Defendants must take other steps to attempt to locate the requested information before they will be excused from production."[2]  Since the June 14 Order, Plaintiffs have received no indication from Abbott that it has performed any additional searches for responsive information and documents regarding the Defendant Fact Sheet.

---

[2] *See* June 14 Order, at 3.

Additionally, Abbott recently described its process for searching "custodial files."[3] Plaintiffs have the same concerns regarding custodial files as they did about the Defendant Fact Sheets – by only searching electronic records in current databases and documents stored in the RIMS database (which Plaintiffs have learned does not catalog documents by custodian and is not text-searchable for the underlying documents), Abbott is potentially excluding older documents that people may have in their personal workspace or have stored somewhere else within the company, that may exist in certain departments, or that may reside in other locations or repositories for documents and therefore fails to capture documents that Abbott may know or have reason to believe exist. In addition to conducting reasonable searches to assemble custodial files when it comes to older documents, Abbott also should be required to conduct a reasonable search to identify historical documents that are responsive to the categories of documents that this Court has already ordered Abbott to produce. In other words, for example, since the Court has ordered Abbott to produce its marketing plans and related internal correspondence, Abbott should be ordered to actually conduct a reasonable search for the responsive documents for all relevant time periods. For older documents, this will very likely entail more than a search of the RIMS index and the assembly of "custodial files" that by virtue of the nature of the search are likely <u>not</u> to result in production of relevant older documents. Without knowing how or where Abbott stores or may look to find older documents, it is difficult if not impossible for Plaintiffs to micromanage the nature of the search, but Plaintiffs submit that a reasonable search in the case of older documents requires that Abbott investigate the potential sources or locations for responsive documents that may exist.

Abbott's Response:

Abbott's search for documents has included custodial files, centralized files, databases (including RIMS, which describes documents, including older stored documents, maintained in Corporate Records) and departmental files.

Plaintiffs express a concern about excluding documents that people may have in their personal work space. Those documents, however, are captured by Abbott's production of hard copy documents of current employees. Plaintiffs also express a concern about excluding documents in departmental files. Departmental files are also within the scope of Abbott's search. In the specific case of marketing plans, based on Abbott's counsel's investigation to date (including discussions with employees involved in Depakote marketing during various time periods), there is no centralized or departmental location where such plans are kept, and the only reasonable place to search for them is custodial files.

Abbott further observes that much of this circumstance has been brought about by the plaintiffs' delay of waiting 15 or more years to file suit. That delay has also worked to Abbott's disadvantage in various respects, including the fact that some critical medical providers do not maintain records that date back to the time period of their treatment of the plaintiffs.

Plaintiffs will be free to ask questions of Abbott's witnesses at deposition regarding their knowledge of the location of documents.

---

[3] *See* July 5, 2013 letter from D Sangiamo to H Novosad and J Boundas, attached hereto as Exhibit B.

### 82.    **Psyzkowski Rog Supplementation**

In its April 30, 2013 Order, the Court ordered Abbott to supplement its response to the Pyszkowski Rogs by June 10, 2013.  Abbott has not done so.  Plaintiffs ask the Court to order Abbott to supplement this response by July 12.

Abbott's Response:

The April 30, 2013 order directs Abbott to provide certain additional information concerning lawsuits that was the subject of inquiry in the Pyszkowski Rogs.  Abbott proposes to do this by Monday, July 15th.

### 83.    **Organizational Charts**

Plaintiffs previously requested Organizational Charts in Issue No. 21 (discussing Ivy RFP No. 18),[4] which was addressed during the April 19, 2013 discovery conference.   At that time, the Court found the issue not ripe, as Abbott's response to Ivy Rog. No. 18 was not yet due. Abbott has now responded to Ivy Rog. No. 18 as follows:

Abbott further objects to Request No. 18 as overbroad and unduly burdensome insofar as it seeks production of organizational charts covering the time period of 1978 to 2010.

Subject to and without waiving its objections, Abbott states that its production to date has included numerous organizational charts or other documents containing information typically contained in organizational charts.  Abbott has undertaken a reasonable search for additional organizational charts and has produced those that it has found.  Additional documents of this type might be contained in Abbott's upcoming production of the custodial files of additional employees, as many of the documents produced to date by Abbott containing information typically contained in organizational charts have been from the production of custodial files.

Abbott's objections should be overruled, and Abbott should be ordered to make a targeted search for responsive Organizational Charts and produce them by July 22.

---

[4] A relevant excerpt of Abbott's responses and objections to the Ivy RFPs is attached as Exhibit C.

