# EXHIBIT "Q"



VENABLE® LLP

750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

Dino S. Sangiamo
**T** 410-244-7679
**F** 410-244-7742
dssangiamo@venable.com

April 10, 2014

<u>VIA EMAIL</u>

The Honorable Stephen C. Williams
Magistrate Judge
U.S. District Court for the
  Southern District of Illinois
750 Missouri Avenue
East St. Louis, Illinois 62201

     **Re:**    **In Re Depakote Cases (Bonner and LeJeune)**
               **United States District Court for the Southern District of Illinois**
               <u>**Case Nos. 13-cv-324-SCW and 13-cv-326-SCW**</u>

Dear Judge Williams:

     Abbott submits this report in follow-up to the issues discussed at the hearing on
March 27, 2014, regarding the production of SOPs. This report addresses the circumstances
under which Abbott obtained SOP QP.009 ("QP.009") (Exh 1 hereto) and describes why Abbott
believes it was not responsive to plaintiffs' requests, does not relate to the substance of the
product labeling at issue in this case and does not carry the significance claimed by plaintiffs at
the last hearing.

     At the March 27, 2014 hearing, the Court inquired into the circumstances under which
QP.009 was discovered by Abbott's counsel. As the Court is aware, Abbott produced QP.009 in
connection with the March 13, 2014, deposition of Scott Anderson, who was proffered for the
following topic pursuant to Fed. R. Civ. P. 30(b)(6):

         "Whether and how Abbott verified the accuracy of scientific and/or medical
         information contained in marketing, sales, informational, and/or promotional
         materials concerning Depakote" for the 1974 to 1996 time period.

     Plaintiffs had identified the above-referenced topic on December 18, 2013, although at
that time there was a typographical error that precluded an interpretation of the meaning. The
error was corrected on January 17, 2014. The Court may recall from the hearing on February 27,
2014, that there was some confusion regarding whether plaintiffs intended to pursue the topic.
Once that confusion was clarified, Abbott proceeded with finding an appropriate witness.

# VENABLE®LLP

Magistrate Judge Stephen C. Williams
April 10, 2014
Page 2

In the course of its efforts, Abbott's counsel spoke with Julie Ewald-Pridgeon, who was in the advertising and promotional area in the 1990s. Ms. Ewald-Pridgeon advised that she was not involved in the medical review of promotional materials at that time, but she was involved in the review of promotional materials for other purposes and was therefore familiar with the promotional material review process. She directed counsel to Mr. Anderson, but also advised counsel of the existence of QP.009 because it applied to the deposition topic under discussion and retrieved copies for counsel. One week prior to Mr. Anderson's deposition, Abbott produced all versions of this SOP that pre-dated March 1996, in the belief that it would be of assistance in connection with that deposition.

At the March 27, 2014 hearing, the Court also inquired into why the SOP had not been produced earlier. Preliminarily, it is important to emphasize that QP.009 applied to promotional materials. The Scope of the SOP states that it "covers all PPD advertising and promotional matter descriptive of a marketed product which falls within the regulatory definition of labeling or advertising." The title of the SOP is "Promotional Labeling." Section II.B. of the SOP defines "advertising and promotional labeling" by reference to 21 CFR 202.1, a regulation that is titled "Prescription-drug advertisements." Mr. Anderson testified that QP.009 "was specific to deal with promotional labeling, the promotional pieces that were created, not with the package insert." (Anderson Depo. at 408: 5-7.) (Exh. 2 hereto.) Perhaps most tellingly, plaintiffs themselves referred to QP.009 as a "marketing SOP" at page 14 of the Joint Submission for the March 27, 2014 discovery conference.

The discussion at the hearing focused on two categories of documents the production of which had previously been ordered: Topic 13 and Topic 55. Abbott believes that QP.009 does not fall within either category.

Topic 13 states as follows:

Internal documents discussing or referencing the language included in or that could be included in Depakote's label concerning (i) any form of birth defect, (ii) any other anti-epileptic drugs, and/or (iii) risks for women (or their children) who are or may become pregnant. This includes any drafts of proposed labeling or warnings.

Abbott has interpreted Topic 13 to refer to the physician prescribing information, also known as the "package insert," which is how the term "label" is typically interpreted in pharmaceutical litigation. For example, at the April 19, 2013 discovery hearing, Abbott's counsel described the fact that "when you hear the term 'label' or 'warning' or 'package insert,' we're kind of talking about the same document on that." (Tr. 4/19/2013 Hearing at 48:16-18).

# VENABLE®LLP

Magistrate Judge Stephen C. Williams
April 10, 2014
Page 3

Not only did plaintiffs not dispute this interpretation at the hearing, they themselves have used the term in the exact same manner. For example, plaintiffs used this interpretation in a March 5, 2013 letter where they sought verification that a set of excerpts from the PDR contained the complete set of FDA-approved labels. This letter provided in part as follows:

> To the extent that the attached set of labels is not the complete set of labels for each formulation of the Depakote drug, Plaintiffs request that Abbott provide any missing labels, identify which labels are inaccurate and provide the accurate replacement label, and indicate whether the set of labels is complete with any additions from Abbott.

(Exh. 3.) These references by plaintiffs to "labels" are to the Depakote package insert/package circular. Similarly, in their May 17, 2013 Motion to Compel and Motions for Sanctions, plaintiffs took issue with Abbott's responses to RFAs regarding the following: (1) "certain statements recited verbatim from Abbott's current labeling for its VPA products" (id. at 9); (2) whether a set of labels from the PDR "comprise a complete set of FDA-approved labels for each formulation of Depakote drug from 1979-2012" (id. at 11); and (3) whether "the content of its VPA Drug Products' labels . . . included comparative information concerning the incidence of specific defects, such as heart defects and oral clefts, associated with the use of VPA drug products as compared to alternative pharmaceutical therapies." (Id. at 12.) These challenges by plaintiffs relate to the content of the physician prescribing information as set forth in the package inserts. Further evidence is found in their March 17, 2014 Opposition to Defendant Abbott Laboratories Inc.'s Motion for Summary Judgment and Brief in Support Thereof briefing. The term "label" is used throughout the briefing to refer to the Depakote package insert. In fact, plaintiffs quote the language from the Depakote package inserts in use at different points in time and attach various versions of the PDR as exhibits to their opposition. Accordingly, throughout the course of this litigation plaintiffs have uniformly interpreted the term "label" or "labeling" to be limited to physician prescribing information rather than more broadly to include advertising and promotional materials. It is perhaps for this reason that plaintiffs made no mention of Topic 13 in the Joint Submission to the Court for the March 27, 2014 hearing.

As Mr. Anderson made very clear at his deposition, QP.009 does not apply to the package insert, i.e., the label. As noted above, he testified that "[t]his document was specific to deal with promotional labeling, the promotional pieces that were created, not with the package insert." (Anderson Depo. at 408: 5-7.) He further explained:

> The document is considered to be promotional. The inclusion of the label within the document is not considered to be promotional. That is a mandatory requirement by the FDA that we put our approved label into the document. So the part that was reviewed by

# VENABLE®LLP

Magistrate Judge Stephen C. Williams
April 10, 2014
Page 4

the medical regulatory group per Quality Policy 009 excluded the label, the review of the label itself.

