IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| IN RE DEPAKOTE CASES | ) ) ) ) ) ) ) ) ) ) ) ) ) | Consolidated Case No.: 12-cv-52-DRH-SCW |

**DEFENDANT ABBOTT LABORATORIES INC.'S
AMENDED PROPOSED BELLWETHER PLAN**

Abbott submits this proposal for selection of cases for trial in the above-captioned cases.

The salient features of Abbott's proposal, which is attached hereto and submitted herewith, are as follows:

- Plaintiffs to provide information sufficient to permit selection of cases to be selected for trial.

- Two representative trials, to be scheduled for March 30, 2015 and June 22, 2015, involving the predominant time period, product usage and injuries.

- Determination of the appropriateness of a multi-plaintiff trial and/or bifurcation on a more developed record after some period of plaintiff-specific discovery.

The particulars and supporting rationale of Abbott's proposal are set forth below. Abbott also requests the opportunity to be heard on these issues.

### I. BACKGROUND FACTS

Plaintiffs allege that they have suffered birth defects as a result of their mother's use of Depakote during pregnancy. The Depakote labeling has always warned of the risk of birth defects. Plaintiffs allege, however, that the warnings were inadequate. The gravamen of plaintiffs' case appears to be that, although Abbott warned of the risk of birth defects throughout,

at any given time, the medical literature was such that Abbott should have also warned that Depakote posed a greater risk of birth defects than other drugs that were available to treat the plaintiff's condition.

### A. Criteria to guide case groupings and the identification of most representative cases

There are three primary criteria that should govern the grouping of plaintiffs' cases and should guide the inquiry into which case groupings predominate and would be most representative: labeling, indication for which Depakote was prescribed for the plaintiff's mother; and injury.

#### 1. Labeling

Although the Depakote label has warned of the risk of teratogenicity at all times, the warning has undergone refinements during the 35-year history of the product. For example, a "black box" warning related to teratogenicity was added in 1996 when the product was approved for use in the prevention of migraine headaches. In 2006, Depakote's labeling was updated to report on the results emerging from various studies. From that point forward, the label included a description of the results of a study conducted by the North American Antiepileptic Drug Pregnancy Registry comparing the risk of birth defects associated with the use of Depakote to the risk of birth defects associated with the group of all other antiepileptic drugs taken as a whole, many of which had not been on the market until recently. There were other changes as well, including a 2003 change to the patient information leaflet and its distribution. Such labeling changes reflect the natural evolution of a product's warnings as labeling conventions change, more information is learned, and, in the case of the comparative warnings, new comparator products come on the market.

Any given label change can involve complex regulatory requirements, involved back-and-forth between FDA and the product's manufacturer, and detailed scientific analysis of newly reported data. Thus, grouping plaintiffs' cases by specific labeling timeframes is critical to minimizing jury confusion regarding such complicated issues, and to minimizing the risk of unfair prejudice. For instance, despite the fact that Depakote's teratogenicity warning has always warned of the risk of birth defects associated with its use during pregnancy, a jury faced with deciding a case involving a plaintiff whose birth pre-dates 1996, but that is presented with, for example, a 1996 label containing a black box teratogenicity warning, could improperly conclude that such subsequent label change was an admission by Abbott that its warning should have been strengthened, when in fact the inclusion of the teratogenicity warning in a black box was only because of the new indication for prevention of migraines. In addition, this same jury presented with a label post-dating 2006 could improperly conclude that Abbott's pre-2006 labeling was inadequate because it should have included such comparative risk information, notwithstanding that such information was not published until well after the particular plaintiff's birth, and involved comparison to products that were not yet on the market until recently.

Without providing some grouping relative to the various iterations of Depakote's labeling, juries will be confronted with labeling and information that is irrelevant to the issue they are properly deciding, i.e., measuring the adequacy of Depakote's labeling against what is known by Abbott, FDA, and the medical community as a whole on or before the date of a plaintiff's birth. Accordingly, Abbott proposes grouping plaintiffs' cases into the following categories: (1) cases in which a plaintiff's birth pre-dates 1997; (2) cases in which a plaintiff's birth was between 1997 and 2006; and (3) cases in which a plaintiff's birth post-dates 2006.

