**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE DEPAKOTE: RHEALYN ALEXANDER, et. al., | ) | Case No.  12-52-NJR-SCW |
| | ) | LEAD CONSOLIDATED CASE |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES INC., | ) | |
| | ) | JURY TRIAL DEMANDED |
| DEFENDANT. | ) | ON ALL COUNTS |

**ABBOTT'S SUPPLEMENTAL BELLWETHER PROTOCOL SUBMISSION**

Abbott submits this paper in response to Plaintiffs' Proposed Trial Protocol and Memorandum in Support Thereof (Doc. No. 282), and in partial response to Plaintiffs' Suggested Topics for Discussion at Status Conference (Doc. No. 290).

The bellwether protocol should facilitate, as much as possible, an efficient resolution of the hundreds of individual Depakote claims pending before the Court.  Plaintiffs' proposed approach – an impossibly short-fused multi-plaintiff trial format that increases the likelihood of reversal on appeal in the event of a Plaintiff-friendly trial result – does not serve the bellwether goal.  To the contrary, Plaintiffs' proposals promise needlessly extended and complicated trials that are less efficient and less informative than a comparable series of single-plaintiff trials of representative cases that emerge from a pool of discovery candidates selected by a fair (if not altogether informed) protocol.  Abbott urges instead that the Court adopt either of two approaches structured to serve the bellwether objective:  (1) fact discovery work-up of cases selected *by the parties* after Plaintiffs provide Abbott and the Court with basic information about every plaintiff set so as to create some semblance of a level playing field; or (2) fact discovery work-up of cases selected *by the Court* utilizing only the very limited data provided by Plaintiffs'

"docket spreadsheet," as informed by the parties' agreed or competing formulations of the relevant bellwether criteria.

In either instance, the determination of how many and which Plaintiffs' claims might be designated for expert discovery and trial, and any determination of possible consolidation for trial, would be made only after a reasonable opportunity for plaintiff-specific discovery affords the parties and the Court a comprehensive and balanced record. Thus far, Plaintiffs have withheld basic information about all but two of their 547 plaintiff sets, while insisting that only the scant information Plaintiffs choose to disclose be utilized by the parties to nominate bellwether candidates for one or more multi-plaintiff trials. Plaintiffs' proposed bellwether protocol is inexcusably unfair, and the only possible outcomes (other than defense verdicts on all claims) are (a) reversal on appeal or (b) rejection by Abbott of any Plaintiff's verdict as a measure of the merits of any of these cases. Either way, the Court would be presiding over a wasted effort. Ironically, Plaintiffs demand "expeditious resolution" of the Depakote cases (*see* Doc. No. 282 at 1) while simultaneously taking steps to minimize the prospects for a fair and expeditious resolution.

## I.    *Plaintiffs' Proposed Bellwether Protocols Are Fundamentally Unfair to Abbott and Would Not Facilitate an Efficient Resolution of the Litigation*

Plaintiffs' proposed trial protocol is a nebulous and moving target. As of May 14, 2014, Plaintiffs were proposing "that the Court try no fewer than six (6) representative Plaintiffs . . . in one trial in February 2015." (Doc. No. 282 at 19.) As of June 5, 2014, Plaintiffs are "suggest[ing] . . . a trial protocol providing for the trial of multiple Plaintiffs' cases together in October 2014." (Doc. No. 290 at 2.) In neither instance did Plaintiffs acknowledge that *only two cases* have been subjected to case-specific fact discovery, and only one of those has proceeded through the expert discovery necessary to prepare it for trial. Plaintiffs' most recent

submission addressed to the subject, Document Number 290, does not identify how many "multiple Plaintiffs' cases" Plaintiffs propose to try together four months hence.  None of Plaintiffs submissions proposes a schedule for taking multiple, as-yet-unidentified cases from pleadings to trial-ready in that period of time – an obviously impossible task.  For whatever reason, Plaintiffs' bellwether protocol is becoming more unworkable with each iteration.  Neither of Plaintiffs' proposals is supported by any case authority, and neither makes any sense as a bellwether protocol.  Both proceed from the faulty premise that a multi-plaintiff trial is somehow more efficient or "representative" than single-plaintiff trials selected with the benefit of a full record following appropriate discovery in a suitable collection of candidate cases.