Abbott's Response:

As noted above, Abbott's production to date has included numerous organizational charts and information typically contained in organizational charts. Abbott does not believe that there is any additional targeted search to be done. This issue was not raised at the meet and confer that the parties held in connection with this hearing, so counsel has not had an opportunity to double check, but counsel will do so to assure that there is nothing further that can be done by way of a targeted search for organizational charts that would bear on Depakote.

## 84.    Scheduling of Prescribing Physician Depositions in *Fragnoli* and *LeJeune*

In light of the current scheduling order, in which fact discovery closes on December 5, 2013, Abbott believes that it is necessary to begin scheduling the depositions of the prescribing physicians/OB-GYNs in the two remaining bellwether cases. Plaintiffs object to scheduling these depositions before October 21. If these depositions cannot be scheduled before that time, this would provide the parties with approximately 5 weeks to complete the depositions before discovery closes. Abbott's experience in attempting to schedule these depositions is that 5 weeks is not enough and that at least two months (October and November) should be allowed. Although Abbott would prefer to begin taking the depositions of these prescribers and OB-GYNs in September, Abbott is willing to compromise and agree that the depositions of the prescribing physicians will not begin before October 1. However, Abbott would like to begin scheduling the depositions now to ensure that they can be completed before the close of fact discovery.

Plaintiffs' Response:

The depositions of prescribing physicians and OB-GYNs should not occur until Abbott's document production is complete and Plaintiffs have had an opportunity to review Abbott's production. Abbott currently proposes to complete its production by August 31, so starting these depositions on October 1 would give Plaintiffs only 30 days to review the production and raise any issues Plaintiffs may encounter with the production. Plaintiffs have agreed to begin scheduling the depositions of other treating physicians, but the prescriber and OB-GYN depositions should not be scheduled at this time.

Respectfully submitted,

*s./Christopher Cueto*
Christopher Cueto, #06192248
Michael Gras, #06303414
LAW OFFICE OF CHRISTOPHER CUETO, LTD.
7110 West Main Street
Belleville, IL 62223
Phone: (618) 277-1554
Fax: (618) 277-0962

10

Ralph D. McBride
Tony L. Visage
Phillip L. Sampson, Jr.
Heath A. Novosad
Blair R. Loocke
Nancy R. McEvily
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 223-2300
Fax: (713) 221-1212

Jennifer M. Salim
BRACEWELL & GIULIANI LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Phone: (214) 468-3800
Fax: (214) 468-3888

John E. Williams, Jr.
John T. Boundas
Steven J. Kherkher
Sejal K. Brahmbhatt
WILLIAMS KHERKHER HART BOUNDAS, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200
Fax: (713) 643-6226

William M. Audet
Joshua C. Ezrin
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Phone: (415) 568-2555
Fax: (415) 568-2556

Jeff Meyer
THE MEYER LAW FIRM, P.C.
6363 Woodway Drive, Suite 720
Houston, Texas 77057
Phone: (713) 974-4100
Fax: (713) 974-0225
Kenneth T. Fibich
Erin Copeland

FIBICH HAMPTON LEEBRON BRIGGS &
JOSEPHSON, LLP
1150 Bissonnet
Houston, Texas 77005
Phone: (713) 751-0025
Fax: (713) 751-0030

Robert L. Salim
SALIM-BEASLEY, LLC
1901 Texas Street
Natchitoches, Louisiana 71457
Phone: (318) 352-5999
Fax: (318) 352-5998

Kathryn Harrington
Mark Ekonen
Amanda S. Williamson
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
P. O. Box 11310
Birmingham, Alabama 35202
Phone: (205) 326-3336
Fax: (205) 326-3332

George Erick Rosemond
ROSEMOND LAW GROUP, PC
8441 Gulf Freeway
Suite 600
Houston, TX 77017
Phone: (713) 230-2342
Fax: (713) 649-3470

**ATTORNEYS FOR PLAINTIFFS**

AND

BRYAN CAVE LLP

By: /s/ Dan H. Ball (with permission)
    Dan H. Ball
    dhball@bryancave.com
    Peter W. Herzog III
    pwherzog@bryancave.com
    Stefan A. Mallen
    samallen@bryancave.com

211 North Broadway, Suite 3600
St. Louis, MO  63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Paul F. Strain
Stephen E. Marshall
Dino Sangiamo
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD  21202
(410) 244-7400