(Anderson Depo. at 411:23 to 412:6.)

Finally, Abbott interpreted Topic 13 to apply to documents discussing the content of what would actually be in the label. Those discussions are guided by specifics of scientific and regulatory considerations. Accordingly, in the experience of Abbott's counsel, one would not look to SOPs as a source of responsive documents for such a request.

Topic 55 states as follows:

Standard Operating Procedures regarding pharmacovigilance, risk management, product safety and regulatory affairs from 1978 to present.

(Discovery Issues for Consideration at the June 6, 2013 Discovery Conference, at 15.) In plaintiffs' submission prior to the March 27, 2014 hearing, they appeared to indicate that they believed the SOP in question could qualify as a Regulatory Affairs SOP, although they later characterized it as a "marketing SOP." Since the hearing, Abbott has again spoken to Ms. Ewald-Pridgeon and others internally, and they all agree that the SOP is not a Regulatory Affairs SOP. For example, this SOP was characterized as being owned by the commercial group because it was used for approval of promotional materials. The SOP is currently under the control of the Quality Assurance group, which is not a part of Regulatory Affairs. Accordingly, Abbott respectfully submits it does not fall within Topic 55.

Regarding the reasonableness of Abbott's searches, to collect the Regulatory Affairs SOPs, counsel went to the Regulatory Affairs department and asked for all of the department's SOPs going back in time as long as they had them. Those documents (totaling 7,800 pages) were provided and produced on October 1, 2013. In January 2014, counsel went back to Regulatory Affairs a second time to double check the completeness of that production and the completeness was confirmed.

In the course of conducting the follow-up related to the Court's inquiry at the March 27, 2014 hearing Abbott went back to the individual responsible for overseeing the original collection of the Regulatory Affairs SOPs last fall, Benjamin Manning, Senior Director, Regulatory. Mr. Manning provided additional information concerning the history of the Regulatory Affairs group at Abbott which has had the effect of identifying the existence of additional Regulatory Affairs SOPs. Specifically, Mr. Manning explained that the documents previously provided by the Regulatory Affairs Department were the SOPs in use since that department was created in 2004. Mr. Manning explained that prior to 2004, individual

# VENABLE® LLP

Magistrate Judge Stephen C. Williams
April 10, 2014
Page 5

departments within Abbott might have their own Regulatory Affairs departments, which, in turn, could have their own SOPs, some of which may still exist. Mr. Manning conducted a search and determined that there were SOPs for the Regulatory Affairs department within the Pharmaceutical Products Division ("PPD"), which was the division responsible for Depakote. Mr. Manning has since provided these SOPs, which total approximately 250 pages and date back to 2000, six years after the birth of the plaintiff in the upcoming bellwether trial. These SOPs are being produced to plaintiffs.[1]

Although distinct from the questions the Court has posed, Abbott feels it appropriate to comment on the claims of prejudice made by plaintiffs at the March 27, 2014 hearing. Plaintiffs stated:

> So our frustration and our concern that we've been talking about for months now has turned into a true prejudice or bias against the plaintiffs because we have already taken the depositions of the people who we would need to question about this, people in a regulatory group, people in pharmacovigilance, people in marketing because—and I'll go through briefly with your Honor some of the information in this policy. (March 27, 2014 Hearing Tr. at 52-53.)

> And this document is clearly not only relevant it is highly important and would be critical to our—with the depositions that we've taken of the people within these various departments, the deal was safety and labeling and risk and marketing, promotional marketing and promotional labeling that goes out in the market. . . . We now truly have been prejudiced because we have taken all these depositions of the people in these departments, we've used the documents that we've been able to get from them to date. This is a critical document that we would have and certainly would like to have used but the chance is gone because the depositions are over with." (March 27, 2014 Hearing Tr. at 59.)

As noted above, QP.009 was produced in connection with the Scott Anderson deposition because it related to the topic about which Mr. Anderson was to testify. Although plaintiffs told the Court at the hearing that this SOP was "relevant" and "highly important" and "a critical document that we would have and certainly would like to have used" with other deponents, plaintiffs' questioning of Mr. Anderson about the SOP was extremely limited in both duration and scope. The transcript of the Anderson deposition is 453 pages long. A mere 5½ pages relates to this SOP. (Anderson Depo. Tr. at 407:3 to 412:6.) Not only was the questioning by plaintiffs' counsel short, it appears to have been nothing more than an attempt to establish that

---

[1]     Abbott is also double-checking its prior collection of SOPs for the other designated areas to ensure completeness.

# VENABLE®LLP

Magistrate Judge Stephen C. Williams
April 10, 2014
Page 6

the SOP covered "labels" and "labeling" rather than promotional materials. Counsel did not ask Mr. Anderson any substantive questions about the SOP. For example, he did not ask about what sort of review was required by the SOP, whether Abbott followed the SOP, what functional areas were responsible for the activities described in the SOP, whether there were any differences between the various versions of the SOP provided by Abbott, what role the individuals identified on the first page of the SOP played in connection with the SOP, where the SOP is maintained at Abbott, or whether he thought that this was a Regulatory Affairs SOP. Abbott respectfully disagrees with plaintiffs' statement that this SOP is "relevant and highly important" and that it is a "critical document."

Similarly, Abbott disagrees with plaintiffs' claim at the hearing that this SOP "really hits directly some of the points that we have in the lawsuit. It is directly relevant to this particular bellwether." (March 27, 2014 Hearing Tr. at 52.) As described above, QP.009 does not apply to the package insert. As regards promotional material, there is no evidence that the physician who prescribed Depakote to Chantele Bonner ever saw any.

Plaintiffs' claim that they were prejudiced by the timing of the production of this SOP is further undercut by their lack of use of any pharmacovigilance or Regulatory Affairs SOPs during the depositions taken of Abbott witnesses other than Mr. Anderson. Plaintiffs stated "we've used the documents that we've been able to get from them to date." (March 27, 2014 Hearing Tr. at 59.) By October 1, 2013, Abbott had produced over 20,000 pages of SOPs. Since that time, plaintiffs have deposed at least 13 Abbott employees and during none of these depositions did plaintiffs show and question the deponent about a single SOP, other than the limited questioning of Mr. Anderson noted above.

As part of their effort to show prejudice, plaintiffs also argued at the March 27, 2014 hearing that QP.009 was relevant to the package insert because it referenced the Physicians' Desk Reference – the PDR. The suggestion appeared to be that QP.009 governed the process by which the package insert was approved because the content of the package insert appears in the PDR; ergo, QP.009 applied to approval of the package insert.

Mr. Anderson made clear at his deposition that this was not so. He explained that QP.009 merely provided that it was necessary to ensure that what got printed in the PDR matched exactly what was in the label. (Anderson Depo. at 408:24 - 409:21.) The PDR Foreward states that, under 21 CFR 201.100(d)(1):

> 'indications, effects, dosages, routes, methods, and frequency and duration of administration and any relevant warnings, hazards, contraindications, side effects, and precautions' must be the '*same in language and emphasis*' as the approved labeling for the products. FDA regards the words '*same in language and*

# VENABLE®LLP

Magistrate Judge Stephen C. Williams
April 10, 2014
Page 7

> *emphasis'* as requiring VERBATIM use of the approved labeling providing such information.