3

### 2. Indication

Plaintiffs in these cases have been prescribed Depakote for two distinct medical conditions, epilepsy and bipolar disorder.[1]  The science, patient profile, types of experts and treating physicians, and the risk/benefit analyses differ as between these two uses.

First, the science supporting the efficacy and safety of Depakote for epilepsy and bipolar is different.  In part, this is due to the alternative treatments that have been available for each condition at different points in time.  For example, in 1995 there were four primary alternative treatments available for epilepsy, but only one approved alternative treatment for bipolar disorder – lithium, a drug not approved to treat epilepsy.  In 2004, there were up to eight alternative treatments for epilepsy, and three alternative treatments for bipolar disorder.  Therefore, the comparative risk analysis is markedly different for the treatment of each indication, and those analyses change over time.

Secondly, the difference in the conditions – epilepsy, a neurological one and bipolar, a psychiatric one – will necessitate experts in different medical fields who will undertake to explain the condition generally, the treatment options at the time, the factors unique to any given plaintiff's condition, and the risk/benefit analysis in treating that plaintiff.  Relatedly, the treating physicians will also come from different medical fields.

Finally, a plaintiff suffering from epilepsy and one suffering from bipolar disorder will have differences almost too numerous to capture.  The genesis and cause of the conditions, the experience of living with the conditions, the management of the conditions, and the risk/benefit analysis each individual plaintiff's physician undertakes will be vastly different.

---

[1] According to information from the plaintiffs, only several of their cases involve the indication for prevention of migraines.

3. **Injury**

As described by plaintiffs in the limited information that they have provided to date, there are various injuries at issue in these cases. Injury is a third basis for trial grouping. For example, two of the injuries alleged by plaintiffs are spina bifida and cardiovascular defects. These injuries differ in several respects that are material to the litigation. First, the warnings for these conditions differ. Since the early 1980s, the Depakote warnings have reported a 1 to 2% rate of spina bifida in children of mothers who took Depakote during pregnancy, and four of plaintiff's expert witnesses in the <u>Bonner</u> case that was being worked up for trial acknowledged that this percentage is exactly right. The risk of cardiovascular injury has been stated differently, being specifically identified in the Depakote labeling since 1992, but without an assigned incidence rate among other differences. Second, the medical literature varies among the injuries on the question of how the risk of Depakote compares to the risk of other antiepileptic drugs. Third, the medical evidence concerning whether Depakote can cause the injuries in question varies. Finally, the conditions vary considerably in terms of prognosis and treatment options. In fact, the conditions implicate entirely different medical disciplines, expertise, and scientific information, spina bifida being a neurological condition and cardiovascular injury being of course cardiovascular. Thus, injury is an important variable in trial selection.

B. **Statistics regarding the plaintiffs' cases**

Abbott has analyzed the available information in an effort to determine which cases would be most representative, when analyzed in light of the case grouping criteria outlined above.

In April 2014, plaintiffs provided Abbott with charts showing the indication for which Depakote was prescribed to the mother of each plaintiff along with each plaintiff's alleged

5

injuries and date of birth, and on May 13, 2014, plaintiffs supplemented the same.  Using that data as a guide, and assuming its accuracy, the dates of birth of the plaintiffs are distributed as follows:

| | |
|---|---|
| Pre 1997 | 108 cases (19.7%) |
| 1997 to 2006 | 337 cases (61.6%) |
| Post 2006 | 102 cases (18.6%) |

As far as indications for which the mother took Depakote are concerned, the predominant[2] ones are as follows:

| | |
|---|---|
| Epilepsy | approx. 375 cases (approx. 68.6%) |
| Psychiatric disorder | approx. 155 cases (approx. 28.3%)[3] |

Determination of a predominate injury or injuries is more challenging.  According to plaintiffs' chart, in many instances a plaintiff may have more than one condition.  It is not evident from the chart whether one of those injuries is the most significant one for a given plaintiff.  Moreover, determination of the injuries actually at issue can depend upon a review of medical records. Abbott therefore believes that selection of representative and predominant injuries should occur after additional review of medical records and medical information as described below.