### A. Plaintiffs Are Not Entitled to Withhold Basic Case Information While Selecting Their Favorite Cases

Plaintiffs' alternative proposed bellwether protocols proceed from the defective premise that Plaintiffs are entitled to withhold from Abbott information about Plaintiffs' claims, and then to utilize the resulting information disparity to Plaintiffs' advantage in selecting plaintiff sets for case-specific discovery and bellwether trials.  There is no logical or legal reason why Plaintiffs should be permitted to stack the deck in this manner.[1]  To the contrary, Abbott is entitled to the due process afforded by case-specific discovery from and about every Plaintiff who has filed suit.  Plaintiffs may regard as inconvenient or "inefficient" their obligation to reveal the details of their claims (including their relevant medical histories), but each Plaintiff who filed suit against Abbott necessarily obliged herself to participate in discovery according to the applicable rules. The Illinois Depakote cases comprise 547 unique personal injury claims, most of which were improperly joined in large groups when filed in state court, and they must be treated for trial

---

[1] Given the quantity of ink Plaintiffs have spilled accusing Abbott of every manner of discovery infraction Plaintiffs can invent, it is beyond ironic that Plaintiffs refuse to disclose even the minimal information Abbott has requested about the Plaintiffs and their claims.

purposes as separate claims until such time as the Plaintiffs meet their burden in moving for consolidation under Federal Rule of Civil Procedure 42, which Plaintiffs cannot do based on the present record.

To this point in the proceedings, Plaintiffs have disclosed only the most rudimentary information about their claims.  Plaintiffs dismiss any other information as "irrelevant" or "not useful."  The specifics of a given plaintiff's injuries?  According to Plaintiffs, "there is no reason to place an emphasis on one injury over another" in selecting bellwether candidates, and thus no reason for Plaintiffs to describe their alleged injuries in any but the most generic and unenlightening terms.  (*See* Doc. No. 282 at 13.)  A mother's use of antiepileptic drugs other than Depakote?  According to Plaintiffs:  "[N]ot relevant to an analysis of a 'representative' Plaintiff" (*id.* at 3), despite the fact that the "comparative risks" of the available AEDs has become a focal point of Plaintiffs' strategy.  Whereas many of the parameters that Abbott identified have been shown by recent experience in the two earlier bellwethers – the *Bonner* and *Fragnoli* cases – to be important, if not altogether critical, Plaintiffs purport to dismiss those criteria by *ipse dixit*.

Plaintiffs' dismissive attitude regarding the mothers' use of alternative AEDs is particularly inexplicable.  Information about a mother's use of other antiepileptic drugs is critical to the selection of "representative" or otherwise informative cases, as the *Bonner* and *Fragnoli* cases demonstrate.  Chantel Bonner's unsuccessful trials of other AEDs is a focal point of the *Bonner* case:  Depakote was uniquely efficacious at controlling her epilepsy without unacceptable side effects; and the fact that Ms. Bonner had tried and failed all of the available alternatives refutes her assertions that she would have utilized a different AED in the face of a different Depakote warning.  Similarly, Dawn Fragnoli testified that she tried Lamictal and

Keppra, two newer AEDs, but that she reverted to Depakote after the alternatives failed to control her seizures.[2]

More generally, the prevailing literature demonstrates that a "polytherapy" case is an entirely different proposition from a case in which the mother took Depakote alone (*i.e.*, "monotherapy").  Indeed, a polytherapy case is unlikely to be "representative" of any situation other than the same combination of therapies used to treat precisely the same seizure profile; and even at that it might well be impossible to determine which, if any, of the AEDs at issue in any such case gave rise to one or more of the birth defects alleged.

### B.    Plaintiffs' "Docket Spreadsheet" Lacks Most of the Information Necessary to an Informed Bellwether Selection Process

Plaintiffs' so-called "docket spreadsheet" – Exhibit A to Plaintiff's Proposed Trial Protocol – does not come close to providing Abbott with the information necessary to identify "representative Plaintiffs."  In particular, the information disclosed in the "Dates of Use," "Reason Rx Depakote," and "Overview of Injuries" fields falls far short of anything approaching a level playing field for the selection of potentially "representative cases."

Either of two alternatives appears in the "Dates of Use" field for each Plaintiff – "During Pregnancy," or "Will Supplement."  "During Pregnancy" tells Abbott (and the Court) nothing of consequence about the potential exposure, because a child who was not exposed to Depakote "during pregnancy" cannot possibly have a valid claim.  On the other hand, a "Will Supplement" entry in this field would seem to suggest that, even years after filing suit, a Plaintiff still cannot confirm *in utero* exposure.