*Attorneys for Abbott Laboratories Inc.*

| Name | Start | End | Title | Department | Ivy | Hold | DFS | 26 | Agreed |
|---|---|---|---|---|---|---|---|---|---|
| Blake, Molly | 10/3/1988 | 12/16/1995 | Clinical Project Manager | Clinical Research | X | | | | |
| Brugger, Andrew | 9/6/1988 | 3/11/1994 | Director, Clinical Research | Clinical Research | X | | | | |
| Kendall, Amy C. | 10/15/2001 | Present | Director Global Medical Communication | Medical Communications/Neuroscience/Global Medical Services/Medical Information | X | X | | | |
| Kercher, Nancy | 2/3/1992 | 5/20/1994 | Senior Regulatory Specialist | Regulatory Affairs | X | | | | |
| McCarthy, Bruce | 7/21/1997 | 3/6/2004 | Global Project Head | Neuroscience | X | | | | |
| Meinhold, Jane M. | 7/9/2001 | Present | Senior Clinical Science Manager | Neuroscience | X | X | | | |
| Motola, Nancy | 12/26/1989 | 10/26/1991 | Senior Regulatory Affairs Admin | Regulatory Affairs | X | | | | |
| Nelson, W. Michael | 1/6/1975 | 8/20/1987 | Regulatory (title unknown) | Regulatory Affairs | X | | | | |
| Silber, Chris | 8/19/1991 | 5/12/2004 | Global Project Head | Clinical Research | X | | | | |
| Wallin, Bruce | 4/12/1993 | 12/1/2001 | DVP Therapeutic Area | Neuroscience | X | | | | |
| Janicki, Robert S. | 2/25/1969 | 10/1/1992 | Not Available | Medical Affairs | X | | | | |
| Luther, Robert R. | 11/13/1980 | 3/17/1992 | Global Project Head | Medical Affairs | X | | | | |
| Steinberg, Frank J. | 5/1/1978 | 8/14/1987 | Not Available | Medical Affairs | | | | | |
| Krall, Ronald L. | 10/16/1989 | 8/22/1992 | Medical Director, PPD | Medical Affairs | X | | | | |
| Pizzuti, David | 5/28/1991 | 9/1/2001 | DVP Medical Affairs | Medical Affairs | X | | | | |
| Powers, Richard L. | Owe | Owe | Owe | Medical Affairs | X | | | | |
| Hoff, Robert G. | 2/6/1995 | 1/1/2013 | Group Project Head | Medical Communications/Global Medical Services/Training & Education | X | | | | X |
| Lavery, James W. | 10/6/1991 | Present | Product General Manager | Marketing | X | X | | | X |
| Luce, Scott P. | 4/9/1989 | 4/4/2009 | DVP Pharmaceutical Operations | Marketing/Sales | X | | | | X |
| McRaith, Kevin | 5/21/1990 | 12/31/2004 | Product GM | Marketing | X | | | | X |
| Molnar, David A. | 7/6/1980 | Present | Senior Clinical Science Manager | Sales/Training & Education | X | X | | | X |
| Mularski, Mark A. | 11/13/1983 | Present | Sales Director PPD | Marketing/Sales/Training & Education | X | X | | | X |
| Penkowsi, Blasine X. | 7/31/1989 | Present | DVP/General Manager Franchise | Marketing | X | X | | | X |
| Sommerville, Kenneth | 11/8/1993 | 9/14/2002 | Director, Clinical Research | Pharmacovigilance/Product Safety/Neuroscience/Clinical Research/Global Medical Services | X | | | | X |
| Spath, Cherilyn M. | 9/26/1994 | Present | Assistant Director Global Medical | Medical Communications/Global Medical Services/Medical Information | X | X | | | X |
| Stoll, Ralph | 8/17/1977 | 8/11/1998 | Global Medical Director | Pharmacovigilance/Product Safety/Post-Marketing Surveillance/Clinical Research/Global Medical Services | X | | | | X |
| Williams, Medgar E. | 1/2/1994 | Present | Sales Director PPD | Sales | X | X | | | X |
| Haas, Tracie A. | 9/17/1995 | Present | DVP AbbVie Foundation | Marketing | X | X | | | X |
| Kody, John | 3/17/2003 | 4/8/2006 | Sales Director PPD | Marketing | X | | | | X |
| Larson, John P. | 4/5/1999 | Present | Director, Commerical Development | Marketing | X | X | | | X |
| Lindley, Nadine R. | 6/2/2003 | 9/22/2009 | Director, Medical Science Liaison | Marketing | X | | | | X |
| Marasco, Rock | 5/26/1981 | 8/12/2007 | VP European & Canadian Nutrition | Marketing | X | | | | X |
| McDonald, Suzanne | 7/11/1988 | 1/1/2004 | DVP Managed Health Care | Marketing | X | | | | X |
| Nolan, Sean | 5/19/1991 | 7/7/2004 | National Sales Director Franchise | Sales | X | | | | X |
| Trenn, Jennifer A. | 10/28/1996 | Present | Senior District Manager Specialty Products | Marketing/Sales | X | X | | | X |