(Exh. 4) (Emphasis in original.)  QP.009 is designed to ensure the necessary verbatim use of the language.  Mr. Anderson further explained that the QP.009 did not include review of the content of the label itself.  (Anderson Depo. at 408:24 - 409:21.)  Finally, Mr. Anderson explained that the PDR was addressed in QP.009 because "the PDR is considered a – a promotional venue because a drug company can decide to pay to have their label listed in the PDR or not."  (Id., at 408:24 – 409:2.)  Thus, the reference to the PDR in QP.009 does not convert it into an SOP relevant to determining the content of the Depakote label.

I hope this submission is helpful to the Court.  I will be prepared to answer questions from the Court at our April 15 conference.

Respectfully submitted,

Dino S. Sangiamo

DSS/jmc
Attachments
cc:  Counsel of Record (w/attachments) (via email)
7957626

# Exhibit 1



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                           PAGE 1

DOCUMENT QP.009

---

**ISSUE DATE      SUPERCEDES**

12/06/1993    NEW

---

**TITLE**  PROMOTIONAL LABELING

---

**REFERENCE DOCUMENTS**

N/A

---

**DISTRIBUTION**

AP16, NC, API, PD, D-443, D-553, D-491

---

|        | WRITTEN BY          | DIR., REG. AFFAIRS   | DIR., PROF. COMM.    |
|--------|---------------------|---------------------|----------------------|
| NAME:  | M. SILVERBERG       | R. CATHERALL/AKH    | D. DAVID/JJ          |
| DATE:  | 12/03/1993          | 12/03/1993          | 12/03/1993           |
|        | DIR., MED. AFFAIRS  | VP PHARM. MKTG.     | EDITOR, STDS.&SPECS. |
| NAME:  | D. PIZZUTI/JH       | D. GOFFREDO/JJ      | N. MERTINS           |
| DATE:  | 12/03/1993          | 12/03/1993          | 12/06/1993           |
|        | VP, QA & RA         |                     |                      |
| NAME:  | L. WYATT            |                     |                      |
| DATE:  | 12/06/1993          |                     |                      |

---

**ATTACHMENTS**

A-0, B-0

---

**APPLICABLE DOCUMENTS**

N/A

---

I.   <u>PURPOSE</u>

To establish the necessary activities and responsibilities for developing, approving, and maintaining PPD Promotional Labeling in compliance with applicable sections of 21 Code of Federal Regulations and the Food, Drug and Cosmetic Act.

II.   <u>SCOPE</u>

A.   This policy covers all PPD advertising and promotional matter descriptive of a marketed product which falls within the regulatory definition of labeling or advertising. This policy will provide methods by which promotional labeling or advertising will be developed and approved prior to final printing and the necessary distribution, storage and inventory control requirements assuring that unapproved or obsolete promotional labeling is not distributed.

CONFIDENTIAL                                                    ABTILSD-A000034722



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                      PAGE 2

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

II.   A.   (Continued)

This policy does not pertain to sales training materials.

B.   Advertising and promotional items include, but are not limited to, copy and visuals for brochures, sales aids, in-service materials, journal advertising, broadcast advertising, patient education materials, consumer promotional materials, published reprints, group promotional programs (e.g. CET, CEP, etc.), teleconference programs, press materials, premiums, and direct mail items. This also includes product related copy on reminder items.

Advertisements and promotional labeling as defined in 21CFR Section 202.1(1) (1) and (2) will apply here.

Section 202.1(1) (1):  "Advertisements subject to section 502(n) of the act include advertisements in published journals, magazines, other periodicals, and newspapers, and advertisements broadcast through media such as radio, television, and telephone communication systems."

Section 202.1(1) (2):  "Brochures, booklets, mailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio or visual matter descriptive of a drug and references published (for example the "Physicians Desk Reference") for use by Medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act".

C.   Consideration of Intent:

1.   An advertisement or promotional labeling piece is not satisfactory if it is false or misleading as defined in the Code of Federal Regulations with respect to the following examples (which are not all inclusive):

a.   Side effects, contraindications, or effectiveness.

b.   Fair balance between information relating to side effects and contraindications and information relating to effectiveness.

c.   Failing to reveal facts in the light of consequence from use.

CONFIDENTIAL                                      ABTILSD-A000034723



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 3

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

II.   C.   1.   (Continued)

    d.   Containing a representation or suggestion, not approved or permitted in the labeling.

    e.   Containing a product comparison that represents or suggests that a product is safer or more effective than another product.

    f.   Containing favorable information or opinions that have been rendered invalid.

    g.   Presenting information from a study in a way that implies greater experience than actually does.

    h.   Containing reference to literature or studies that misrepresent the degree of safety and/or effectiveness of a product.

    i.   Using a statement by a recognized authority that is favorable but is inconsistent with other data.

    j.   Using quote or paraphrase out of context to convey false or misleading idea.

    k.   Using literature or reference that intend to support a claim but do not.

    l.   Using literature or references recommending conditions of use that are not approved in the labeling.

III.   POLICY

    A.   Development and Approval

       1.   At the inception or reprinting of promotional labeling or advertising, Marketing (Creative Services Department) shall assign a commodity number and complete a review and approval form (copy attached, Attachment A, yellow form) for initial review.

       2.   Each piece of promotional labeling or advertising of a program requires a separate routing form and should as a rule be routed together as a packet with companion pieces for review.

CONFIDENTIAL                                          ABTILSD-A000034724



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                    PAGE 4

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.   A.   (Continued)

3.   On a scheduled basis, Marketing (Creative Services) distributes promotional labeling or advertising for review by Medical and Regulatory. This material, to be reviewed for the first time, will include copies of all new references cited in the piece. All materials are formally discussed and approved within a meeting format attended by Medical, Regulatory, Marketing Product Management and Creative Services; though such material can be routed sequentially for review or approval, if desired.  The prescribed sequence for routing is:  Creative Services, Product Management, Medical and Regulatory.

NOTE:   Business reply cards that offer product samples are additionally distributed for review and approval to Corporate Legal, Corporate Regulatory, and PPD Sales Services for review.

4.   Creative Services is responsible for developing the meeting agenda and chairing the meeting.  All promotional labeling and advertising items on the agenda are reviewed and changes are made on the master copy which is then signed and dated by Marketing (Product Management), Medical and Regulatory.  Marketing (Creative Services) keeps the original copy in their files.

5.   Following initial approval of copy/layout (yellow form), a second approval is required upon completion of the mechanical artwork production phase, and implementation of changes from initially approved copy.  Mechanical stats are distributed to Medical, Regulatory, and QA (Label Control) for review.  A pink form (Review and Approval for Final Circulation) is attached.  All three-dimensional pieces should have booked-up dimensional stats in final size distributed to Medical, Regulatory and QA. Mechanical stat review follows the same approval procedure as that of copy/layout for initial review (yellow form).  Where the initial copy was prepared as final art via computer design, the pink form may be used.  Reviewers may require a yellow form and a second review and approval.