## II.  ABBOTT'S PROPOSAL

### A. Criteria defining case selection

Abbott proposes that the Court enter a schedule that would provide for the trial of two cases, with the focus being on (1) the 1997 to 2006 time period and (2) the use of Depakote to treat epilepsy.  As shown above, this would capture the predominant time period and indication.

---

[2] Because Abbott is listing only the predominant indications, the percentages do not total 100%.
[3] Abbott is using approximations to account for the fact that plaintiffs' chart shows that a small minority of the cases (about 5%) involve a mixed indication.

In addition, one of the two trials would involve plaintiffs from this time period whose mothers took Depakote to treat epilepsy and who allege a common injury that is determined after review to be representative. The other trial would involve plaintiffs from this time period whose mothers took Depakote to treat epilepsy and who allege a different common injury that is also determined to be representative. The trials would be set for March 30, 2015 and June 22, 2015.

Without proposing rigid subgrouping by time frame in advance, Abbott suggests that, if each trial is to involve multiple plaintiffs, the parties and the Court should attempt to have a nearly identical time period covered in each trial. In other words, the plaintiffs in the first trial should all be born in approximately the same year and the plaintiffs in the second trial should also be born in approximately the same year. As noted above, there is no dispute that Abbott has warned of plaintiffs' injuries; the dispute appears to be over whether Abbott's warning was stated in appropriate terms given what was known at the time. As a result, it is most sensible and there is the least likelihood of juror confusion, if the time period covered by any one trial is as narrow as possible. The parties and the Court should also attempt to have commonality of state law to the extent possible.

The foregoing approach will assure that the first trials cover the predominant time period, indication and injuries.

### B. Process for case selection

#### 1. Information to be provided by plaintiffs

To enable a reasoned selection of cases, plaintiffs should be required to provide Abbott with the following information for all plaintiffs:

(1) all medical records, including pharmacy records, in the possession of plaintiffs or their counsel, which, according to plaintiffs' prior oral representations, should constitute a sizeable collection of available information that they already have in hand;

  (2)  dates of the mother's use of Depakote and of any other drug taken by the mother to treat the condition for which Depakote was prescribed;

  (3)  the child's injuries;

  (4)  the condition for which Depakote was prescribed (specifying, in the case of psychiatric disorders, the nature of the psychiatric disorder);

  (5)  the names of all doctors who ever prescribed Depakote or any other drug used to treat the condition for which the mother took Depakote; and

  (6)  blank authorizations.

Production of these materials and information will be critical to a fair bellwether selection process.

### a. Importance of the information and materials

It is critical that Abbott be provided this information and these materials. As an initial matter, Abbott should be placed on as equal a footing as possible with plaintiffs so that plaintiffs are not in possession of important information that Abbott lacks in selecting cases. For example, experience in the few cases that have been worked up to date teaches that the mother taking Depakote may have been treated unsuccessfully with other antiepileptic drugs. Because, as noted above, Depakote has always carried an extensive warning of the risks of birth defects and four of plaintiff's experts have conceded that Abbott's warning since the early 1980s of a 1-2% risk of spina bifida -- the most common injury in these cases -- is exactly right,[4] plaintiffs have had to resort to arguing that the warnings were inadequate because Abbott should have begun to warn sooner than it did that Depakote posed a greater risk of birth defects than other antiepileptic drugs. Obviously, if the mother had discontinued use of the ostensibly safer alternative antiepileptic drugs because they were ineffective in controlling her seizures or caused her side effects, that would be a significant factor for the jury to consider. Plaintiffs themselves

---

[4] These experts were Edward J. Lammer, M.D., Godfrey P. Oakley, Jr., M.D., Richard H. Finnell, Ph.D., and Lemuel Moye, M.D.

designated an expert in the Bonner case whose primary purpose was to testify that Ms. Bonner could have been treated successfully on another antiepileptic drug.