The alternatives appearing in the "Reason Rx Depakote" field for each Plaintiff include "Epilepsy," "Psychiatric Disorder," and "Migraine."  Plaintiffs elsewhere (in the *Bonner* case,

---

[2] Ms. Fragnoli testified that she had a car accident caused by a grand mal seizure while she was being treated with Lamictal and/or Keppra (but not Depakote).

for example) have insisted that the specific type of epileptic seizures suffered by a given mother – information absent from Plaintiffs' Exhibit A – is an important consideration in the prescribing calculus.  In their Trial Protocol briefing, Plaintiffs dismiss such considerations altogether. Similarly, Plaintiffs' Proposed Trial Protocol seems to imply that "Psychiatric Disorder" as used in Exhibit A equates to "Bipolar" (*see, e.g.*, Doc. No. 282 at 6, 7), but any such equivalence is not reflected in the spreadsheet/exhibit.  In all likelihood, the generic term "Psychiatric Disorder" is masking any number of material variations.  Moreover, whereas epileptics generally are treated by neurologists, some of whom are epileptologists with very specialized experience, women with bipolar disease generally are treated by psychiatrists, a physician population with potentially different knowledge of the risks of Depakote notwithstanding the unitary label.  Thus, Plaintiffs' assertion that it makes no difference whether a particular mother was prescribed Depakote "for epilepsy or for a psychiatric condition" does not stand up even to minimal scrutiny.

The information in the "Overview of Injuries" field not only is insufficiently generic, but also of suspect accuracy.  In one of the only two points of comparison available to Abbott at this juncture, Dawn Fragnoli claimed in her Plaintiff Fact Sheet that her son suffers from Depakote-induced "[c]lub foot, partial hearing loss in the right ear, and ADHD," whereas the Plaintiffs identify in their Exhibit A entry for the *Fragnoli* case only "Musculoskeletal Defects" – presumably, the catch-all term that includes club foot.  Assuming Ms. Fragnoli did not misrepresent under oath the nature of her son's alleged injures, a fifty percent accuracy rate in the "Overview of Injuries" column of Plaintiffs' Exhibit A hardly bodes well for the informed selection of bellwether candidates based on the limited information Plaintiffs provided to Abbott and the Court to this point.

Axiomatically, whatever protocol the Court specifies for selecting "representative cases" for trial as bellwethers must be fair and equitable, and any protocol that has Abbott selecting cases for work-up and potential trial from the scant and unverified information provided thus far by Plaintiffs would be inherently and unjustifiably skewed in Plaintiffs' favor. Whereas a plaintiff's knowledge of her own case parameters is limited only by the diligence and depth of her counsel's investigation, Abbott's knowledge of that same plaintiff set is limited to what Plaintiffs have chosen to disclose.

Abbott identified in its May 14, 2014 Proposed Bellwether Plan (and repeats here for ease of reference) the following categories of information critical to a reasonably fair bellwether selection process in which the parties select cases to be worked up:

    (1)    all medical records, including pharmacy records, in the possession of Plaintiffs or their counsel, which, according to Plaintiffs' prior oral representations, should constitute a sizeable collection of available information that they already have in hand;

    (2)    dates of the mother's use of Depakote and of any other drug taken by the mother to treat the condition for which Depakote was prescribed;

    (3)    the child's injuries;

    (4)    the condition for which Depakote was prescribed (specifying, in the case of psychiatric disorders, the nature of the psychiatric disorder);

    (5)    the names of all doctors who ever prescribed Depakote or any other drug used to treat the condition for which the mother took Depakote; and

    (6)    blank authorizations.

(*See* Doc. No. 284 at 7-8.) Plaintiffs have not budged. Despite having imposed years of costly and burdensome discovery on Abbott (including reams of written discovery requests), Plaintiffs are unwilling even to provide the minimum information necessary to any reasonable approach to the task at hand; and still they insist that they should be at liberty to select their favorite cases

from the stacked deck while Abbott plays a high-stakes game of "Go Fish."  Plaintiffs' proposed

bellwether selection protocol is not only unfair, but also unrepresentative.