# EXHIBIT "K"

**VENABLE**®LLP

750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

Dino S. Sangiamo

**T (410) 244-7679**
**F (410) 244-7742**
dssangiamo@venable.com

September 20, 2013

VIA EMAIL

John T. Boundas, Esquire
Williams Kherkher
8441 Gulf Freeway, Suite 600
Houston, Texas  77017-5051

Jay H. Henderson, Esquire
Jay Henderson, PLLC
5020 Montrose Boulevard, Suite 300
Houston, Texas  77006

Heath A. Novosad, Esquire
Bracewell & Giuliani
Pennzoil Place, South Tower
711 Louisiana Street, Suite 2300
Houston, Texas  77002-2770

Re:    **In Re Depakote Cases (Bonner and LeJeune)**
       **United States District Court for the Southern District of Illinois**
       **Case Nos. 13-cv-324-SCW and 13-cv-326-SCW**

Dear Counsel:

In response to Heath's email dated September 6, 2013, asking for the custodial files of an additional 19 former and current employees, we agree to make a custodial production for all but the following:

Robert Funck
Richard Gonzalez
Robert Schoelhorn
Miles White

We will provide more information concerning a proposed time for production after we have had more of chance to assess likely volume.

Please let me know if there is anything in addition to Jay's email of yesterday afternoon that you would like for us to consider in connection with the four individuals mentioned above.

Sincerely,

Dino S. Sangiamo

DSS/jmc
7106264

## Novosad, Heath

| | |
|---|---|
| **From:** | Novosad, Heath |
| **Sent:** | Friday, September 06, 2013 9:20 AM |
| **To:** | Sangiamo, Dino S. (DSSangiamo@Venable.com); 'Dan Ball' (dhball@bryancave.com); mbmacwilliams@venable.com |
| **Cc:** | J Boundas |
| **Subject:** | Depakote Cases |

Counsel –

We are requesting that Abbott produce the custodial files for the individuals listed below.  Please let us know by Thursday, September 12 if Abbott will agree to produce these custodial files by September 30.  Thanks.

| Count | Name | Start | End | Title | |
|---|---|---|---|---|---|
| 1 | Bauer, Fredric B. | | | | M |
| 2 | Carr, Robert A. | | | | M |
| 3 | Chmiel, Joseph J. | | | | Re |
| 4 | Church, Karen K. | | | | Re |
| 5 | Funck, Robert | | | Chief Compliance Officer | |
| 6 | Goffredo, David | | | Senior VP/President of US Pharmaceuticals | |
| 7 | Gonzalez, Richard | | | AbbVie CEO | |
| 8 | Jordan, David | | | Divisional VP, Stats and Data Management | |
| 9 | Leonard, John | | | Chief Scientific Officer | |
| 10 | Mason, Heather L. | | | Senior VP | |
| 11 | Milligan, David V. | | | VP, Diagnostic Products R&D | |
| 12 | Mini, Louis | | | | M |
| 13 | Nabulsi, Azmi | | | Associate Medical Director of Epidemiology | |
| 14 | Pernet, Andre | | | Divisional VP, Therapeutic Area Ventures, PPD | |
| 15 | Schoelhorn, Robert | | | Former CEO | |
| 16 | Shook, James G. | | | | M |
| 17 | Smith, Christopher | | | | Re |
| 18 | Walvoord, Ellen M. | | | VP, Investor Relations | |
| 19 | White, Miles | | | Current CEO | |

Heath A. Novosad | Partner | Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300 | Houston, Texas | 77002-2770
T: 713.221.1258 | F: 713.437.5356
heath.novosad@bgllp.com | www.bgllp.com/novosad | www.bgllp.com

--------------------------------------------------------
CONFIDENTIALITY STATEMENT
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
--------------------------------------------------------

# EXHIBIT "L"



750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

Dino S. Sangiamo
**T** 410-244-7679
**F** 410-244-7742
dssangiamo@venable.com

October 3, 2013

**VIA EMAIL**

John T. Boundas, Esquire
WILLIAMS KHERKHER
8441 Gulf Freeway, Suite 600
Houston, Texas  77017-5051

Heath A. Novosad, Esquire
Bracewell & Giuliani
Pennzoil Place, South Tower
711 Louisiana Street, Suite 2300
Houston, Texas  77002-2770

Re:   In Re Depakote Cases (Bonner, LeJeune)
       **United States District Court for the Southern District of Illinois**
       **Case Nos. 13-cv-324-SCW and 13-cv-326-SCW**

Dear John and Heath:

This letter reports on the status of the production of documents from individual Abbott employees.  As of today, Abbott has completed production of the custodial files of the employees identified at Attachment A.  In addition, Abbott has completed the production of documents for the custodians listed on Attachment B to the extent such documents pre-date January 1, 2005.  Abbott has determined that there were no documents to produce for the custodians identified at Attachment C. Abbott further reports that it has completed the production of documents for the Legal Hold Segregation Custodians identified at Attachment D.