6.   Following final approval of the mechanical stats, no further changes except correction of spelling/typographical errors, will be made without approval by Medical, Regulatory Affairs and QA. Label Control will assure all approved promotional material will be 100% proofread by qualified proofreading personnel.  This includes proofing of the blue lines (proof) against the final approved mechanical stat prior to printing.

7.   The file of approved documents will be maintained in Creative Services.

CONFIDENTIAL                                              ABTILSD-A000034725



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 5

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

III.   A.   (Continued)

8.   Subsequent revision to any promotional piece requires a new commodity number.

9.   Each subsequent reprint of previously approved promotional labeling requires generation and approval of yellow form (Review and Approval of Initial Circulation) where changes have been made, and/or a pink form (for Final Circulation) where minimal or no changes are made.  "Minimal changes" are understood to be those which have no impact on original copy.

B.   Purchase

1.   After final approval, Marketing (Creative Services) will proceed with final production.  All materials must be reviewed by Regulatory Affairs if not produced within two trimesters after approval.

2.   All purchase orders will require that the vendor identify shipping containers with the commodity number, purchase order number and quantity of contents.

C.   Release of Final Material

1.   It is the responsibility of Creative Services to assure that representative copies of all final materials are forwarded to QA. QA (Label Control) will proof final samples of all materials, regardless of intended use or medium, against the approved master documentation (Review and Approval for Final Circulation, Pink form) and complete a release form.  If the samples are consistent with the final approved copy, a copy of the release form will be sent to Creative Services.  QA will send copies of the release form with two samples of the final piece to Medical and 4 samples will be sent to Regulatory Affairs; along with completed copies of the approval form to all approvers.  Regulatory Affairs is responsible for determining if materials require submission to FDA after release by QA.

2.   If the printed samples are inconsistent with the final approved copy, QA will note the discrepancies on an NCMR (Non-Conforming Materials Report), attached to and referenced on the Release form, and forward all samples and copies of the materials back to Creative Services.  Creative Services may resubmit the final materials for review by all original approvers of the piece.  If all original approvers agree that the discrepancies are acceptable, the reviewers will sign and date the Final Circulation attached to the final piece, which will then be returned to QA for review and release as described in III. C. 1.

CONFIDENTIAL                                    ABTILSD-A000034726



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 6

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
| --- | --- |
| 12/06/1993 | NEW |

III.   C.   2.   (Continued)

If the discrepant piece requires modification, the original reviewers will indicate the necessary changes (e.g., replace pages, cover erroneous text with stickers, etc.) and sign a new Final Circulation Form.  Marketing (Creative Services and Product Management) will implement the necessary corrections.  Creative Services will forward samples of the corrected pieces to QA for disposition in the same manner described in III. C. 1.

3.   In the event that DROP SHIPMENT, direct mailing of promotional labeling or advertising is required of the vendor, it will be the responsibility of Marketing (Creative Services) to obtain representative samples of the promotional labeling or advertising and forward them to QA (Label Control).  Marketing (Creative Services) will assure that vendor material release does not take place until receipt of the respective approved release documents.  QA will then proceed as defined in III. C. 1., above.

D.   Storage and Inventory Control

1.   Upon receipt of shipments of promotional labeling at the respective warehousing facility, a review of shipment containers shall be made to assure that appropriate case identification markings are present and that the labeling containers are intact.

2.   When shipments received at ADH are approved for distribution, they are logged into their inventory system that includes the following data.

a.   Commodity number

b.   Quantity

c.   Maximum order quantity and bundle size

d.   Product

e.   Title of the piece

f.   Status (OK to distribute, or, quarantine/on hold)

3.   For shipments to ADH, Dallas, all promotional labeling will be held in quarantine (on hold) upon receipt until a fax or other written communication referencing the shipment indicates it is approved for distribution.  This written communication comes from Marketing (Creative Services) and is based on the release form from QA (Label Control).

CONFIDENTIAL



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 7

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.   D.   (Continued)

4.   Placing an item on "Regulatory/Quality Hold" needs to be done through Creative Services at the direction of Regulatory, Medical or QA management.  Items that are put "Regulatory/Quality Hold", after an initial release, are not allowed to be distributed until Creative Services notifies ADH to release the "hold".

a.   "Product Management Hold" whereby Creative Services personnel can release items.  The reasons for hold status are neither regulatory, medical nor quality related in nature.

b.   "Regulatory/Medical/Quality Hold" whereby Creative Services may effect the release only based on written approval from Regulatory, Medical or QA.

5.   All obsolete and rejected promotional labeling will be physically identified and the respective warehouse records will be identified with a prominent "OBSOLETE" or "REJECT" status.  Where ADH is involved, they will be notified in writing by Creative Services.  All such notifications to ADH must be acknowledged by ADH in writing, along with a signed and dated statement of compliance.

6.   a.   All "REJECT" promotional labeling and advertising shall be immediately removed from stock and subsequently destroyed within 60 days.

b.   All "OBSOLETE" promotional labeling shall be immediately removed from stock and destroyed within 6 months.

7.   Promotional labeling in ADH inventory shall be reviewed minimally every two trimesters, as outlined in Section III. B. 1., initiated by Creative Services.

E.   Changes in Promotional Labeling

1.   Regulatory and Medical will determine which product labeling changes will effect current promotional labeling.  This determination will be documented on the completed change request document on the product labeling; and will be communicated by approvers by D-44M (QA).

2.   PPD Marketing (Product Management and Creative Services) shall cross-reference product label changes with existing promotional label package files to identify and resolve any promotional labeling inconsistencies.  Marketing will identify all active pieces.  Regulatory Affairs and Medical will then determine which pieces require change.



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                        PAGE 8

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.   E.   (Continued)

3.   PPD Marketing (Creative Services) shall issue expiration dates of approved distributed promotional labeling, and destruction notices for obsoleted or rejected materials to ADH and any other vendors maintaining inventory.

For material that needs immediate withdrawal from field sales, PPD Marketing shall notify PPD Sales (Senior Management, North Chicago) who, in turn, shall notify PPD Sales Representatives/District and Regional Managers that their stock on hand should be destroyed.

NOTE:   PPD Creative Services will assure the documented destruction of all affected promotional labeling.

F.   Recorded Audio/Visual Promotional Material and Non-interactive Software

1.   Recorded audio/visual promotional material and non-interactive software will be developed and approved in the same manner as that described in Section III. A., including approval of the script at preliminary review.  Final approval will be given for finished materials only.

2.   Once approved Marketing (Creative Services) will supply QA (Label Control) with copies of the approved, signed-off promotional material script and the recorded promotional material for review prior to use, in accordance with III. C., above.

G.   Interactive Software, Demonstration Programs, and Software Utilization/Demonstration/Access Programs

1.   Software to be used as promotional material must follow the same review cycle as promotional printed material with the following additions:

a.   Software must be validated and documented to assure it functions as intended, per PPD software validation requirement.

b.   All software must be identified with a file name and a commodity number.

c.   Master copy of software must be filed in Marketing (Creative Services).

d.   Software program must be instructional or demonstrative only and not be presented for clinical or diagnostic applications.