### b. Need for the medical records in plaintiffs' possession

It is also important that Abbott have this information in the form of medical records, not just summary information from counsel. Abbott's understanding is that plaintiffs' counsel have medical records for a substantial majority of the plaintiffs, as they should in light of the fact that many of these cases were filed years ago. For example, the medical records can sometimes reveal that the prescribing physician provided the mother clear warnings of the risk of birth defects prior to her pregnancy.[5] In other cases, medical records, including pharmacy records, show that the evidence that the mother even took Depakote is dubious, at best. Perhaps most significantly, the information that plaintiffs have provided to describe their cases has been suspect. The two charts that plaintiffs provided on April 16, 2014 referenced above consisted of one providing information for the cases in this Court and one providing information on 27 cases pending in other courts.[6] Abbott has no ability to use medical records to cross-check the information for the plaintiffs in this Court, but has some limited ability to do so for the 27 cases pending in other courts. According to plaintiffs' chart, 11 of those 27 cases involved spina bifida. From medical records, however, it appears that five of those 11 plaintiffs do not have spina bifida or any other form of neural tube defect.[7] Without the medical records, Abbott would have been left believing that there were twice as many spina bifida cases as there actually are and that certain plaintiffs had spina bifida when in fact they did not. Other than the provision of authorizations, discussed below, the only medical records production that Abbott seeks at this

---

[5] This was true, for example, in one of the three original bellwether cases, which plaintiffs voluntarily dismissed for undisclosed reasons.
[6] The charts had information for most, but not all, plaintiffs.
[7] Abbott raised this discrepancy with plaintiffs a week ago on May 7, but has not heard anything back from them on this issue.

time is production of medical records in the actual possession of plaintiffs or their counsel, which plaintiffs apparently have for a substantial majority of their cases. There is simply no reason why these should not be produced.

### c. Need for authorizations

For similar reasons, it is important that Abbott be provided blank authorizations to enable Abbott to collect records on its own without being restricted to what plaintiffs chose to collect. This request would impose essentially no burden on plaintiffs and would assist the parties and the Court in making selections.

### d. Need for counsel certification

Finally, plaintiffs' track record to date compels Abbott to request that plaintiffs' counsel certify the completeness and accuracy of the information that they provide. As noted above, in the subset of cases that Abbott has been able to cross-check, plaintiffs' counsel have an error rate of nearly 50% in reporting on whether a given plaintiff had spina bifida. In addition, the information that plaintiffs and their counsel provided in the work-up of the two bellwether plaintiffs in this Court was grossly deficient. Specifically, plaintiffs were required to identify in their Plaintiff Fact Sheets all physicians who had ever prescribed Depakote. The fact sheet for the Bonner case, despite being amended four times, omitted no less than six physicians who prescribed Depakote to the plaintiff's mother.[8] For Ms. Fragnoli, the number of omitted physicians who prescribed Depakote to her was also six.[9] Under the circumstances, it is especially important that the accuracy and completeness of the information provided be certified by plaintiffs' counsel, so that the Court and Abbott have an assurance that the plaintiffs have

---

[8] Those physicians were Drs. Best, Crookshank, Dugal, O'Neal, Snider, and Springer.
[9] Those physicians were Drs. Berber/Herbst, Colon, Moon, Mulne, Re, and Wine.

been questioned thoroughly by their counsel in securing the reported information and that counsel have conducted the appropriate investigation.

Abbott's proposal entails a staged production of the medical information and documents described above, with the first wave being those potential plaintiffs for the first two trial groups, and the second wave being the remaining plaintiffs for consideration in subsequent trial groups. Abbott will need this information for both bellwether case selection and ongoing case analysis and discussions among the parties. Production of records, authorizations and certified information will also assist in minimizing the risk of there being false starts, i.e., cases selected for work-up that prove to have a fundamental defect rendering them not representative.

### 2. Cases proposed by parties

Under Abbott's proposal, each side would propose three cases for each of the two trial groupings identified above. The parties would make these selections 60 days after receipt from plaintiffs of the information described above. The 60 days would allow time for the parties to evaluate the information and to conduct an appropriate collection of key medical records.

### 3. Input from Court

Fifteen days after case proposal by the parties, the Court would select three cases from each of the two groups that the parties would proceed to work up. This step is designed to provide an added layer of assurance that the parties' selections are representative.

### C. The issue of multi-plaintiff trials

Abbott's proposal calls for a trial management hearing to be held 30 days before the close of fact discovery in each trial group. The purpose of the hearing would be to address issues such as whether the cases are suited for multi-plaintiff trials, whether a bifurcation of liability and damages would be appropriate, and other similar matters. The proposal allows for this decision

to be made on a developed factual record so that issues of case similarity or other factors can be addressed with concrete information.