Bellwether selection should not, and need not, unfold as Plaintiffs propose.  Instead, if

Abbott is denied the minimally sufficient information it has requested, then the cases to be

worked up for discovery (and potential trial selections at a later date upon a more fulsome

record) should be selected *by the Court* using the Exhibit A information and informed by

parameters suggested (jointly, if possible, but separately, as necessary) by the parties.  That is,

the parties would be permitted to submit limited briefing addressing how cases should be

selected for bellwether work-up utilizing the Exhibit A data, but not to argue which Plaintiffs

should be selected.  Such a selection process easily could be completed within a few weeks of

the Court's order entering such a protocol.

## II.    *Plaintiffs' Claims Cannot Be Tried Jointly, and Plaintiffs' Proposed Multi-Plaintiff Bellwether Trials Will Not Facilitate Resolution of the Litigation*

These proceedings are not a class action, and they are not predisposed to any sort of

multi-plaintiff trial.  More than two years (and numerous explanations) after these cases first

arrived in this Court, Plaintiffs still fail to understand or acknowledge the nature and cabined

significance of the removal of the Illinois Depakote cases under the Class Action Fairness Act's

"mass action" provision.  For removal purposes, the Depakote cases became a "mass action"

when the Plaintiffs proposed to consolidate them for trial in St. Clair County.  A "mass action,"

however, does not "envision[] the trial of several plaintiffs and common issues of law and facts."

(*See* Doc. No. 282 at 17.)  Rather, a "mass action" is the statutorily defined result of a proposal

that the claims of 100 or more persons be "tried jointly." *See* 28 U.S.C. § 1332(d)(11)(B).  A

"mass action" is a jurisdictional construct that has no applicability beyond supplying the basis for

subject matter jurisdiction in the federal district courts.  No matter how many times Plaintiffs

repeat their disingenuous characterization, they cannot change the procedural and historical reality:  Abbott has never proposed or accepted the idea of a joint trial.  Abbott properly pointed to Plaintiffs' proposal to try jointly hundreds of the Illinois Depakote cases as giving rise to a "mass action," and thus federal jurisdiction; but Plaintiffs' argument that Abbott suggested, called for, or accepted the joinder of multiple Plaintiffs' claims for purposes of trial misrepresents (repeatedly) the record of this litigation.[3]

There is no valid rationale for a multi-plaintiff bellwether trial, and Plaintiffs' contention that multi-plaintiff bellwether trials "would promote judicial efficiency because it would avoid the duplicative presentation of evidence" fails to recognize the practical realities the parties and the Court must confront.  By all appearances to this point, resolution of the 547 separate Depakote claims pending before this Court will require a meaningful number of trials.  The "matrix" of cases includes multiple conception/labeling periods spanning decades across a continuously evolving state of medical knowledge;[4] two predominate treatment indications; and a multitude of alleged injuries.  Even crediting Plaintiffs' simplistic approach of dividing the injury classes into "single-injury" and "multiple-injury" plaintiffs, the resulting math – 3 labeling periods times 2 treatment indications times 2 injury categories = 12 possible combinations – demonstrates the likelihood of numerous trials even if only one state's law was at issue.  And, barring a clean sweep in Abbott's favor (a distinct possibility), it stands to reason that trials will continue until both sides have sufficient faith in the validity and applicability of the results to

---

[3] Similarly, Plaintiffs' assertion that "Abbott chose to remove the cases to this Court" (Doc. No. 282 at 16), although technically true in a very limited sense, is a disingenuous mischaracterization of the procedural reality of Plaintiffs' improper bundling of Depakote cases in St. Clair County.  Having exercised its right to a federal forum – *i.e.*, having "chosen" to remove the cases to federal court when doing so became an option – Abbott merely acknowledged that the "geography" of the removals was specified by 28 U.S.C. § 1441(a).  Thereafter, Abbott sought to transfer the cases to the only proper venue available – the Northern District of Illinois – but Plaintiffs opposed that effort rather than allow the matter to proceed without objection in that uniquely proper forum.

[4] A jury sitting in a multi-plaintiff trial would be required to sort out not only which label applied, but within each labeling "window" which articles were relevant to the state of medical knowledge over the unique and evolving timeline relevant to each plaintiff set.

- 9 -

allow a settlement to emerge.  Consequently, some of the same evidence will be presented in multiple trials; at which point the challenge is extracting the most informative, valid, and translatable results from those multiple trials.