With regard to sales representatives, Abbott has completed the production of documents for Kimberly Dahmen and Jill Wilcox.  There were no documents to produce for Nancy Guritz and Kari Starcher.

With regard to Evelyn Olson, whom we previously identified as a Legal Hold Segregation Custodian, we learned that the segregation to which she was referring was a network share that was duplicative of a share identified by another custodian that had already been produced.  We anticipate completing the production for the following Legal Hold Segregation Custodians by Tuesday, October 8, 2013:

> Laura Anderson
> Helmuth Fendel
> Sharon Gardner
> Jeanne Martin
> Chuck Santora

At that point, Abbott's production of documents for the Legal Hold Segregation Custodians will be complete.

# VENABLE® LLP

John T. Boundas, Esquire
Heath A. Novosad, Esquire
October 3, 2013
Page 2

 We will complete the production of Amy Kendall's custodial file and will produce Jane Meinhold's custodial file by October 15, 2013.

 Please let me know if you would like to discuss the foregoing.

 Sincerely,

 Dino S. Sangiamo

Attachments
#7169642v1

**Attachment A**

Custodians for whom Production of Documents is Complete as of October 3, 2013

Noreen Arnold
Jeff Baker
Ingrid Bryzinski
Joanne Celba
Michelle Collins
Helen Eliopoulos
James Embrescia
Sherri Gallas
Mary Garofalo
Jeff Haas
Tracey Heimberger
Robert Hoff
Rebecca Jenrow
John Kody
Bill Kormany
Diane Lawson
Nadine Lindley
Scott Luce
Richard Marks
Jeremy McCumber
Suzanne McDonald
Jay McGuffin
Mark McLoudrey
Kevin McRaith
Babs Menon
Lee Muraoka
Steve Niemcryk
Faith O'Neil
Greg Pawell
Blasine Penkowski
Ron Reed
Robert Reder
Mario Saltarelli
Charles Schwamlein
Theodora Siettas
Cherilyn Spath
Sharon Stec
James Steck
Steve Townsend
Kathy Tracy
Richard Tresley
Marleen Verlinden
Bruce Yamamoto

## **Attachment B**

Custodians for whom Production of Pre-January 1, 2005 Documents is Complete

Tracie Haas
Steve Hough
John Larson
James Lavery
David Molnar
Mark Mularski
Jennifer Trenn
Medgar Williams

## **Attachment C**

Custodians for whom Abbott Determined there were no Documents to Produce

Fredric Bauer
Molly Blake
Andrew Brugger
Karen Church
Milbhor D'Silva
Jon Freeland
David Goffredo
Suzanne Giordano
Barbara Hagins
Ann Karen Henry
Robert Janicki
Nancy Kercher
Ronald Krall
Robert Luther
Rock Marasco
Bruce McCarthy
David Milligan
Nancy Motola
Azmi Nabulsi
Michael Nelson
Sean Nolan
Andree Pernet
David Pizzuti
Robert Powers
James Shook
Chris Silber
Ken Sommerville
Chris Smith
Frank Steinberg
Ralph Stoll
Bruce Wallin
Ellen Walvoord

**Attachment D**

Legal Hold Custodians for whom Production of Documents is Complete as of October 3, 2013

William Axelsen
Lindsay Bensman
Alice Boswell
Leigh Bruhn
Teresa Cappetta
Dawn Carlson
Diane Carpenter
Bella Cohen
Ann Drew
Regula Egli
Mary Faulkner
Julie Fugate
Nicholas Greco
Shelley Hecker
Holtzman-Belcher
Troy Iaconis
Brian Idstein
Kuldeep Johnson
Catherine Kacos
Yovita Kraeger
Kim Kubik
Pavit Kukreja
Richard Leber
David Ludolph
Kim Martini
Julie Mayew
Dawnell McNeill
Jill Milam
Julie Nguyen
James Notorfrancesco
Alyssa O'Neill
James Pellettiere
Wendy Plyman
Weining Robieson
Eva Rohrer
Sheri Salzeider
Beth Santi

Teresa Stotts
Kim  Troxell
Kent Ulveling
Matthew Villano