CONFIDENTIAL                                        ABTILSD-A000034729



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 9

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.   G.   1.   (Continued)

    e.   Software must be designed, formatted and coded such that the program listing cannot be obtained by the user and the program cannot be modified by the user for Clinical or Diagnostic or other promotional application.

    f.   Software used as Promotional Labeling must be reviewed for continued applicability with each product change.

    g.   The Approval Request for Promotional items in this category should contain the following:

        (1)   Description of software program and purpose or intended use.

        (2)   Text of software screens and any accompanying literature, describing application.

        (3)   Plan for inventory control and distribution.

        (4)   Definition as to whether copyright is required.

        (5)   Certification as specified in G. 1. a. and e., above.

  H.   PDR (Physician Desk Reference)

    1.   Product prescribing information should be sent to Medical (Label Coordinator), Regulatory and QA for review and approval.

    If there are product summaries, they should be routed sequentially per Section III. A..  If no product summaries exist, such material can be routed to Creative Services, Medical, Regulatory and QA for review and approval.

    2.   Photos for the Product Identification Section should be reviewed and signed-off by QA and Product Development (using an approval copy of an issued PDR) prior to submission.  New photos of new products should also be signed-off by Product Development to assure conformance to actual product.

  I.   Package Insert/Brief Summary Copy

    1.   PPD Marketing (Creative Services) may access current product package insert/brief summary copy through HPD Graphics.  Label Control should review the printout from HPD Graphics for accuracy and return to Marketing (Creative Services) signed and dated.

ABTILSD-A000034730



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 10

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.     I.   (Continued)

        2.   QA should notify Medical, Regulatory and Marketing (Creative
             Services) of any changes in prescribing information which it
             believes may affect final material.  This includes notifying
             Marketing of changes to product prescribing information that
             would be in turn affect the product Brief Summary used in journal
             advertisements.

    J.   Record Retention

        1.   All master copy and approval documents, and related information
             should be retained in accordance with the PPD QA Policy for
             Record Retention.

IV.   <u>RESPONSIBILITY</u>

    Six functional areas are involved in the development and review of
    Promotional Labeling:

    A.   MARKETING is responsible for developing promotional labeling,
         securing the required approvals and Creative Services incorporating
         the changes made by Medical, Regulatory and QA (Label Control) in the
         final piece.  In addition, Creative Services is responsible for the
         distribution of promotional labeling and when necessary the
         destruction of obsolete, rejected, or recalled literature.  The
         Creative Services Department (D-321) within Marketing will be
         responsible for management of the promotional labeling review
         process.

    B.   REGULATORY is responsible for reviewing and approving the promotional
         labeling to assure compliance with applicable regulations and
         consistency with current product labeling.  Regulatory is responsible
         for submission of promotional and advertising materials to FDA, as
         well as interfacing with FDA regarding promotional labeling or
         advertising.  Regulatory may determine if materials should be placed
         on Regulatory Hold or Rejected.

    C.   MEDICAL is responsible for reviewing and approving of all promotional
         labeling for medical accuracy, and consistency with current product
         labeling.  Medical may determine if materials should be placed on
         Medical Hold or Rejected.

    D.   QA (LABEL CONTROL), is responsible for review and proofreading of all
         promotional labeling for accurate use of trademarks, logos, generic
         names, and prescribing information.  In addition Label Control
         reviews all final printed material to determine compliance to the
         final copy approval by Medical and Regulatory.  The Quality Assurance
         function is responsible for assuring all related PPD disciplines are
         operating in compliance with the requirements of this policy.

CONFIDENTIAL

ABTILSD-A000034731



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                          PAGE 11

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|---|---|
| 12/06/1993 | NEW |

III.    (Continued)

  E. SALES is responsible for notifying the Sales Force of any recalled literature and for providing direction regarding its destruction.

  F. PUBLIC AFFAIRS is responsible for developing promotional labeling associated with press releases, in accordance with Section III. A..

END OF TEXT

CONFIDENTIAL                                                     ABTILSD-A000034732

QP.009
Attachment A-0

☐ **Sign-off Meeting/Date:**_____          **For initial circulation**
☐ **Routing**                                          **copy/layout**

## REVIEW   AND   APPROVE

Product                                                    Date _____
Description _____                               No. _____

Total Number of Pages          _____

RETURN TO APPROVAL COORDINATOR BY: _____ *to Dept. 321, Bldg. AP30*

### To be filled out by Product Manager or Project Initiator.

Audience:   ☐  Physician Leave-behind – promotional
            ☐  To be used with physician, but intended NOT to be left with doctor – promotional
            ☐  Physician Leave-behind – educational
            ☐  Reps Use Only (Sales Training) – non-promo.
            ☐  RM/IM Use Only – non-promotional
            ☐  Other (please explain)

Quantity:_____          Bundled in: _____
Quantity to be distributed per rep:

Sales Force: ☐ PMR  ☐ PPR  ☐ HR  ☐ SR  ☐ Other_____
Approximate date of distribution to Sales Force: _____
If Journal Ad, approximate date of issue:       _____
If Direct Mail, approximate date of mailings:   _____

|  | Signature | Date | OK as is | Note Changes |
|---|---|---|---|---|
| Approval Coordinator | _____ | _____ | ☐ | ☐ |
| Project Manager | _____ | _____ | ☐ | ☐ |
| Product Manager | _____ | _____ | ☐ | ☐ |
| Assoc. Product Manager | _____ | _____ | ☐ | ☐ |
| Label Control Reviewer | _____ | _____ | ☐ | ☐ |
| Medical Physician | _____ | _____ | ☐ | ☐ |
| Medical Reviewer | _____ | _____ | ☐ | ☐ |
|  | _____ | _____ | ☐ | ☐ |
|  | _____ | _____ | ☐ | ☐ |
|  | _____ | _____ | | |
| Regulatory Reviewer | _____ | _____ | ☐ | ☐ |
| PPI Requirements | ☐ No PPI | ☐ Full PPI | ☐ Brief PPI | |
| Other | _____ | _____ | ☐ | ☐ |
|  | _____ | _____ | ☐ | ☐ |

Label: (Comments) _____

Medical: (Comments) _____

Regulatory: (Comments) _____

Stamped "For Reps Use Only"   ☐  Yes    ☐  No

### Please be sure all questions are answered – yellow slip is signed and date.

☐  Legal File     ☐  Hold for production

Comments: _____

CONFIDENTIAL                                          ABTILSD-A000034733

QP.009
Attachment B-0

## REVIEW   AND   APPROVE

Product _____   Date _____

Description _____   No. _____

Total # Pages  _____

RETURN TO APPROVAL COORDINATOR BY: _____  *to Dept. 321, Bldg. AP30*

| | Signature | Date | OK as is | Note Changes |
|---|---|---|---|---|
| Approval Coordinator | _____ | _____ | ☐ | ☐ |
| Project Manager | _____ | _____ | ☐ | ☐ |
| Product Manager | _____ | _____ | ☐ | ☐ |
| Assoc. Product Manager | _____ | _____ | ☐ | ☐ |
| Label Control Reviewer | _____ | _____ | ☐ | ☐ |
| Medical Physician | _____ | _____ | ☐ | ☐ |
| Medical Reviewer | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |
| Regulatory Reviewer | _____ | _____ | ☐ | ☐ |
| PPI Requirements | ☐  No PPI | ☐  Full PPI | ☐  Brief PPI | |
| Other | | | ☐ | ☐ |
| | _____ | _____ | ☐ | ☐ |