Although Abbott proposes that final determination of the issue be deferred, it states that its initial position is that multi-plaintiff trials would probably not be appropriate. In fact, these plaintiffs <u>themselves</u> have previously articulated the reasons why this is so. In their petition for leave to appeal Judge Darrah's denial of the remand motion plaintiffs filed in the Northern District of Illinois, plaintiffs dismissed the possibility of "any sort of joint trial on liability," arguing instead that such a consolidation for trial purposes would be "impossible." <u>Plaintiffs</u> stated:

> While the trials of the various Plaintiffs' claims would no doubt present common issues, especially those involving Abbott's ongoing research in developing Depakote and what it knew and disclosed (and when) about the risks it posed for causing birth defects, <u>it would be impossible to determine either liability or damages in a common trial of any kind</u>. As noted above, Depakote was initially prescribed as a treatment for epilepsy, but its uses were later expanded to include other conditions such as migraines and manic episodes associated with bipolar disorder. Accordingly each individual case of exposure to Depakote came as a result of an individual physician's decision to prescribe it for a particular patient in response to that patient's medical condition at the time. And even with respect to Abbott's own conduct, a case-by-case evaluation would be required; the degree to which Abbott became aware that Depakote caused birth defects and the nature and extent of its disclosure of those facts to physicians, regulators and the public changed over time, making the set of facts known to each prescribing physician different for each instance in which the drug was administered. <u>All of this potential for variation from case to case would make determinations of causation a highly individualized inquiry, and would thus make it impossible to hold any sort of joint trial on liability, whether in one mass proceeding or even using principles of claim preclusion</u>. And, of course, because Depakote causes a range of different birth defects, and thus would have affected each patient and each child differently, the assessment of damages would have to be individualized.

<u>J.B. v. Abbott Labs</u>., No. 12-8027, Doc. No. 1-1, Pls.' Pet. Leave To Appeal, at 17-18 (7th Cir. filed May 21, 2012) (attached hereto as Ex. A) (emphasis added). Although plaintiffs made

these statements in the context of a large set of cases, their articulated rationale applies generally to multi-plaintiff Depakote trials.

Abbott further notes at this time that the question of multi-plaintiffs trials also has a bearing on trial scheduling. The experience in Bonner is instructive. The parties had predicted that Bonner, which was a single plaintiff case, would take in excess of three weeks to try. Each additional plaintiff would likely add at least a week to the length of trial to account for testimony from the plaintiff's mother, the prescribing physician(s), case-specific experts, damages fact witnesses, and damages experts. In Bonner, the plaintiffs named three expert witnesses on damages, named two more experts to testify about the medical specifics of the plaintiff's case, designated testimony from six lay witnesses who were family members or neighbors, and designated testimony from four treating physicians. Abbott was also going to call plaintiff-specific expert witnesses. For purposes of scheduling, Abbott notes here that if the Court were to allow multi-plaintiff trials without the commonality of injury and indication, the number of liability experts would increase still more significantly.

### D.   Cases falling outside the time frame and injury contours defined above

The foregoing trial plan excludes plaintiffs who were born before 1997 or after 2006. Plaintiffs for the two trials after the two described above should come from those time frames, which collectively constitute 38.3% of the cases. Abbott's proposal calls for the production of the requested medical records, authorizations and information for these plaintiffs by September 5, 2014.

### III. Conclusion

For the foregoing reasons, the Court should enter the Proposed Scheduling Order submitted herewith. Abbott also requests the opportunity to be heard on these issues.

Respectfully submitted,

BRYAN CAVE LLP

By: */s/ Michaela F. Roberts*
Dan H. Ball, #6192613
dhball@bryancave.com
Peter W. Herzog III
pwherzog@bryancave.com
Stefan A. Mallen, #6279262
smallen@bryancave.com
211 North Broadway, Suite 3600
St. Louis, MO  63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Paul F. Strain
Stephen E. Marshall
Dino S. Sangiamo
Michaela F. Roberts
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD  21202
(410) 244-7400

*Attorneys for Abbott Laboratories Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 14, 2014 the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.

*/s/ Michaela F. Roberts*