  With so many material factors in play, there is no reason to believe that a hypothetical multi-plaintiff trial would present a clear result in any one of the trial Plaintiff's cases.  To the contrary, although the general causation experts, in all likelihood, might well overlap, the trial of six or more Plaintiffs' cases[5] would require testimony from literally dozens of case-specific prescribing and treating physicians, and a significant (but somewhat lesser) number of specific causation and damages witnesses.  The bellwether protocol must take into account warnings, indication, exposure, genetic and other alternative causes, alternative and additional medications, specific causation, injury, prognosis, and damages.  Abbott proposes that the bellwether protocol be configured to identify candidates for representative cases that might, after being worked up and tried, educate the parties as to the value of a particular category of case in light of those factors.  Plaintiffs suggest instead that a single jury should be called upon to track, segregate, and distill the effects of all of those factors for six or more Plaintiffs simultaneously.  The opportunities for mistake, confusion, "cross-pollination," evidentiary prejudice, and other potential failures of due process are many and obvious, not to mention the inefficiencies and logistical complications inherent in a trial that continues for many weeks longer than a comparable single-plaintiff trial.  The challenges inherent in the multi-plaintiff trials proposed by Plaintiffs would be exceedingly difficult for the Court to manage, and the permutations nearly incomprehensible to the average juror.

---

[5] Plaintiffs have not indicated how they arrived at (or justify) the idea of six-plaintiff trials, as opposed to any other number.

Moreover, even bundled into six-plaintiff groups, trial of all of Plaintiffs' claims is impracticable, if not practically impossible.  As a practical matter, there is no difference between 547 trials and 91 trials (*i.e.*, 547 plaintiffs divided by 6 plaintiffs per trial equals 91 trials): Neither is going to happen.  The bellwether protocol, one way or another, will precipitate some sort of bulk resolution of the Plaintiffs' claims.  Thus, it makes little difference whether the claims remaining after a series of bellwethers are tried are informed by verdicts in single-plaintiff "representative" cases, or by verdicts on multiple claims grouped together in a like number of (longer and more cumbersome) trials.  If the claims proposed for a multi-plaintiff trial are sufficiently identical that they can be consolidated in accordance with Federal Rule of Civil Procedure 42 (an unlikely prospect), then the claim-specific verdicts in those multi-plaintiff trials are unlikely to afford the parties any more guidance than that afforded by the trial of any one of those claims by itself.  The reverse, however, is not true; *i.e.*, the issues addressed in single-plaintiff trials need not be identical to those presented by untried claims in order to educate the parties on the value, if any, of the untried claims.  Thus, Plaintiffs' proffered multi-plaintiff bellwether trials exacerbate the risks of unfair prejudice to Abbott, thus increasing the likelihood of appeal, while simultaneously degrading the "educational" value of those trials.

These practicalities, ignored or dismissed by Plaintiffs, reveal why Plaintiffs are unable to point to a single case from any jurisdiction in which a court has set multiple plaintiffs for a consolidated first (or even subsequent) bellwether trial in a pharmaceutical case prior to undertaking discovery in the candidate cases.  The cases Plaintiffs cite from the Seventh Circuit – *see* Doc. No. 282 at 18 n.45 – involve Unfair and Deceptive Trade Practices Act claims; Fair Debt Collection Practices Act claims; prisoners' rights claims; section 1983 discrimination

claims; and securities violations; but no product liability claims of any type, in any district, let alone involving prescription pharmaceuticals.

And despite scouring the country for examples, Plaintiffs have come up empty in the pharmaceutical products cases. The multi-plaintiff *Zyprexa* trial referenced in footnote 46 of Plaintiffs' Trial Protocol submission – *see* Doc. No. 282 at 18, n.46 – was the product of a ***joint*** proposal that followed months of case-specific discovery. The *Copley Pharmaceuticals* albuterol MDL involved plaintiffs exposed to a single batch of contaminated medicine, not a failure to warn case with claims spanning decades. The *Ephedra* consolidation combined only two proposed bellwether claims following extensive case-specific discovery. And in the *Welding Rods* litigation (which was not a pharmaceutical products case), the court rejected a proposed consolidation of seven plaintiffs prior to discovery; and even after discovery determined that a consolidation of only two of five proposed plaintiffs was appropriate. Here, as in each of the examples highlighted by Plaintiffs, the most sensible course is to determine the advisability of multi-plaintiff trials with the benefit of an appropriate record following case-specific discovery. There is no justification for pre-judging the issue. Case-specific discovery must be completed in every trial pool case in any event, and the appropriate course is to utilize the information that emerges from those efforts to fashion, at a later point, a workable, fair bellwether trial.