**PLEASE BE SURE YOU HAVE INITIALED AND DATED THIS SLIP**

☐  Legal File

**END OF ATTACHMENT**

CONFIDENTIAL

ABTILSD-A000034734



ABBOTT LABORATORIES

PHARMACEUTICAL PRODUCTS DIVISION

QUALITY POLICY                                    PAGE 14

DOCUMENT QP.009

| ISSUE DATE | SUPERCEDES |
|------------|------------|
| 12/06/1993 | NEW |

**DESCRIPTION OF CHANGE:**

New (M. Silverberg, CR No. 04088).

**END OF DOCUMENT**

CONFIDENTIAL                                    ABTILSD-A000034735

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

---

| | Info |
|---|---|

| | |
|---|---|
| **Checked Out By:** | |
| **Document ID:** | QP.009 |
| **Title:** | PROMOTIONAL LABELING |
| **Application Context:** | GPDQ2 |
| **Version Label:** | 1.0, Superseded |
| **Action Required:** | Create New / Revise |
| **Approved Date:** | 06-Dec-1993 |
| **Effective Date:** | |
| **Effective Date Type:** | Effective Date |
| **Division Name:** | Global Pharmaceutical Operations |
| **Control Site:** | GPO – PPD Lake County IL (Div QA) |
| **Abbott Document Type:** | Policy |
| **Disable Overlay:** | T |
| **Overlay Name:** | |
| **Translation Source:** | |
| **Abbott Owner:** | qdmprdoc |
| **Document Category:** | gdp_quality_system |
| **Document Date:** | |
| **Language:** | English(en) |
| **QMD Status:** | Superseded |
| **Status Date:** | 06-Dec-1993 |
| **Authors:** | |
| **Pending Agency Approval:** | F |
| **Departments/Areas Affected:** | |
| **Source Document:** | |
| **XML Document Source:** | |
| **CR Initiator:** | |
| **CR Number:** | N/A |
| **Description of Change:** | N/A, This document was migrated to QMD per GPO VCR # 09544 |
| **Legacy CR Numbers:** | N/A |
| **Legacy Control Site:** | Division |
| **Legacy SME:** | NVA |
| **Legacy SME Functional Areas:** | NVA |
| **Legacy User Site Effective Dates:** | |
| **Legacy User Sites:** | |

| | Post Approval |
|---|---|

| | |
|---|---|
| **Business Type:** | N/A |
| **Governing Document:** | |
| **Reference Document:** | |

---

Created: 07-Oct-2008 14:56:20 UTC          Document Properties          Page 1 of 2

CONFIDENTIAL                                                    ABTILSD-A000034736

Abbott - Global Pharmaceutical Operations
**Document Properties**

Document ID: QP.009
Control Site: GPO - PPD Lake County IL (Div QA)

| Periodic Review | |
|---|---|
| **Periodic Review State:** | Enabled |
| **Last Review Date:** | |
| **Review Interval:** | 0 months |
| **Next Review Date:** | |
| **Subject Matter Expert:** | Helstad_Elizabeth_A |
| **SME Functional Area:** | Documentation Control |

| Site Effectivity |
|---|

< No Site Effectivity Data to Display >

**END OF DOCUMENT**

CONFIDENTIAL                                   ABTILSD-A000034737

# Exhibit 2

Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

B.P., A MINOR, BY DAWN FRAGNOLI ) No. 13-cv-324-SCW

INDIVIDUALLY AS PARENT AND NEXT )

FRIEND, )

              Plaintiffs, )

J.B., A MINOR, BY LINDA LEJEUNE ) No. 13-cv-326-SCW

INDIVIDUALLY AS LEGAL CUSTODIAN )

AND NEXT FRIEND, )

              Plaintiffs, )

       vs. )

ABBOTT LABORATORIES, INC., )

              Defendant. )

- C O N F I D E N T I A L -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

The videotaped 30(b)(6)deposition of

ABBOTT LABORATORIES, INC. through SCOTT ANDERSON,

called for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States District

Courts pertaining to the taking of depositions, taken

before JULIANA F. ZAJICEK, CSR No. 84-2604, a

Certified Shorthand Reporter of said State of

Illinois, at The Hyatt Deerfield, 1750 Lake Cook Road,

Deerfield, Illinois, on March 13, 2014, at 8:33 a.m.

Confidential - Subject to Further Confidentiality Review

Page 406

1    assessment based on what they understood and what they

2    knew at the time.   That was -- and, I -- and, again, I

3    don't know what the specifics were.   All I can -- all

4    I know is that that is what -- what is in the label is

5    the assessment that they made at the time.

6                       (WHEREUPON, a certain document was

7                       marked Anderson Deposition Exhibit

8                       No. 453, for identification, as of

9                       03/13/14.)

10   BY MR. HENDERSON:

11       Q.    This is Exhibit 453.   And I only have one

12   copy of it, and I'm happy for you gentlemen to take as

13   much time as you need to peruse it, but it's -- was

14   sent to us within the last three days by Abbott's

15   counsel.

16       MR. HERZOG:   Just for the record, I think it was

17   sent to you a week before the deposition in accordance

18   with the order.

19       MR. HENDERSON:   That may well be true.   It was

20   sent to us in the last week, how about that?

21       MR. HERZOG:   I just don't want any

22   misimpression.

23       MR. HENDERSON:   Yeah, I -- I didn't mean to -- I

24   just meant that it -- it was something that has come

Confidential - Subject to Further Confidentiality Review

1   to my attention recently.

2   BY MR. HENDERSON:

3       Q.    And I want you to tell me if you can

4   explain to the court and jury what that document is,

5   Exhibit 453?

6       A.    This document is the quality policy that

7   was set up called QP 009.  It's the type -- that's the

8   number of the policy.  And this was the policy that

9   went into place in the -- at the end of 1993 that

10  specifically described the process that was going to

11  be used from that time on for reviewing and approving

12  promotional -- labeling promotional materials.

13      Q.    We only have one copy and you have it in

14  front of you, but if you would, there's a couple of

15  highlighted sections.  And it looks to me that from

16  reading that document that according to Abbott's

17  internal protocols, the product labeling was

18  considered a part of the promotional compendium of

19  information that -- that Abbott used to market

20  Depakote.

21            Is that true?

22      A.    When we are talking about labeling,

23  labeling is a larger term.  Labeling in this context

24  here is the promotional materials.  FDA considers

Confidential - Subject to Further Confidentiality Review

Page 408

1    promotional materials part of the labeling for the

2    product.  The label or package insert is also, in the

3    general sense, part of -- or not part of promotional,

4    but part of the product labeling.