### III. The **Bonner** and **Fragnoli** Cases Can Be Tried While Other Bellwether Candidates are Identified and Developed in Discovery

Plaintiffs' suggestion that multiple as-yet-unidentified cases can be prepared for trial in fewer than four months, particularly given Plaintiffs' intransigence on plaintiff-specific discovery to this point, is patently absurd; but that does not mean that one or more cases cannot proceed to trial while discovery is undertaken in support of additional bellwethers. Although the

Court concluded that the *Bonner* case was not sufficiently "representative," that conclusion was reached without the benefit of Plaintiffs' Exhibit A.  According to Plaintiffs' calculations based on the Exhibit A data (and assuming, without conceding, the accuracy of both), the *Bonner* case: (1) is representative of 91 plaintiffs' claims (the second largest grouping) from a temporal perspective; (2) as an epilepsy case, is representative of the largest category of treatment indications; and (3) satisfies Plaintiffs' preference for a claim asserting multiple categories of injuries.  And although the Court commented that Mr. Bonner's home state, Louisiana, "has a fairly unique product liability law," Plaintiffs have not demonstrated that there is anything about Louisiana product liability law that, at a substantive level, would invalidate the results of trying that case as a bellwether.  *Bonner* may not be perfectly representative – no case or group of cases will completely cover the waterfront – but all concerned might do well to consider resetting the *Bonner* case for trial as early as September 2014, an approach that Plaintiffs have acknowledged as viable.  (*See* Doc. No. 290 at 2.)

Even if the *Bonner* case is discarded, the *Fragnoli* case, in which fact discovery has been completed, is an epilepsy case that falls into the same labeling/conception date window and presents a multiple-injury plaintiff (assuming the veracity of sworn Plaintiff's Fact Sheet responses and deposition testimony).  The *Fragnoli* case is governed by Georgia law, and Plaintiffs have not indicated that there is anything "unrepresentative" about the application of Georgia product liability law under the circumstances of the Depakote Cases.  (*See* Doc. No. 282 at 9 n.23, 10 n. 24.)

**IV.     The Potential Application of Non-Mutual Offensive Collateral Estoppel to the Depakote Cases is Inappropriate, and Any Such Considerations Are Premature**

As Judge Fallon noted in his leading article, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008), approaches treating bellwether trials as pseudo-class actions are disfavored:

> Initially, courts attempted to use the results of bellwether trials to bind related claimants formally. The early use of bellwether trials in this binding fashion was essentially an alternative to the adjudication of a class action. That is, notwithstanding the absence of class certification, it was nevertheless thought that the trial of representative claims could somehow have a binding effect on the consolidated cases of related claimants. Appellate courts have been skeptical of this practice, and for good reason.

*Id.* at 2331; *see also id.* at 2331-38 (contrasting the Plaintiffs' proposed "binding" approach with Abbott's proposed "Modern Informational Approach"). Plaintiffs themselves previously articulated the "good reason[s]" why principles of claim preclusion could not come into play in these Depakote cases:

> Accordingly each individual case of exposure to Depakote came as a result of an individual physician's decision to prescribe it for a particular patient in response to that patient's medical condition at the time. And even with respect to Abbott's own conduct, a case-by-case evaluation would be required; the degree to which Abbott became aware that Depakote caused birth defects and the nature and extent of its disclosure of those facts to physicians, regulators and the public changed over time, making the set of facts known to each prescribing physician different for each instance in which the drug was administered. All of this potential for variation from case to case would make determinations of causation a highly individualized inquiry, *and would thus make it **impossible** to hold any sort of joint trial on liability, whether in one mass proceeding or even using principles of claim preclusion.*

*J.B. v. Abbott Labs.*, No. 12-8027, Doc. No. 1-1, Pls.' Pet. Leave Appeal, at 17-18 (7th Cir. filed May 21, 2012) (emphasis added). Against this backdrop, and without explaining their about-face or citing a single case in which the doctrine has been applied in the context of prescription pharmaceutical failure-to-warn claims, Plaintiffs' Proposed Trial Protocol initiates their attempt to reverse course and lay the groundwork for the use of non-mutual offensive collateral estoppel

- 14 -

"regarding the adequacy of the Depakote label . . . ."  (Doc. No. 282 at 15.)  Any potential

application of collateral estoppel, however, requires that "the issue sought to be precluded must

be the same as that involved in the prior action"; and Plaintiffs make no attempt to explain how

"the adequacy of the Depakote label" is or might be the same issue from one case to the next,

particularly where the Plaintiffs' claimed label inadequacies vary from one case to the next.