5            This document was specific to deal with

6    promotional labeling, the promotional pieces that were

7    created, not with the package insert.

8        Q.    Well, let me see that for a minute,

9    please, sir, and I'll -- I'll hand it back to you if

10   you need it.

11           Exhibit 453 on -- on page 2 talks about

12   advertisements and promotional labeling.  And what it

13   says down here under Section 202.1 is it says that

14   brochures, booklets, mailing pieces, a whole list of

15   things right there, are included in the list of

16   advertisements and promotional labeling, including in

17   the PDR.

18           Do you see that?

19       A.    I see that.

20       Q.    Okay.  So according to Abbott's protocol,

21   the PDR is considered part of the advertising and

22   promotional database.

23           Is that what that says?

24       A.    Yes, that is.  The PDR is considered a --

Confidential - Subject to Further Confidentiality Review

Page 409

1    a promotional venue because a drug company can decide

2    to pay to have their label listed in the PDR or not.

3    That didn't mean that we reviewed specifically what

4    was in the label, but we reviewed the label to make

5    sure that it was con -- the label that was going to go

6    into the PDR.  The PDR would print and give us copies

7    of what was going to appear on their pages.  It was

8    the responsibility for medical and regulatory and our

9    label control, which were our quality control, to go

10   through that document to make sure that the document

11   that was going to appear in the PDR 100 percent

12   matched the approved label.  That's why it was

13   included in that.

14        Q.    Is there -- is there a distinction in this

15   between the -- the -- the prescribing information and

16   the PDR?

17        MR. HERZOG:  I object to the form of the

18   question.

19   BY THE WITNESS:

20        A.    The document specifically says PDR.  It

21   doesn't say product label.  It says the PDR.

22   BY MR. HENDERSON:

23        Q.    Yeah.  Then -- yeah, then my question is:

24   Is the label considered promotional information or

Confidential - Subject to Further Confidentiality Review

Page 410

1      just the label when it's found in the PDR?

2            MR. HERZOG:  Object to the form of the question.

3            You can answer.

4      BY THE WITNESS:

5            A.    The label is considered promotional when

6      we were paying to put it into the PDR.  There was a

7      different policy in place for approval of the -- the

8      actual label itself.

9      BY MR. HENDERSON:

10           Q.    Okay.  Well, I --

11           A.    That was not covered by this policy.  This

12     was prom -- this was just things that were in

13     promotional.

14           Q.    The label that is in these documents we've

15     looked at today, would that be considered part of the

16     promotional package?

17           A.    The inclusion of the approved label would

18     have to be in those documents per FDA regulations.  So

19     when the documents were reviewed, the documents

20     were re -- the package insert was not reviewed with

21     each and every document.  The document itself, the

22     promotional piece, the brochure, whatever it was, was

23     reviewed to make sure that everything was the way it

24     should be.  Regulatory would then designate that this,

Confidential - Subject to Further Confidentiality Review

1   according to the FDA regulations, requires a package

2   insert to be attached.  The package insert, which came

3   directly from our label control department, which is

4   the department that would be proof -- doing the

5   proofread of all of the approved labels, would then be

6   attached to whatever document that was.  It did not

7   open up the -- the ability to review the label for the

8   contents each and every time, because that would

9   require going back to FDA.  So that's --

10       Q.    I'm -- I'm -- maybe I'm not asking my

11  question -- I'm going to try one more time and if I

12  miss you, we'll -- we'll move on.

13              In this document that we just went over,

14  there is a copy of the label at the end.  And I'm

15  wondering, did Abbott consider this entire document to

16  be a promotional piece including the label that's at

17  the end?

18       MR. HERZOG:  Object to the form of the question,

19  outside the scope, asked and answered.

20

21              Go ahead.

22  BY THE WITNESS:

23       A.    The document is considered to be

24  promotional.  The inclusion of the label within that

Confidential - Subject to Further Confidentiality Review

1   document is not considered to be promotional. That is

2   a mandatory requirement by the FDA that we put our

3   approved label into the document. So the part that

4   was reviewed by the medical regulatory group per

5   Quality Policy 009 excluded the label, the review of

6   the label itself.

7             (WHEREUPON, a certain document was

8             marked Anderson Deposition Exhibit

9             No. 454, for identification, as of

10             03/13/14.)

11  BY MR. HENDERSON:

12     Q.   I think I have it.

13        Let me show you Exhibit 454. The Bates

14  page is not stapled and I apologize for that, but I do

15  have two copies. Here it is.

16    MR. HENDERSON: I thought I missed yours there,

17  Peter, but it is on there.

18  BY MR. HENDERSON:

19     Q.   This is Ex -- Bates ABTILSD000009851.

20        This is a document with which you are

21  familiar from your review?

22    MR. HERZOG: This is Exhibit 454, correct?

23    MR. HENDERSON: Correct.

24  BY THE WITNESS:

# Exhibit 3

BRACEWELL
& GIULIANI

Texas
New York
Washington, DC
Connecticut
Seattle
Dubai
London

Heath A. Novosad
Partner

713.221.1258 Office
713.437.5356 Fax

Heath.Novosad@bgllp.com

Bracewell & Giuliani LLP
711 Louisiana Street
Suite 2300
Houston, Texas
77002-2770

March 5, 2013

*By Certified Mail, RRR*

Stephen E. Marshall                                        *semarshall@venable.com*
Venable LLP
750 East Pratt Street
Baltimore, Maryland 21202

Dan H. Ball                                                    *dhball@bryancave.com*
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102

Re:   *A.W., et al. v. Abbott Laboratories, Inc.*, Case No. 12-CV-57-GPM-DGW, In
      United States District Court for the Southern District of Illinois.

Counsel:

Plaintiffs request that Abbott verify that the attached set of excerpts from the Physicians'
Desk Reference ("PDR") contain the complete set of FDA-approved labels for each
formulation of the Depakote drug from 1979 – 2012. To the extent that the attached set of
labels is not the complete set of labels for each formulation of the Depakote drug, Plaintiffs
request that Abbott provide any missing labels, identify which labels are inaccurate and
provide the accurate replacement label, and indicate whether the set of labels is complete
with any additions from Abbott.

Abbott's previously produced excerpts from the PDR in the *Rix* lawsuit (*see*
ABTPAW001002847 - ABTPAW001002971) only contained pages relevant to "Depakote"
and in some instances did not include the entire wording of the labels. The parties have had
many disputes regarding discovery issues, liability and damages in this case, but the accuracy
of the labels included with the Depakote drugs and the time period each label was in effect
should not be one of them. Ensuring that both parties have a complete and accurate set of
labels benefits everyone, and we hope that Abbott will work with Plaintiffs in this reasonable
request.



RECEIVED
MAR  8 2013
VENABLE

BRACEWELL
&GIULIANI

Stephen E. Marshall
Dan H. Ball
March 5, 2013
Page 2


Please contact me at 713-221-1258 if you have any questions or concerns about Plaintiffs'
request. Otherwise, I look forward to hearing from Abbott regarding the verification of the
attached labels at your earliest convenience.