Plaintiffs have argued that the label is inadequate for numerous reasons, ranging, for example

from the inclusion of allegedly misleading comparative risk information to the failure to include

comparative risk information; and from the alleged failure to specify a higher rate of incidence of

spina bifida than the rate specified *by Plaintiffs' own experts* (1-2%), to the alleged failure to

include in the Depakote label the rates of spina bifida seen with alternative therapies.  As one

court has noted, "[n]umerous . . . courts in products liability cases have refused to apply

collateral estoppel when there was any ambiguity in discerning precisely what the jury actually

and necessarily decided."  *Coburn v. SmithKline Beecham Corp.*, 174 F. Supp. 2d 1235, 1238

(D. Utah 2001) (citing *Anderson v. Bungee Int'l Mfg. Corp.,* 44 F. Supp. 2d 534, 539

(S.D.N.Y.1999); *Setter v. A.H. Robins Co.,* 748 F.2d 1328, 1331 (8th Cir.1984); *Kramer v.

Showa Denko K.K.,* 929 F. Supp. 733, 750 (S.D.N.Y.1996)).

Moreover, any decision at this stage of these proceedings that credits Plaintiffs'

newfound view of the applicability of non-mutual offensive collateral estoppel in terms of the

adequacy of the Depakote labeling or any other contested issue would be premature.[6]  Among

other infirmities of Plaintiffs' suggested approach, whether to apply the doctrine is a fact-

---

[6] Indeed, it is not clear at this point what Plaintiffs are requesting insofar as their collateral estoppel argument is
concerned, other than "that the cases be grouped by highest similarity . . . ." (Doc. No. 282 at 14), so that collateral
estoppel might "be used to preclude the necessity of the same jury decisions in subsequent cases involving a *similar*
label and *similar* state law" (id. at 15 (italics added)).  The case law makes clear, however, that "similar" issues are
not susceptible to the application of collateral estoppel, which requires that the issues be "identical" and actually
decided.

intensive analysis requiring the comparison of the circumstances of a case at bar to the circumstances of a predecessor case. There is no "predecessor case" in which failure-to-warn claims relating to any Depakote label has proceeded to a plaintiff's verdict. Thus, this is an entirely theoretical exercise to this point, and Abbott expressly reserves the right to take up the issue with the Court at the appropriate time, assuming the litigation ever reaches such a point.

### Conclusion

This litigation requires a viable roadmap for preparing and trying informative bellwethers working toward a rational resolution of the Illinois Depakote Cases. The only roadmap offered by Plaintiffs' proposed protocol is their plan to use their stranglehold on the information about the particulars of their cases to facilitate selection of their preferred cases from a stacked deck, and then to work up and try those cases en masse at a breakneck pace. Plaintiffs' proposed protocol appears designed, not to fairly educate the parties on the value of the Depakote cases, but to convert Plaintiffs' delay and stonewalling in the prosecution of their cases into undue pressure on Abbott. Nothing about Plaintiffs' approach is workable, lawful, or fair.

Abbott seeks a minimally fair process for selecting cases to be worked up as potential bellwether trial candidates. Either of Abbott's optional approaches – cases selected by the parties with the benefit of roughly equivalent information, or cases selected by the Court using the scant information Plaintiffs are willing voluntarily to supply – can advance toward bellwether trials commencing in 2015; and either of Abbott's approaches for selecting and working up additional single-plaintiff bellwethers can proceed in parallel with the trial of the *Bonner* and/or *Fragnoli* cases in relatively short order.

BRYAN CAVE LLP

By: /s/ Dino S. Sangiamo
    Dan H. Ball
    dhball@bryancave.com
    Peter W. Herzog III
    pwherzog@bryancave.com
    Stefan A. Mallen
    samallen@bryancave.com
    211 North Broadway, Suite 3600
    St. Louis, MO  63102
    (314) 259-2000 (telephone)
    (314) 259-2020 (facsimile)

    VENABLE LLP

    Paul F. Strain
    Dino Sangiamo
    Michael B. MacWilliams
    750 East Pratt Street, Suite 900
    Baltimore, MD  21202
    (410) 244-7400

    **ATTORNEYS FOR ABBOTT
    LABORATORIES INC.**