Very truly yours,

BRACEWELL & GIULIANI LLP

Heath A. Novosad


cc:   Christopher Cueto
      LAW OFFICE OF CHRISTOPHER CUETO, LTD.

      Robert L. Salim
      LAW OFFICE OF ROBERT L. SALIM

      Ralph D. McBride
      Tony L. Visage
      Phillip L. Sampson
      Blair R. Loocke
      Nancy R. McEvily
      Jennifer M. Salim
      BRACEWELL & GIULIANI LLP

      Tommy Fibich
      FIBICH HAMPTON & LEEBRON LLP

      John Boundas
      Sejal Brahmbhatt
      WILLIAMS KHERKHER HART BOUNDAS, LLP

      Jeffrey D. Meyer



Stephen E. Marshall
Dan H. Ball
March 5, 2013
Page 3


THE MEYER LAW FIRM, P.C.

William M. Audet
AUDET & PARTNERS, LLP

# Exhibit 4



# PDR® 47 EDITION 1993

# PHYSICIANS' DESK REFERENCE®

---

**Product Manager**
DANIEL B. ZURICH

**Sales Manager**
CHARLIE J. MEITNER

**Account Managers**
CHAD E. ALCORN
JAMES R. PANTALEO
MICHAEL S. SARAJIAN
JOANNE C. TERZIDES

**Commercial Sales Manager**
ROBIN B. BARTLETT

**Direct Marketing Manager**
ROBERT W. CHAPMAN

**Manager, Professional Data**
MUKESH MEHTA, R. Ph.

**Index Editor**
ADELE L. DOWD

**Director of Production**
MARJORIE A. DUFFY

**Assistant Director of Production**
CARRIE WILLIAMS

**Production Manager**
KIMBERLY V. HILLER

**Format Editor**
MILDRED M. SCHUMACHER

**Production Coordinator**
ELIZABETH A. KARST

**Art Associate**
JOAN K. AKERLIND

**Medical Consultant**
LOUIS V. NAPOLITANO, MD

Copyright © 1993 and published by Medical Economics Data, a division of Medical Economics Company Inc., at Montvale, N.J. 07645. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, or otherwise) without the prior written permission of the publisher. PHYSICIANS' DESK REFERENCE®, PDR®, PDR For Ophthalmology®, PDR For Nonprescription Drugs®, PDR Drug Interactions and Side Effects® are trademarks of Medical Economics Company Inc., registered in the United States Patent and Trademark Office.

Officers of Medical Economics Data, a division of Medical Economics Company Inc: **President and Chief Executive Officer,** Norman R. Snesil; **Executive Vice President,** Mark L. Weinstein; **Senior Vice President and Chief Financial Officer,** J. Crispin Ashworth; **Senior Vice President of Business Development,** Stephen J. Sorkenn; **Vice President of Product Management,** Curtis B. Allen; **Vice President of Sales and Marketing,** Thomas F. Rice; **Vice President of Operations,** John R. Ware; **Vice President of Information Systems and Services,** Edward J. Zecchini

ISBN 1-56363-015-X

# Foreword to the Forty-seventh Edition

Excellence in prescribing information for physicians is the mission of the PHYSICIANS' DESK REFERENCE®. This edition represents the 47th consecutive year the PDR® has provided the most complete and fully cross-referenced labeling information available on pharmaceutical and diagnostic products. Included in this reference is full product information for most pharmaceuticals, both prescription and OTC, product overviews for selected drugs and accurate photographs of many products for their easy identification. Information is also provided on active and inactive ingredients, educational materials, pregnancy categories used in drug labeling, poison control centers, and procedures for reporting drug and vaccine adverse events.

**The 1993 PHYSICIANS' DESK REFERENCE includes many significant improvements such as addition of generic names to the Product Name Index (Pink Section) so that this single index covers both brand and generic names, and addition of page numbers to Product Identification photographs for easy look-up in the Product Information section.**

PHYSICIANS' DESK REFERENCE is published annually by Medical Economics Data with the cooperation of the manufacturers whose products appear in the Product Identification (Gray Section), the Product Information (White Section), and the Diagnostic Product Information (Green Section). Intended primarily for physicians, the purpose of PDR is to provide essential information on major pharmaceutical and diagnostic products. In addition to this volume, the complete library of PDR publications includes: PDR GUIDE TO DRUG INTERACTIONS / SIDE EFFECTS / INDICATIONS™, PDR FOR NONPRESCRIPTION DRUGS®, and PDR FOR OPHTHALMOLOGY®. The PHYSICIANS' DESK REFERENCE database is also available on highly powerful electronic platforms: Pocket PDR®—a handheld device, PDR Drug Interactions and Side Effects diskettes™, and PDR Library on CD-ROM™ for personal computers. For additional information on these databases please see the endsheets in this volume. The complete text computer tape version, PDR Direct Access™, is also available.

This edition of PHYSICIANS' DESK REFERENCE includes the latest available information on nearly 3000 products. During the year as important new or revised information about these products becomes available to us, it is published in a PDR Supplement. Retain the Supplement with this PDR and before prescribing or administering any product described in PHYSICIANS' DESK REFERENCE, consult the latest Supplement to determine if new information about the product has been published.

Under the federal Food, Drug & Cosmetic (FD&C) Act, a drug approved for marketing may be labeled, promoted, and advertised by the manufacturer only for those uses for which the drug's safety and effectiveness have been established. The Code of Federal Regulations 201.100(d)(1) pertaining to labeling for prescription products require that for PDR content, "indications, effects, dosages, routes, methods, and frequency and duration of administration and any relevant warnings, hazards, contraindications, side effects, and precautions" must be the "*same in language and emphasis*" as the approved labeling for the products. FDA regards the words "*same in language and emphasis*" as requiring VERBATIM use of the approved labeling providing such information. Furthermore, information in the approved labeling that is emphasized by the use of type set in a box or in capitals, bold face, or italics must also be given the same emphasis in PDR.

The FDA has also announced that the FD&C Act "does not, however, limit the manner in which a physician may use an approved drug. Once a product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling." Thus the FDA states also that "accepted medical practice" often includes drug use that is not reflected in approved drug labeling. For products which do not have official package circulars, the publisher has emphasized to manufacturers the necessity of describing such products comprehensively so that physicians would have access to all information essential for intelligent and informed prescribing. Additional information on any product may be obtained through the manufacturer.

The function of the publisher is the compilation, organization, and distribution of this information. Each product description has been prepared by the manufacturer, and edited and approved by the manufacturer's medical department, medical director, and/or medical consultant. In organizing and presenting the material in PHYSICIANS' DESK REFERENCE, the publisher does not warrant or guarantee any of the products described herein or perform any independent analysis in connection with any of the product information contained herein. PHYSICIANS' DESK REFERENCE does not assume, and expressly disclaims, any obligation to obtain and include information other than that provided to it by the manufacturer. It should also be understood that the publisher is not advocating the use of any product described herein. Manufacturers suggest headings under which products should appear in the Product Category Index (Blue Section) and the Generic and Chemical Name Index (Yellow Section).

PDR Customer Service is available at 1-800-232-7379 or Fax 201-573-4956.